UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

CASE NO. 24-81143-CIV-DMM

777 PARTNERS LLC and
SUTTONPARK CAPITAL LLC,

      Plaintiffs,

v.

LEADENHALL CAPITAL PARTNERS LLP,
LEADENHALL LIFE INSURANCE LINKED
INVESTMENT FUND PLC, NOAH DAVIS,
SAIPH CONSULTING LLC, and
PAUL KOSINSKI,

      Defendants.

_____/

**PLAINTIFFS 777 PARTNERS LLC AND SUTTONPARK CAPITAL LLC'S
EXPEDITED MOTION FOR A PRELIMINARY INJUNCTION AND INCORPORATED
<u>MEMORANDUM OF LAW</u>**

Plaintiffs 777 Partners LLC ("777 Partners") and SuttonPark Capital LLC ("SuttonPark")

(777 Partners and SuttonPark shall collectively be referred to as the "Plaintiffs") hereby move on

an expedited basis pursuant to Federal Rule of Civil Procedure 65 and Local Rule 7.1(d)(2) for a

preliminary injunction and seek immediate injunctive relief enjoining the Defendants Leadenhall

Capital Partners LLP and Leadenhall Life Insurance Linked Investments Fund PLC (collectively

"Leadenhall"), Saiph Consulting LLC ("Saiph"), Paul Kosinski[1], and Noah Davis[2] (all individually

and through any agents) from the following: (i) further accessing or attempting to access Plaintiffs'

computer systems without authorization; (ii) reviewing, accessing, copying or otherwise making

---

[1] Mr. Kosinski is Saiph Consulting, LLC's founder and managing member and former executive of SuttonPark. Ratner Decl. ¶ 12.

[2] Mr. Davis is 777 Partners' former Chief Technology Officer and was subsequently hired by Saiph as an employee. Ratner Decl. ¶ 19.

use of the data or other information that was acquired through the unauthorized intrusions into Plaintiffs' computer systems and theft of Plaintiffs' laptops; (iii) mandating the return of any and all copies of the data or other information, in whatever form they are stored, acquired through the unauthorized intrusions into Plaintiffs' computer systems; and (iv) mandating the return of the stolen laptops and other equipment to Plaintiffs' possession. In support of this motion and memorandum, Plaintiffs reply upon, incorporate and reference the September 27, 2024, declarations of John G. McCarthy (the "McCarthy Decl."), attached hereto as **Exhibit 1**, Ian Ratner ( the "Ratner Decl."), attached hereto as **Exhibit 2**, Shawn Taheri (the "Taheri Decl."), attached here to as **Exhibit 3**, and Eric Mazur (the "Mazur Decl."), attached hereto as **Exhibit 4**.

**Request for Expedited Ruling:** A ruling on this Motion is requested by Wednesday, October 10, 2024, because, for every day Defendants are not enjoined from future illegal and unauthorized intrusions into Plaintiffs' computer systems and not ordered to return all data or other information thereby acquired as well as the stolen laptops, Plaintiffs will be irreparably harmed by impairing the integrity of Plaintiffs' proprietary computer system and data, further dissipation of the information taken, and any further improper use of such information.

## I.  PRELIMINARY STATEMENT

This action concerns violations of federal criminal law, the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, and Florida's Computer Abuse and Data Recovery Act ("CADRA"), FLA. STAT. § 668.801, *et seq.* (2024). Plaintiffs' Complaint [DE 1] asserts that Leadenhall, through its agents, exploited and exceeded limited access rights to information on SuttonPark's system to unfairly and illegally benefit itself in its pending New York litigation against Plaintiffs (the "Leadenhall Litigation"). *See Leadenhall Capital Partners LLP, et ano. v. Wander, et al.*, 24 Civ. 3453 (JGK) (S.D.N.Y.).

As set forth in the Complaint, Plaintiffs allege that Leadenhall exploited the knowledge and expertise of its agents—Saiph, Kosinski (a former executive of SuttonPark) and Saiph's employee, Davis (Plaintiffs' former CTO)—to gain unauthorized and unlawful access to Plaintiffs' computer systems, far beyond the scope of the limited access permitted to review information related to its collateral on SuttonPark's system. In particular, the Complaint alleges that at the direction, behest, and with awareness of Leadenhall, Saiph, through its employee Davis—who utilized his knowledge of Plaintiffs' computer systems and their vulnerabilities—hacked into a variety of Plaintiffs' computer systems, thereby obtaining significant confidential and proprietary information belonging to Plaintiffs. Taheri Decl. ¶¶ 3-31; Mazur Decl. Ex. A (Initial Report) at pp. 3-7; Compl. [DE 1] at ¶¶ 18-28. As the Complaint also alleges, pursuant to the same motivations and again at the direction, behest, and with the awareness of Leadenhall, Davis broke into SuttonPark's offices and stole laptop computers and other equipment, thereby acquiring further confidential and proprietary information belonging to Plaintiffs contained on those laptops. Compl. [DE 1] at ¶¶ 29-31. Davis was subsequently arrested and charged by the authorities for burglary, as evidenced below.



The evidence supporting Plaintiffs' allegations is overwhelming. As set forth in the accompanying declarations, this evidence includes: (i) an extensive and detailed computer forensics report as to the unauthorized intrusions into Plaintiffs' computer systems (Mazur Decl. at Exh. A); (ii) video surveillance footage that shows Davis trespassing in SuttonPark's offices to steal laptops and other equipment belonging to Plaintiffs (Taheri Decl. at Exs. A and B); (iii) the specific targeting, the night before an important hearing in the Leadenhall Litigation, of computer files belonging to Steven W. Pasko, a co-defendant in the Leadenhall Litigation, and Jennifer Logee, a compliance officer in the insurance segment of 777 Partners business, to which Defendants could have no legitimate basis to believe they had authorized access (Ratner Decl. ¶ 16); and (iv) admissions by Saiph that its employee had committed at least some of the alleged

misconduct, followed by an attempt to conceal Leadenhall's involvement (McCarthy Decl. ¶¶ 6-7).

To avoid the irreparable harm that will flow from this unlawful conduct, Plaintiffs seek preliminary relief to enjoin Defendants against further unlawful and unauthorized access into their computer systems, against viewing, accessing, copying, or otherwise making use of the illegally obtained information, and for return of the stolen information, laptops and equipment. Plaintiffs further assert that injunctive relief is warranted for the reasons set forth below.

## II.  STATEMENT OF FACTS

On May 3, 2024, Leadenhall filed the Leadenhall Litigation against 777 Partners, SuttonPark, their former principals, certain affiliates of Plaintiffs and other third parties, alleging certain claims against Plaintiffs—which Plaintiffs dispute—including for civil RICO and fraud in connection with a secured credit facility provided by Leadenhall to subsidiaries of 777 Partners and guaranteed by 777 Partners.[3] Ratner Decl. ¶ 7; Compl. ¶ 1. Under the terms of the secured lending facility, certain affiliates of Plaintiffs were required to provide collateral to secure the debt. Ratner Decl. ¶ 10. 777 Partners provided an unsecured guaranty of the lending facility. *Id*. The amount of assigned collateral then determined how much money those affiliates were able to borrow. *Id*. In the Leadenhall Litigation, Leadenhall alleges that 777 Partners and its affiliates fraudulently inflated the value of the collateral by including assets that it either did not own, or that had already been assigned to other lenders for different loans. Ratner Decl. ¶ 11.

---

[3] Importantly, the issues in this action cannot be addressed in the Leadenhall Litigation pending in New York. All of the acts alleged took place in Florida. The information/data and the systems (laptops, servers, ISPs) implicated are all believed to be in Florida. Moreover, all of the witnesses are located in Florida, including third-party witnesses such as members of the Boca Raton Police Department, who have been involved in the investigation, as well as the managers of the building where Sutton Park's offices are located who are believed to have additional video and access logs that could reflect additional intrusions and access that are not currently known. And, finally, the New York Court would not likely have jurisdiction over Saiph, Kosinski and Davis as Florida residents, not doing business in New York.

Pursuant to Leadenhall's asserted contractual rights under the credit facility, Leadenhall claims it is entitled to certain access to SuttonPark's systems to review and audit the collateral securing the credit facility, *i.e.*, revenue from structured settlements, annuities, and lottery winnings. Ratner Decl. ¶ 12; Compl. ¶ 18. To that end, Leadenhall engaged Saiph and its founder, Kosinski, as its agents to perform an audit of SuttonPark with respect to the collateral. Ratner Decl. ¶ 12; Mazur Decl., Ex. A, Data Intrusion Investigation Initial Report (hereinafter "Initial Report") at p. 3; Compl. ¶ 19. Concerned that Kosinski was a former senior executive of SuttonPark who had solicited its employees to join a competitor, Plaintiffs initially forcefully objected to this proposed engagement. Ratner Decl. ¶ 13; Compl. ¶ 19. Nevertheless, due to the insistence of Leadenhall and Plaintiffs' desire to collaborate with Leadenhall, and based on Leadenhall's and Saiph's repeated assurances that review of documents would be strictly limited to those directly pertaining to Leadenhall's collateral, Plaintiffs eventually relented. Ratner Decl. ¶ 14; Compl. ¶ 19.

In approximately May or June 2024, Plaintiffs provided Saiph, as Leadenhall's agent, with network credentials allowing it limited access to SuttonPark's systems for the limited purpose of a collateral audit. Ratner Decl. ¶ 14; Taheri Decl. ¶¶ 6-8; Compl. ¶ 20; Mazur Decl., Ex. A (Initial Report) at p. 3. Importantly, such credentials were only provided to, and for the use of, two Saiph employees—Kosinski and Lauren Boersig—and authorized access was limited to allowing Saiph to access data for Leadenhall's portfolios within one particular computer system, the MP Fin System. Taheri Decl. ¶ 9; Mazur Decl., Ex. A (Initial Report) at p. 3; Compl. ¶ 20. The MP Fin System is the proprietary application used by SuttonPark to manage receivables and other assets securing loans from various lenders as well as receivables owned by third-party clients and serviced by SuttonPark on a fee basis and contains Personal Identifiable Information ("PII") data

belonging to various customers and clients of the borrower entities. Taheri Decl. ¶ 10; Mazur Decl., Ex. A (Initial Report) at p. 3; Compl. ¶ 20.

Davis's authorization to access Plaintiffs' computer systems was revoked when he ceased to be employed by Plaintiffs on April 26, 2024. Taheri Decl. ¶ 3; Mazur Decl., Ex. A (Initial Report) at p. 3. Although Plaintiffs deactivated Mr. Davis's access credentials to their systems after he ceased to be an employee, Plaintiffs learned that not every account or password that Davis had access to was deactivated, including an ability to access CrowdStrike, Plaintiffs' information security system which has a remote access functionality. Taheri Decl. ¶ 4; Mazur Decl., Ex. A (Initial Report) at p. 3.

Nevertheless, Davis, apparently at the behest of his employer's client, Leadenhall, used his extensive knowledge of Plaintiffs' systems from his time as Plaintiffs' CTO, to gain extensive and unauthorized access into their systems on at least three occasions. Mazur Decl., Ex. A (Initial Report) at pp. 3–7, 9–16; Compl. ¶ 21. Further, because of this knowledge, and because of the system authority Davis was able to access and grant himself during these illegal intrusions, it is likely that these are not the only instances in which Davis improperly accessed Plaintiffs' systems. Mazur Decl. ¶ 7. Similarly, Plaintiffs are unsure of the full extent of Davis's activities during any such intrusions, including potentially copying and/or altering important commercial data. *See* Mazur Decl. ¶ 8; *see also* Mazur Decl., Ex. A (Initial Report) at p. 11.

On June 28, 2024, Davis utilized his former 777 Partners' email address and credentials to improperly access the server that runs the front-end of SuttonPark's MP Fin system. Mazur Decl., Ex. A (Initial Report) at pp. 3, 9–10. On Sunday, July 7, 2024, the day before a preliminary injunction hearing in the Leadenhall Litigation, Davis again utilized these credentials to remotely access two laptops assigned to individuals affiliated with Plaintiffs, without permission or

authorization. Mazur Decl., Ex. A (Initial Report) at pp. 3–4, 10–13; Ratner Decl. ¶ 16; Compl. ¶ 25. Davis first accessed the laptop of Mr. Pasko, a co-founder and former managing partner of 777 Partners. Taheri Decl. ¶ 18-19; Mazur Decl., Ex. A (Initial Report) at pp. 4, 11–13. During this intrusion, Davis entered commands to transfer Mr. Pasko's Microsoft Outlook OST file. Taheri Decl. ¶ 19; Mazur Decl., Ex. A (Initial Report) at pp. 12–13. An OST file, which stands for "offline storage table," is a synchronized copy of an Outlook users' entire mailbox, including all sent items, drafts, calendars, and folders containing emails. Taheri Decl. ¶ 19; Mazur Decl., Ex. A (Initial Report) at pp. 4. There is no apparent reason for Davis to transfer Mr. Pasko's Outlook account other than to gather information that Leadenhall believed would be useful to it in the Leadenhall Litigation. Compl. ¶ 24.

Davis then also accessed the laptop of Jennifer Logee. Taheri Decl. ¶ 20; Mazur Decl., Ex. A (Initial Report) at pp. 3–4, 10–11. Ms. Logee is the chief compliance officer of Brickell Insurance Holdings, a separate business line from SuttonPark. Ratner Decl., ¶¶ 19-20; Taheri Decl. ¶ 20; Compl ¶ 25. During this intrusion, Davis accessed the directory of files contained on Ms. Logee's laptop, as well as certain specific file folders on the laptop. Taheri Decl. ¶ 20; Mazur Decl., Ex. A (Initial Report) at pp. 3–4, 10–11. Davis also accessed the One Drive-based storage account assigned to Ms. Logee. Taheri Decl. ¶ 20; Mazur Decl., Ex. A (Initial Report) at pp. 3–4, 10–11.

In addition, on August 9, 2024:

- Davis again improperly accessed a variety of Plaintiffs' systems unrelated to Leadenhall's collateral audit, wrongfully using his former 777 Partners' credentials. Taheri Decl. ¶ 21; Mazur Decl., Ex. A (Initial Report) at pp. 4–7, 13–16.

- First, Davis once more accessed the front-end of the MP Fin system, viewing and seemingly editing data residing in the system. Taheri Decl. ¶ 21; Mazur Decl., Ex. A (Initial Report) at pp. 4–5, 13–14.

- Second, Davis accessed the web server that runs the back-end database of the MP Fin System. Taheri Decl. ¶ 21; Mazur Decl., Ex. A (Initial Report) at pp. 5, 14.

- Third, Davis twice accessed the virtual network of a 777 Partners subsidiary unrelated to Leadenhall's collateral audit. Taheri Decl. ¶ 21; Mazur Decl., Ex. A (Initial Report) at pp. 5, 6, 14–15.

- Fourth, Davis accessed a file server containing accounting and executive data belonging to 777 Partners and several of its affiliated companies unrelated to Leadenhall's collateral audit. Taheri Decl. ¶ 21; Mazur Decl., Ex. A (Initial Report) at pp. 6, 15.

- Fifth, Davis accessed the computer records of a former 777 Partners' affiliate to access an SAP database that contained financial data unrelated to Leadenhall's collateral audit. Taheri Decl. ¶ 21; Mazur Decl., Ex. A (Initial Report) at pp. 6–7.

During these intrusions, Davis, again wrongfully, set up multiple local administrator accounts giving him administrator level control over the systems and another means to access Plaintiffs' systems. Mazur Decl., Ex. A (Initial Report) at pp. 4–7, 13–15. Lastly, Davis again accessed the MP Fin system, this time using the credentials that had been provided to Saiph for Ms. Boersig's use in accessing SuttonPark's systems. Taheri Decl. ¶ 22; Mazur Decl., Ex. A (Initial Report) at pp. 10, 16. All the systems and information of Plaintiffs that Davis accessed (some of which appears to have been altered) would clearly be considered by Leadenhall as potentially useful in prosecuting the Leadenhall Litigation against Plaintiffs. Ratner Dec. ¶ 22; Compl. ¶ 22.

On this same date, August 9, 2024, 777 Partners' current head of IT received system alerts notifying him of suspicious activity. Taheri Decl. ¶¶ 11-12; Compl. ¶ 27. Davis falsely denied involvement with this activity. Taheri Decl. ¶ 13. Accordingly, Plaintiffs engaged a forensic cyber investigator, and began an investigation into this suspicious activity. Taheri Decl. ¶ 16; Ratner Decl. ¶ 17; Mazur Decl. ¶ 4; *id*. Ex. A (Initial Report) at pp. 1–2, 7–9. This investigation uncovered the unauthorized and improper intrusions described herein, as well as digital forensic evidence firmly supporting the conclusion that these intrusions were all attributable to Davis, including the August 9, 2024 use of Ms. Boersig's credentials:

- For all but the intrusions involving Ms. Boersig's credentials, access credentials issued to Davis during his employment with 777 Partners were utilized. Mazur Decl. Ex. A (Initial Report) at pp. 3–7, 9–15, 16–17.

- After logging in with these credentials, multi-factor authentication was necessary in order to access the systems, which in each case involved a text message being sent to a cellular telephone registered to Davis. Taheri Decl. ¶ 13; Mazur Decl. Ex. A (Initial Report) at pp. 9–15, 16–17.

- The CrowdStrike Remote Access Tool Davis used to perpetrate these intrusions required specific and detailed knowledge of the Plaintiffs' systems and related software, such as that possessed by Davis. Mazur Decl. Ex. A (Initial Report) at pp. 16–17.

- The first intrusion on June 28 came from the same IP address used by Davis to log in when working from home while an employee of 777 Partners, and each subsequent intrusion was made from IP addresses located where Davis is known to reside and work. Mazur Decl. Ex. A (Initial Report) at pp. 9–17.

- The intrusion utilizing Ms. Boersig's credentials is attributable to Davis because it came from the same IP address and location used in connection with several of the prior intrusions that utilized Davis's credentials and cellular telephone for two-factor authentication, whereas Ms. Boersig is known to reside and work in a different region of the country. Mazur Decl. Ex. A (Initial Report) at pp. 16–17.

By letters dated August 20, 2024 and August 30, 2024, Plaintiffs notified Leadenhall and Saiph respectively about the illegal intrusion by a Saiph employee into Plaintiffs' networks. McCarthy Decl. ¶ 4. Leadenhall filed an amended complaint in the Leadenhall litigation on August 30, 2024. McCarthy Decl. ¶ 5.

Not content with merely virtually breaking into Plaintiffs' systems, on September 5, 2024, Davis also illegally entered SuttonPark's offices to engage in further unlawful conduct. Taheri Decl. ¶¶ 24-31. Surveillance footage from that night shows that Davis entered the server room using a key and left that room with computer equipment. Taheri Decl. ¶ 29, Ex. B. Davis also went to the office of a former executive whom he knew possessed physical keys for various locks throughout the office where he retrieved the key to the desk of Plaintiffs' current head of IT. Taheri Decl. ¶ 30. On other footage he can be seen filling two large bags with what is now known to be

laptops belonging to SuttonPark that had been locked inside the desk of Plaintiffs' current head of IT, before departing with the stolen laptops and other equipment. Taheri Decl. ¶ 31.

On September 11, 2024, Saiph sent a letter to Plaintiffs, acknowledging that Davis had entered SutonPark's offices and taken equipment. McCarthy Decl. ¶ 6, Exhibit A (Letter from Harold E. Morlan, III re Noah Davis v.1). Saiph's initial letter referenced Leadenhall in the subject line, intimating that the intrusion was made on Leadenhall's behalf. *Id*. Realizing the admission, Saiph quickly followed up with a "corrected" letter that scrubbed the reference to Leadenhall in a ham-fisted effort to obscure Leadenhall's involvement in the misconduct. McCarthy Decl. ¶ 7, Exhibit B (Letter from Harold E Morlan, III re Noah Davis v.2).

Based on: (i) the targeted access to and attempt to transfer Mr. Pasko's email files; (ii) the timing of at least one intrusion  occurring just prior to an important hearing in the Leadenhall Litigation; (iii) Leadenhall's insistence on retaining Saiph specifically, which possessed significant proprietary knowledge about Plaintiffs' operations and computer systems, through its founder (Kosinski) and employee (Davis), in spite of Plaintiffs' objections; (iv) the agency relationship between Leadenhall and Saiph, Kosinski, and Davis; and (v) Saiph's inadvertent acknowledgment of Leadenhall's relationship to these intrusions, there is a substantial likelihood that Plaintiffs will succeed based on these facts and that there is a substantial threat that Plaintiffs would suffer continuous irreparable injury. Ratner Decl., ¶ 22; Compl. ¶ 31.

### III.  LEGAL STANDARD

A court may grant a preliminary injunction when the moving party demonstrates: (1) a substantial likelihood that plaintiff will succeed on the merits; (2) a substantial threat that plaintiff will suffer irreparable injury if a preliminary injunction is not granted; (3) the threatened injury outweighs the harm a preliminary injunction may cause the defendant; and (4) the grant of a

preliminary injunction will not disserve the public interest. *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc).

## IV.  ARGUMENT

In this action, Plaintiffs assert a variety of claims against Defendants in connection with their wrongful conduct. However, the preliminary relief requested herein relates specifically to the claims arising under the CFAA and CADRA. Accordingly, Plaintiffs' arguments and analysis focus on those claims, which independently provide sufficient bases for granting the relief requested. *See* 18 U.S.C. § 1030(g) ("Any person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain . . . injunctive relief or other equitable relief."); *see also* FLA. STAT. § 668.804(1)(c) ("A person who brings a civil action for a violation under [CADRA] may . . . Obtain injunctive or other equitable relief from the court to prevent a future violation of [CADRA]."); *WhiteSource Software, Inc. v. Coscina*, No. 21-21171-CIV-UU, 2021 WL 1259215, at *2 (S.D. Fla. Apr. 2, 2021) ("[B]ecause . . . the CFAA claim alone is sufficient to establish that the likelihood of success on the merits factor weighs in favor of granting a TRO, the Undersigned need not address [Plaintiff's other] counts."), *report and recommendation adopted*, 2021 WL 1264020 (S.D. Fla. Apr. 6, 2021).

The requested relief is appropriate and comparable to equitable and injunctive relief that has been previously granted in the Southern District of Florida related to claims arising under the CFAA. *See, e.g.*, *Fla. Atl. Univ. Bd. of Trs. v. Parsont*, 465 F. Supp. 3d 1279, 1291 (S.D. Fla. 2020) ("The Defendants are hereby enjoined and restrained from accessing [Plaintiff's] computers or computer servers, either directly or indirectly, for any purpose whatsoever; . . . The Defendants are hereby enjoined and restrained from obtaining any confidential, secured, federally protected, and/or proprietary information belonging to [Plaintiff], either directly or indirectly, for any purpose

whatsoever; . . . The Defendants shall immediately disgorge and serve on [Plaintiff] any confidential, secured, federally protected, and/or proprietary information of [Plaintiff] in their possession, custody, or control, in whatever form it exists . . . ."); See also, *WhiteSource Software, Inc.*, No. 12-20072-CIV-JIC, 2021 WL 1264020, at *1 ("ORDERED AND ADJUDGED that Defendant . . . shall RETURN all correspondence, files, and tangible and/or intangible assets and other [of Plaintiff's] property to [Plaintiff] upon receipt of this Order."); *Wit Walchi Innovation Techs., GMBH v. Westrick*, 2012 WL 33164, at *3 ("Defendant . . . and any entities and individuals who are acting in concert or participation with him, is hereby **RESTRAINED AND ENJOINED**, pending further Order of this Court, from . . . transferring the Laptop, to any party or entity other than Plaintiffs; . . . Defendant . . . shall return the laptop to Plaintiffs . . . ." (emphasis in original)).

A.     **Plaintiffs Have a Substantial Likelihood of Success on the Merits of Their CFAA and CADRA Claims**

"A substantial likelihood of success on the merits requires a showing of only likely or probable, rather than certain, success." *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1232 (11th Cir. 2005) (emphasis in original). Plaintiffs easily satisfy this standard because there is indisputable video surveillance and computer forensic evidence that Defendants violated the CFAA and CADRA.

1) **Plaintiffs Have a Substantial Likelihood of Success on the Merits of Their CFAA Claim**

The CFAA punishes one who "intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains . . . information from any protected computer[.]" 18 U.S.C. § 1030(a)(2). The CFAA also authorizes private civil actions: "Any person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief." 18 U.S.C. § 1030(g). The CFAA does not limit its own reach to "personal" or "direct" access. To the contrary,

it penalizes even *indirect* access to a "protected computer." *See, e.g.*, *Teva Pharm. USA, Inc. v. Sandhu*, 291 F. Supp. 3d 659, 671 (E.D. Pa. 2018) ("A person who did not directly access the computer may still be liable under the CFAA if he 'directs, encourages, or induces' someone else to access a computer that he himself is unauthorized to access ... One who is not authorized to access the information may gain access through one who has access authority, giving rise to liability for indirect access." (internal citations omitted)).

Courts in this district have held that such civil claims have "four elements: (1) a defendant intentionally accessed a protected computer; (2) without authorization or exceeding authorized access; and the defendant (3) thereby obtained information; and (4) the plaintiff suffered damage or loss of at least $5,000.00." *Hall v. Sergeant*, No. 18-80748-CIV-RKA, 2020 WL 1536435, at *28 (S.D. Fla. Mar. 30, 2020). Plaintiffs satisfy all four of these elements and state a claim under the CFAA. First, Defendants intentionally accessed a protected computer. Davis's access was unquestionably intentional, as his remote access to Plaintiffs' computer systems required him to affirmatively log in using credentials and complete a multi-factor authentication procedure utilizing a text message sent to his cellular phone, Taheri Decl. ¶ 13; Mazur Decl. Ex. A (Initial Report) at pp. 9–15, 16–17, and his access to the Plaintiffs' laptops was a product of theft. Further, a "protected computer" is defined under the statue as one "which is used in or affecting interstate or foreign commerce or communication." 18 U.S.C. § 1030(e)(2). Plaintiffs laptop computers and computer systems are "used in or affect[] interstate or foreign commerce or communication" because 777 Partners is an investment firm that conducts business nationwide as well as internationally, across a variety of industries including the insurance, aviation, sports, and media sectors. Ratner Decl. ¶ 6. *United States v. Hornaday*, 392 F.3d 1306, 1311 (11th Cir. 2004) ("The

internet is an instrumentality of interstate commerce."). In short, Plaintiffs are very likely to show that Defendants – directly or indirectly – intentionally accessed its protected computer system.

Second, Defendants' access was either without authorization, or exceeded their authorized access. The CFAA punishes any individual who "intentionally access[es] a computer without authorization or exceeds authorized access." 18 U.S.C. § 1030(a)(2) (emphasis added). Although the CFAA does not define "without authorization," it makes clear that "exceeds authorized access" means "to access a computer with authorization and to use such access to obtain or alter information in the computer that the accessor is not entitled so to obtain or alter." 18 U.S.C. § 1030(e)(6); *see also EarthCam, Inc. v. OxBlue Corp.*, 703 F. App'x 803, 808 (11th Cir. 2017) ("[O]ne of the lessons from [our precedent] may be that a person exceeds authorized access if he or she uses the access in a way that contravenes any policy or term of use governing the computer in question."). Plaintiffs are substantially likely to show that Defendants either lacked or "exceed[ed] authorized access."

As previously noted, Davis's access to Plaintiffs' laptop computers was a product of theft, and his authorization to access Plaintiffs' computer systems was revoked when he ceased to be an employee of 777 Partners on April 26, 2024. Taheri Decl. ¶¶ 3-31; Mazur Decl. Ex. A (Initial Report) at p. 3; Compl. ¶ 29. Nor was Davis authorized to access Plaintiffs' computer systems pursuant to his employment with Saiph and Saiph's limited authorization solely for the collateral audit, as such authorization was only provided to and for the use of Saiph employees Kosinski and Boersig. Taheri Decl. ¶ 9; Ratner Decl. ¶ 14; Compl. ¶ 20; Mazur Decl. Ex. A (Initial Report) at p. 3. And even if Davis, as an employee of Saiph, was authorized to access the particular database detailing Leadenhall's collateral within the MP Fin System related to the limited authorization provided to Saiph for the purposes of the collateral audit, as alleged above, Davis exceeded that

authorization by accessing information and systems on Plaintiffs' computer network far beyond that one database, and that had nothing to do with the purported collateral audit being conducted by Saiph on behalf of Leadenhall. Mazur Decl. Ex. A (Initial Report) at pp. 3–7, 9–17; *see Van Buren v. United States*, 593 U.S. 374, 396 (2021) ("In sum, an individual 'exceeds authorized access' when he accesses a computer with authorization but then obtains information located in particular areas of the computer—such as files, folders, or databases—that are off limits to him."); *Fla. Atl. Univ. Bd. of Trs.*, 465 F. Supp. 3d at 1291.

Third, Plaintiffs are substantially likely to show that Defendants obtained information by means of this access. Davis's theft of Plaintiffs' laptops, combined with his knowledge of how to exploit the vulnerabilities of Plaintiffs' network security, provides him access to the information contained on those computers. Mazur Decl. Ex. A (Initial Report). And as conclusively demonstrated by Plaintiffs' computer forensic evidence, Davis utilized his unauthorized remote access into Plaintiffs' computer systems to view a broad swath of confidential data and other information contained on Plaintiffs' computer systems, such as: (i) information on both the front- and back-ends on the MP Fin system, (ii) information stored on Ms. Logee's laptop and in her assigned OneDrive account; (iii) information contained on the virtual network of one of 777 Partners' subsidiaries; (iv) accounting and executive data relating to Plaintiffs and other related entities; and (v) financial data contained in an SAP database belonging to a former 777 Partners' affiliate; (vi) all of the data from Steven Pasko's, a co-founder and former managing partner of 777 Partners, Microsoft Outlook OST File[4]; and (vii) the information on the 7 laptops which were taken by Davis. Taheri Decl. ¶¶ 3–31; Mazur Decl. Ex. A (Initial Report) at pp. 3–7, 9–17.

---

[4] An OST file, which stands for "offline storage table," is a synchronized copy of an Outlook users' entire mailbox, including all sent items, drafts, calendars, and folders containing emails. Taheri Decl. ¶ 19.

-16-

Finally, Plaintiffs suffered a loss of more than $5,000 as a result of Defendants theft and illegal access. Ratner Decl. ¶ 23. The CFAA defines "loss" to include "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offenses . . . ." 18 U.S.C. 1030(e)(11); *see also Brown Jordan Int'l, Inc.*, 846 F.3d at 1174 ("'Loss' includes the direct costs of responding to the violation . . . [and] does not need to be related to an interruption of service in order to be compensable."). In tasking certain employees of Plaintiffs and engaging outside computer forensics experts to investigate Davis's illegal intrusions into their computer systems, Plaintiffs have already expended more than $5,000, and will likely need to spend even more to uncover and remediate the full scope of Davis's illegal activity, which is in addition to the value of the stolen laptops. Ratner Decl. ¶ 24; *see also Brown Jordan Int'l, Inc.*, 846 F.3d at 1174–75 (noting that Plaintiff had hired outside computer forensics experts "to engage in an extensive forensic and physical review of [plaintiff's] systems to determine the extent of [defendant's] hacking activity" and holding that "[t]hese losses were incurred in the course of responding to the offense and are therefore compensable under the CFAA"); *Fla. Atl. Univ. Bd. of Trs.*, 465 F. Supp. 3d at 1294 (holding that plaintiff had suffered a loss under the CFAA because its investigation had "*already* cost more than $5,000 in employee time" (emphasis in original)).

Moreover, Plaintiffs are likely to succeed on their CFAA claims against Saiph, Kosinski, and Leadenhall, in addition to Davis, because the CFAA also penalizes those who gain indirect access to a protected computer through directing others to engage in unlawful and unauthorized access. *Fla. Atl. Univ. Bd. of Trs.*, 465 F. Supp. 3d at 1291 ("[T]he CFAA does not limit its own reach to 'personal' or 'direct' access. To the contrary, it penalizes even *indirect* access to a 'protected computer.'" (emphasis in original) (citing and quoting *Teva Pharm. USA, Inc. v.*

*Sandhu*, 291 F. Supp. 3d 659, 671 (E.D. Pa. 2018). Further, "courts have held that an employer can be vicariously liable for an employee's violations of the CFAA if those transgressions occur in the scope of employment or the employer directs the employee's conduct." *Doty v. ADT, LLC*, No. 22-60972-CIV-RS, 2020 WL 9071421, at *8 (S.D. Fla. (Dec. 30, 2020) (collecting cases[5]).

### 2) Plaintiffs Have a Substantial Likelihood of Success on the Merits of Their CADRA Claim

For essentially the same reasons as stated above in connection with the CFAA, Plaintiffs are also likely to succeed on their CADRA[6] claim. Indeed, this court has recognized that "both statutes have similar elements." *Fla. Atl. Univ. Bd. of Trs.*, 465 F. Supp. 3d at 1279.

### B.     Plaintiffs Will Suffer Irreparable Injury Absent the Requested Injunctive Relief

When deciding whether an injunction should issue, the Eleventh Circuit has referred to the irreparable-injury inquest as "the sine qua non of injunctive relief." *Siegel v. LePore*, 234 F.3d

---

[5] *See, e.g.*, *NetApp, Inc. v. Nimble Storage, Inc.*, 41 F. Supp. 3d 816, 835 (N.D. Cal. 2014) ("As to vicarious liability, courts have held that an employer can be vicariously liable for an employee's violations of the CFAA if those transgressions occur in the scope of employment or the employer directs the employee's conduct."); *SBM Site Servs., LLC v. Garrett,* No. 10–cv–00385–WJM–BNB, 2012 WL 628619, at *6 (D. Colo. Feb. 27, 2012) ("[T]he Amended Complaint states a claim for a CFAA violation against [the employer]" because "[i]t is reasonable to infer that [the employee] accessed [Plaintiff's] laptop during the time that he was employed with [the employer] and in the scope of such employment."); *Charles Schwab & Co. v. Carter,* No. 04 C 7071, 2005 WL 2369815, at *6 (N.D. Ill. Sept. 27, 2005) ("[Plaintiff] alleges that Defendants affirmatively urged [their employee] to access [Plaintiff's] computer system beyond his authorization for their benefit. Looking to the language of the CFAA, the CFAA's unequivocal purpose is to deter and punish those who intentionally access computer files and systems without authority and cause harm. Thus, if the allegations in the Complaint are true, imposing vicarious liability would further the CFAA's purpose. To hold otherwise would exempt a principal from liability when its agent improperly accessed a computer at the direction of the principal.")(internal citations and quotation marks omitted).

[6] As it relates to Plaintiffs' claims, the only significant difference between CFAA and CADRA is the meaning of a "protected computer." Under CADRA a "protected computer" is defined as "a computer that is used in connection with the operation of a business and stores information, programs, or code in connection with the operation of the business in which the stored information, programs, or code can be accessed only by employing a technological access barrier." FLA. STAT. § 668.802(6). Plaintiffs' computer systems and laptops at issue in this case met that definition, as Plaintiffs are unquestionably "businesses" and their computers employ "technological access barriers," as demonstrated by the need to use log in credentials and multi-factor authentication. Taheri Decl. ¶ 13; Mazur Decl. Ex. A (Initial Report) at pp. 9–15, 16–17.

1163, 1176 (11th Cir. 2000). In addition, if Defendants are permitted to further access Plaintiffs' confidential computer network without authorization and not ordered to return all data or other information thereby acquired as well as the stolen laptops, Plaintiffs "will 'be irreparably harmed . . . by impairing the integrity of [Plaintiffs'] proprietary computer system.'" *Fla. Atl. Univ. Bd. of Trs.*, 465 F. Supp. 3d at 1296 (quoting *TracFone Wireless, Inc. v. Adams*, 98 F. Supp. 3d 1243, 1256 (S.D. Fla. 2015)). Further, as this Court has recognized, "federal courts around the country agree that the interference with an entity's control of its computer systems constitutes irreparable injury." *Fla. Atl. Univ.*, 465 F. Supp. 3d at 1296 (collecting cases). Moreover, "in accessing [Plaintiffs'] computers without authorization, Defendants have interfered with [Plaintiffs'] right to control access to its own computers and have acquired data to which Defendants have no lawful right in violation of the CFAA . . . [,]" thus causing irreparable injury to Plaintiffs. *Facebook, Inc. v. Power Ventures, Inc.*, 252 F. Supp. 3d 765, 782 (N.D. Cal. 2017), *aff'd*, 749 F. App'x 557 (9th Cir. 2019). As such, "[n]umerous courts have found that unauthorized access of computers and the acquisition of data in violation of the CFAA constitute irreparable harm." *Id.* (citing, *inter alia*, *TracFone Wireless, Inc.*, 98 F. Supp. 3d at 1256).

**C.     The Threatened Irreparable Injury to Plaintiffs Outweigh Any Damage the Requested Relief May Cause Defendants**

In weighing the threatened irreparable injury to Plaintiffs against any damage that may be caused to Defendants, "the Court need not consider the 'hardship' to a defendant whose conduct is 'unlawful.'" *Fla. Atl. Univ. Bd. of Trs.*, 465 F. Supp. 3d at 1297; *see also TracFone Wireless, Inc.*, 98 F. Supp. 3d at 1256 ("[Defendant] has no legitimate interest in [violating the CFAA]."); *YourNetDating, Inc. v. Mitchell*, 88 F. Supp. 2d 870, 872 (N.D. Ill. 2000) (defendants "will suffer no legitimate harm of which they can complain if the [injunctive relief] is granted because they

-19-

have no honest business hacking [the plaintiff's] system . . . ."). The only hardship weighing on the scales is the irreparable injury that will be suffered by Plaintiffs absent the requested injunction.

**D.      The Requested Injunctive Relief Will Not Be Adverse to the Public Interest**

Finally, the public interest weighs strongly in favor of granting injunctive to Plaintiffs. "The CFAA is a criminal statute. And, it goes without saying, 'the public interest is advanced by enforcing faithful compliance with the laws of the United States and the State of Florida.'" *Fla. Atl. Univ. Bd. of Trs.*, 465 F. Supp. 3d at 1298 (quoting *TracFone Wireless, Inc.*, 98 F. Supp. 3d at 1256). Further, since an injunction in this case would "do[] nothing more than [redress] conduct that Congress has already deemed criminal, it necessarily advances the public interest." *Id.*

**E.      Bond**

Because much of the injunction is directed at preventing the Defendants from continuing to violate the law, and, given that the Defendants cannot—as a matter of law— be wrongfully enjoined from violating the law, most of this injunction requires very little security. Plaintiffs request that the Court order them to post a bond of not more than $1000.

Dated: September 30, 2024                    Respectfully submitted,

                                             GUNSTER YOAKLEY & STEWART P.A.

                                             */s/ Brian M. McPherson*
                                             GEORGE LEMIEUX
                                             Florida Bar No. 16403
                                             BRIAN M. MCPHERSON
                                             Florida Bar No. 735541
                                             777 S. Flagler Dr.
                                             East Tower, Suite 500
                                             West Palm Beach, FL33401
                                             Telephone: (561) 655-1980
                                             Facsimile:  (561) 655-5677
                                             Primary Email: Glemieux@gunster.com
                                             Primary Email:  Bmcpherson@gunster.com

                                             *Attorneys for Plaintiffs 777 Partners LLC and
                                             SuttonPark Capital LLC*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 30, 2024, I electronically filed the foregoing with the Clerk of Court using CM/ECF. I also certify that the foregoing document is being served on all counsel of record identified on the below Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or by some other authorized manner for those counsel or parties who are not authorized to electronically receive Notices of Electronic Filing.

/s/ Brian M. McPherson
Brian M. McPherson

## SERVICE LIST
### Case No. 9:24-cv-81143-DMM
### 777 Partners LLC et al. v. Leadenhall Capital Partners LLP et al.

Harold Morlan, Esq.
E-mail: hmorlan@shutts.com
Shutts & Bowen LLP
300 South Orange Avenue, Suite 1600
Orlando, FL 32801
Telephone: 407-835-6786
**Attorneys for Defendant,**
**Saiph Consulting LLC**

**Served by electronic mail**

Leigh M. Nathanson, Esq.
E-mail: lnathanson@kslaw.com
King and Spalding
1185 Avenue of the Americas
New York, New York 10036
Telephone: 212-790-5359
**Attorneys for Defendants,**
**Leadenhall Capital Partners LLP; and**
**Leadenhall Life Insurance Linked**
**Investment Fund PLC**

**Served by electronic mail**

Jacob Cohen, Esq.
E-mail: jacob@jacobcohenlaw.com
750 S. Dixie Highway
Boca Raton, FL 33432
Telephone: 561-715-7866
**Attorneys for Defendant, Noah Davis**

**Served by electronic mail**