**EXHIBIT 3**

**Declaration of Shawn Taheri in Support of
Plaintiffs' Motion For a Preliminary Injunction dated
September 27, 2024**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

**CASE NO. 24-81143-CIV-DMM**

**777 PARTNERS LLC** and
**SUTTONPARK CAPITAL LLC**,

      Plaintiffs,

v.

**LEADENHALL CAPITAL PARTNERS LLP,**
**LEADENHALL LIFE INSURANCE LINKED**
**INVESTMENT FUND PLC, NOAH DAVIS,**
**SAIPH CONSULTING LLC**, and
**PAUL KOSINSKI**,

      Defendants.

_____/

**DECLARATION OF SHAWN TAHERI IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

SHAWN TAHERI, pursuant to 28 U.S.C. § 1746, declares as follows:

1. I have been Director of Information Technology at 777 Partners LLC ("777 Partners") since early May following the resignation of Defendant Noah Davis from the position of Chief Technology Officer of 777 Partners which became effective on April 26, 2024. I have worked in the information technology ("IT") department at 777 Partners since April 2021. I graduated from the University of Florida with a Bachelor of Science degree in Industrial & Systems Engineering. I have held various jobs in the IT area for the past decade or so.

2. I have personal knowledge of the matters described in this declaration, and if called as a witness, I could and would testify competently to the matters discussed in this declaration. I make this declaration in my capacity as Director of IT for 777 Partners.

SGR/71608189.3

3.     For my first three years with 777 Partners, Davis was the head of our IT department and my boss.  Davis's authorization to access Plaintiffs' computer systems was revoked upon Davis's resignation.  As the former director of IT, it had been part of Davis's job to set and enforce company policies and he knew that the Plaintiffs did not intend for him to keep any access to any systems as it was his job to ensure access was cut off for departing employees.

4.      I disabled Davis's credentials to access the various computer systems and applications used by Plaintiffs upon his resignation.  However, as the former IT director, Davis had access to over 100 accounts.  I have since learned that not every account or password that Davis had access to was deactivated, including an ability to access  CrowdStrike, Plaintiffs' information security system which has a remote access functionality..

5.     In early May 2024, I learned that 777 Partners and its affiliates had retained restructuring professionals from B. Riley to replace 777 Partners principals Josh Wander and Steven W. Pasko, as managers of 777 Partners

6.     At some point in May or early June, I was directed by the B. Riley professionals to provide user credentials to a company called Saiph Consulting LLC ("Saiph"), a firm that is owned and managed by Paul Kosinski, a former senior executive of SuttonPark Capital LLC ("SuttonPark"), one of the companies affiliated with 777 Partners.

7.     B. Riley informed me that Saiph had been hired by Defendants Leadenhall Capital Partners LLP and Leadenhall Life Insurance Linked Investments Fund PLC (collectively "Leadenhall") to conduct an audit of certain collateral being serviced by SuttonPark.

8.     Eventually, I provided Saiph, as Leadenhall's agent, with credentials allowing it limited access to SuttonPark's systems for the limited purpose of a collateral audit.

2

9.     Upon B. Riley's instructions, I provided credentials only to, and for the use of, two Saiph employees—Kosinski and Lauren Boersig—and authorized access was limited to allowing Saiph to access data in Leadenhall's portfolios within one particular computer system, the MP Fin System.

10.     The MP Fin System is the proprietary application used by SuttonPark to manage receivables and other assets securing loans from various lenders as well as receivables owned by third-party clients and serviced by SuttonPark on a fee basis and may contain Personal Identifiable Information ("PII") data belonging to various customers and clients of the borrower entities.

11.     In addition to the remote access function I discussed above, CrowdStrike monitors the security of Plaintiffs' computer networks and report potential suspicious security events on its network infrastructure to me.

12.     On the morning of August 9, 2024, I received an alert from CrowdStrike that someone with a username that had been assigned to Davis when he was employed by 777 Partners had logged into the 777 Partners networks using CrowdStrike's remote access tool and had created a new local administrator account on a virtual machine contained on one of our network servers.  As explained above, I was not aware that he still had the ability to log in to CrowdStrike to gain remote access to our networks.

13.     I immediately sent Davis a message using MS Teams with a copy of the CrowdStrike notice, to which he replied, "This was not me."  He also commented "I had no idea that account still had access to CrowdStrike.  I wonder how they got past MFA."  MFA refers to multi-factor authentication.  CrowdStrike employs multi-factor authentication meaning that in

3

SGR/71608189.3

order for someone to use Davis's credentials to gain access they also had to enter a code from an authenticator app setup linked to his CrowdStrike account and available only on his smartphone.

14. The CrowdStrike notification indicated that the administrator account established by the intruder had the username "suttonadmin".  I disabled that username on the virtual machine.

15. In response to my request, CrowdStrike sent me information about other activity using Davis's username, including establishing other local administrator accounts under the name "suttonadmin."  I have disabled all the accounts identified by CrowdStrike.

16. On or about August 13, 2024, I was directed by B. Riley to work with Eric Mazur of B. Riley to conduct a forensic investigation of the intrusions into 777 Partners' network infrastructure.  I have had an opportunity to review the Data Intrusion Investigation Initial Report (the "Initial Report") prepared by Mazur (Mazur Dec., Ex. A) and it is true to the best of my knowledge.  The ten events described in the Initial Report are accurate and complete.

17. I share Mazur's conclusion that Davis was the individual responsible for the ten unauthorized intrusion events described in detail in the Initial Report.  Unless the context dictates otherwise, my references hereafter to Davis's actions are based on this conclusion.

18. During intrusions on Sunday, July 7, 2024, Davis accessed the laptops of two individuals who continue to work for 777 Partners and/or its affiliates.

19. Davis first accessed the laptop of Mr. Pasko, a co-founder and former managing partner of 777 Partners.  During this intrusion, Davis entered a command to transfer all of the data from Mr. Pasko's Microsoft Outlook OST file.  An OST file, which stands for "offline storage table," is a synchronized copy of an Outlook users' entire mailbox, including all sent items, drafts, calendars, and folders containing emails.

20.     Davis then also accessed the laptop of Jennifer Logee.  Ms. Logee serves as the chief compliance officer of a 777 Partners affiliate wholly unrelated to SuttonPark, who handles contract compliance with respect to asset purchases and dispositions.  During this incursion, Davis accessed the directory of files contained on Ms. Logee's laptop, as well as certain specific file folders on the laptop.  Davis also viewed the contents of the One Drive-based storage account assigned to Ms. Logee.

21.     On August 9, 2024, in addition to the intrusion that triggered the CrowdStrike notification discussed earlier, Davis did the following:

a.  improperly accessed the front-end of the MP Fin system, viewing and possibly altering data residing in the system (Initial Report at pp. 4–5, 13–14);

b.  improperly accessed the web server that runs the back-end database of the MP Fin System (Initial Report at pp. 5, 14);

c.  accessed a file server containing accounting and executive data belonging to 777 Partners and several of its affiliated companies (Initial Report at pp. 6, 15); and

d.  accessed a virtual machine of a former 777 Partners' affiliate which, to the best of my knowledge, contained no data related to Leadenhall's collateral audit (Initial Report at pp. 6–7).

22.     Lastly, Davis again accessed the MP Fin system, this time using the credentials that had been provided to Saiph for Ms. Boersig's use in accessing SuttonPark's systems. Initial Report at pp. 10, 16.

23.     After discovering these intrusions, I also blocked the two sets of credentials that we had given to Saiph.

24.     In early September, I was working on repurposing certain excess laptops belonging to 777 Partners, which included performing factory resets.  Importantly, these laptops were not forensically cleaned and wiped and a person with the right tools and knowledge could access data from the prior user.

25.     On the evening of Thursday, September 5, 2024, I placed at least seven of these laptops in my desk at SuttonPark's offices, located at 2255 Glades Road, Suite 100E, Boca Raton, Florida, together with at least two other laptops that had not been reset.  I locked my desk with a key, which I took with me.

26.     No one worked in SuttonPark's offices on Friday, September 6, 2024.

27.     On Monday, September 9, 2024, I returned to the SuttonPark offices and discovered that at least seven laptops belonging to 777 Partners were missing from my desk.

28.     There are multiple surveillance cameras installed inside the SuttonPark offices.  I eventually watched the video footage that had been recorded by these surveillance cameras and discovered that Davis entered SuttonPark's offices in the late evening of September 5, 2024.  Attached hereto as Exhibit A is a screenshot taken from recordings made by a surveillance camera positioned over the front door of SuttonPark's offices which shows Davis in our office at approximately 8:40 p.m. ET on September 5, 2024.

29.     Surveillance footage from that night shows that at some point Davis entered the server room using a key and he can be seen leaving that room with computer equipment.  Exhibit B hereto are two screenshots showing this.

30.     Davis can also be seen on another camera's footage entering the office of a former executive whom he knew possessed physical keys for various locks throughout SuttonPark's offices where he apparently retrieved keys including the key to my desk.  I found that key, which

6

I believe was used to unlock my desk, on the desk in that office on September 9, 2024, laying separately from the other keys.

31.     On other video footage he can be seen filling two large bags with what I now believe to be the laptops that had been locked inside my desk, before departing with the stolen laptops and other equipment.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 27, 2024.

*Shawn Taheri*

Shawn Taheri

7

SGR/71608189.3

# Exhibit A



# Exhibit B



