**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

**CASE NO. 9:24-CV-81143-DMM**

**777 PARTNERS LLC and**
**SUTTONPARK CAPITAL LLC,**

      **Plaintiffs,**

**v.**

**LEADENHALL CAPITAL PARTNERS**
**LLP, LEADENHALL LIFE**
**INSURANCE LINKED INVESTMENT**
**FUND PLC, NOAH DAVIS, SAIPH**
**CONSULTING LLC and PAUL**
**KOSINSKI**

      **Defendants.**

                      /

**DEFENDANTS SAIPH CONSULTING LLC AND PAUL KOSINSKI'S RESPONSE IN OPPOSITION TO PLAINTIFFS 777 PARTNERS LLC AND SUTTONPARK CAPITAL LLC'S EXPEDITED MOTION FOR A PRELIMINARY INJUNCTION AND INCORPORATED MEMORANDUM OF LAW**

Defendants Saiph Consulting LLC ("Saiph") and Paul Kosinski ("Kosinski") submit this Response in Opposition to Plaintiffs 777 Partners LLC ("777 Partners") and SuttonPark Capital LLC's ("SuttonPark" and together with 777 Partners, "Plaintiffs" or "777") Expedited Motion for a Preliminary Injunction (the "Motion").

**INTRODUCTION**

Leadenhall Capital Partners, LLC ("Leadenhall") engaged Saiph in August of 2023 to conduct a forensic audit of the collateral that Plaintiffs pledged to secure loans of hundreds of millions of dollars from Leadenhall. Leadenhall informed Saiph of allegations that Plaintiffs fraudulently double pledged the assets securing Leadenhall's loans to 777 Partners. Paul Kosinski personally performed the onsite due diligence portion of the audit, lawfully obtaining 777's

relevant business records using authorized access to its servicing systems and employees, pursuant to the loan contract between 777 and Leadenhall. He obtained almost all of such records (99.5%+) used to provide analysis and information to Leadenhall from 777's servicing system by June 21, 2024. Some additional records were provided directly to Saiph from SuttonPark employees, and some additional records were obtained by Saiph partner Lauren Boersig and analysts under her supervision on or before August 9, 2024. Saiph obtained only records it was authorized to access, and did so without assistance from independent contractor, Noah Davis ("Davis"), a systems engineer with the Tyler Durden Group LLC ("TDG"). At no time, did Kosisnki or Saiph use, review, or know about any 777 records obtained unlawfully or otherwise by Davis, as Plaintiffs alleged. Davis's only role with respect to obtaining any 777 business records on behalf of Saiph was to troubleshoot and develop alternatives to the remote access platform that 777 provided for Saiph to review 777's business records on behalf of a different client (Northwestern Mutual Life "NML") for an audit of a different pool of structured settlement annuities pledged to NML.

At no time did Kosinski or anyone at Saiph direct, condone, or know about any unauthorized access of 777's computer systems, property or offices by Noah Davis or any other person. Saiph immediately terminated Saiph's relationship with Davis's company, TDG, the same afternoon it first learned of allegations that Davis entered 777's offices without permission in early September 2024. Additionally, Saiph did not learn of the allegations that Mr. Davis infiltrated 777's computer systems using his old 777 login credentials until it reviewed 777's Complaint filed on September 17, 2024. Plaintiffs' have failed to provide evidence that Davis obtained any information during the alleged intrusion, a requirement under the Computer Fraud and Abuse Act and its state law counterpart upon which Plaintiffs' Motion is premised. In addition, there is no evidence that Saiph, Kosinski, Leadenhall, or anyone affiliated with them directed, encouraged, or induced –or even knew about– the misconduct Plaintiffs allege against Davis.

SBDOCS 405558 8

In addition, according to 777's own expert, Davis's last alleged intrusion occurred on August 9, 2024, more than 60 days ago. Since that time, again as Plaintiffs own expert states, Plaintiffs have closed the door they left wide open and finally revoked their former employee, Davis's login credentials, as it negligently failed to do following his departure from 777. Plaintiff's utter failure to demonstrate substantial likelihood of success on the merits and actual and imminent irreparable harm, combined with the unfairness to the wholly innocent defendants – Saiph, Kosinski, and Leadenhall –  who helped uncover 777's far reaching fraud – affecting not just Leadenhall, but many other lenders, their stockholders, and ultimately the general public – establishes the balance of equities against 777 as well as the harm to the public interest that granting Plaintiffs' specious Motion for Preliminary Injunction would cause. Accordingly, the Motion is due to be denied.

## STATEMENT OF FACTS

1.      In August 2023, Leadenhall Capital Partners, LLC engaged Saiph Consulting to conduct a forensic audit of the collateral that 777 Partners LLC, SuttonPark Capital LLC, and their affiliates had pledged to secure loans of hundreds of millions of dollars from Leadenhall. When engaging Saiph, Leadenhall informed Saiph of allegations that 777 fraudulently double-pledged the assets securing Leadenhall's loans to 777. *See* Declaration of Paul Kosinski ("Kosinski Decl.") ¶ 4. These allegations formed the basis for RICO and fraud litigation initiated by Leadenhall against Plaintiffs in May 2024 in the Southern District of New York. *See generally Leadenhall Capital Partners LLP et al. v. Wander et al.*, No. 1:24-cv-03453-JGK (S.D.N.Y., filed May 3, 2024) (the "Leadenhall NY Litigation").

2.      As background, on May 7, 2021, Leadenhall entered into a secured credit facility with 777 Partners, Sutton Park, and certain of their affiliates, memorialized in a Loan and Security Agreement and related agreements. *See* Declaration of Craig Gillespie ("Gillespie Decl.") ¶ 3.

3

3.　　On September 19, 2022, Craig Gillespie, the Managing Partner at Leadenhall, received an anonymous email from sender noreply@anonymousemail.me stating as follows: "The assets you are lending against at SuttonPark do not exist. Josh Wander either never brought them or already pledged them to another lender. You are at great risk… your investment is unsecured. What he is doing is criminal." Gillespie Decl. ¶ 4.

4.　　After receiving this tip, Leadenhall investigated the claims and discovered that Plaintiffs and their affiliates had double-pledged collateral, had never owned the collateral, or no longer owned assets that had been pledged to Leadenhall as collateral. Gillespie Decl. ¶ 5. Because of this, Leadenhall exercised its right under the LSA to audit the collateral securing its loans. Gillespie Decl. ¶ 5.

5.　　Under the Loan and Security Agreement between 777 and Leadenhall, 777 was obligated to provide Collateral Documentation to Leadenhall upon request and to allow, with 3 days' notice, access to 777 and affiliated parties premises to Leadenhall and its agents. Kosinski Decl. ¶ 10.

6.　　Leadenhall informed Plaintiffs that it intended to retain Paul Kosinski, SuttonPark's former Chief Operating Officer, to conduct a forensic audit of the collateral. Gillespie Decl. ¶ 6.

7.　　Kosinski voluntarily resigned from SuttonPark in October 2020, after he became concerned with 777's business practices, including its ignoring/bypassing internal controls implemented to ensure compliance with various structured settlement facilities in place at that time. Kosinski Decl. ¶¶ 5-6. Following Kosinski's resignation from SuttonPark, he founded Saiph Consulting in order to assist market participants in originating, underwriting, financing, and servicing of structed settlements and other specialized receivables. Kosinski Decl. ¶ 7.

8.　　Leadenhall chose Saiph to conduct the Collateral Audit because of Kosinski's expertise. Specifically, Kosinski had detailed knowledge of SuttonPark's operations and processes for allocating and pledging assets to creditors like Leadenhall. Gillespie Decl. ¶ 6. Leadenhall

4

therefore believed that Saiph would be capable of effectively interpreting SuttonPark's records to determine which assets pledged as collateral still existed and whether they were free and clear of other security interests. Gillespie Decl. ¶ 6.

9. At first, Plaintiffs objected directly to Kosinski's involvement, but later indicated that the objections were actually coming from their "senior lender" and alleged co-conspirator, Advantage Capital Holdings, LLC ("A-CAP"). Gillespie Decl. ¶ 9. In November 2023, the co-founder and managing partner of 777 Partners, Steven Pasko, sent an email to Leadenhall (Gillespie) stating: "At the request of A-CAP, I wanted to reiterate our original concerns regarding your request to use Paul Kosinski to perform an asset review of SuttonPark, our objection is for two primary reasons: first, it would violate his severance agreement and, second and more importantly, he is currently a direct competitor." Gillespie Decl. ¶ 9.

10. Plaintiff and alleged co-conspirator's objections effectively delayed Saiph's ability to complete the Collateral Audit, which required on-site access to Plaintiff's systems for months. Gillespie Decl. ¶ 10.

11. For the first nine months of the Leadenhall Audit Contract, 777 obstructed Leadenhall's request for access to the systems and information necessary to allow Saiph, as Leadenhall's agent, to perform an audit of 1,130 annuity receivables that 777 pledged to Leadenhall as collateral for two specific financing facilities. Kosinski Decl. ¶ 9.

12. On May 3, 2024, Leadenhall filed the NY Litigation, asserting RICO, fraud, and breach of contract claims against Plaintiffs and A-CAP, among other defendants. *See generally* Leadenhall NY Litigation. Once the NY Litigation was filed, 777 provided Saiph with the requested access to information material to the audit. Kosinski Decl. ¶ 11.

13. Around the same time, 777 Principals (and Leadenhall NY Litigation Defendants) Wander and Pasko were relieved of their leadership roles at 777 and replaced by B. Riley. Kosinski Decl. ¶ 11. Following this, Shawn Taheri, SuttonPark's IT director, provided Saiph with a single

5

set of login credentials to access to the 777 servicing system ("MP Fin"), with limited access to only the records in MP Fin pertaining to the Leadenhall collateral. Kosinski Decl. ¶ 13.

14. On May 19, 2024, Leadenhall's counsel sent a letter to 777 Partners' management reiterating its request for access to Plaintiff's records for the purpose of the Collateral Audit. Gillespie Decl. ¶ 12. The parties subsequently agreed upon the scope of the Audit, and on June 7, 2024, Leadenhall entered into an Amended Consulting Agreement with Saiph. Gillespie Decl. ¶ 12. Under the Amended Consulting Agreement, Saiph's work on the Collateral Audit was limited to specific analyses on specific files, all of which pertain to specific assets pledged as collateral. Gillespie Decl. ¶ 14.

15. The Collateral Audit was performed primarily by two individuals at Saiph: Paul Kosinski and Lauren Boersig. Gillespie Decl. ¶ 15. Saiph did not provide any information to Leadenhall from 777's records, other than that contained within or derived from analysis of the 777-Leadenhall Audit Records. Kosinski Decl. ¶ 17.

16. On May 28, 2024, Kosinski personally began the onsite diligence, in accordance with the Leadenhall Audit Contract and the Loan and Security Agreement. Kosinski Decl. ¶ 4. Specifically, Kosinski's Audit protocol consisted of meeting with onsite servicing and account personnel, inspecting the surviving system, and supporting records via the limited access provided. Kosinski Decl. ¶ 4. Three days later, SuttonPark announced mass immediate layoffs of the servicing employees, and several others also left the join a competitor. Kosinski Decl. ¶ 16. This reduction of more than two-thirds of the full-time employees further frustrated Leadenhall's contractual right to audit its collateral. Kosinski Decl. ¶ 16.

17. On June 21, 2024, Kosinski concluded the onsite portion of the audit and had received all records that 777 was then willing to make available for the collateral audit. Kosinski Decl. ¶ 17.

SBDOCS 405558 8

18.     At nearly every turn 777 attempted to stymie Saiph's work. Instead of providing a bulk file download to Saiph, 777/SuttonPark only provided partial information. Kosinski Decl. ¶ 12. Further, 777/SuttonPark omitted information needed to trace the assets' chain of title—information critical in revealing major problems with Leadenhall's collateral. Kosinski Decl. ¶ 12. Further still, the single set of login credentials initially provided to Saiph to access the Leadenhall Collateral Data could only be used from the network at 777/SuttonPark's physical offices. Kosinski Decl. ¶ 14.

19.     On July 10, 2024, as part of a completely separate engagement, Northwestern Mutual Life designated Saiph as its agent and formally requested that B. Riley provide Saiph with access to the 777 records associated with NML's collateral portfolio. Kosinski Dec. ¶ 21. The NML collateral portfolio (at approximately 6,600 records), was substantially larger than the Leadenhall portfolio. Kosinski Dec. ¶ 21. Therefore, Saiph requested remote access to NML's collateral portfolio so that it could more efficiently complete the audit, an option suggested by Taheri. Kosinski Dec. ¶ 21. For the same reason, Saiph also planned to employ a targeted data extraction tool to obtain the targeted NML collateral information from the MP Fin system, thus avoiding having the collateral information be pulled and or abstracted. Kosinski Dec. ¶ 21. This process was previously permitted by 777 for use by another secured lender, Credigy, to access its information prior to Saiph being provided such access. Kosinski Dec. ¶ 21.

20.     On August 2, 2024, 777 provided Kosinski and Boersig, with updated login credentials, now granting remote access to the NML and Leadenhall records contained with the MP Fin system. Koinski Decl. ¶ 22. However, the virtual machine 777 provided to Saiph so as to allow Saiph to access the NML records, was unstable and could not allow multiple users access at the same time. Kosinski Dec. ¶ 23. The virtual machine required consistent maintenance and troubleshooting to use. Kosinski Dec. ¶ 23.

SBDOCS 405558 8

21.     Ultimately, Boerisg and her team in New York completed the subsequent audit analysis and report and delivered it to Leadenhall on September 5, 2024. Kosinski Decl. ¶ 18. This Audit Report comprises the entirety of the work product and information Saiph provided to Leadenhall, with the exception of interim email reports Saiph provided to Leadenhall on August 29, 2024 and September 5, 2024. Kosinski Decl. ¶ 18. These reports relied only upon 777 records from MP Fin, and Boersig's and Mr. Kosinski's conversations with, additional documentation provided by, 777 servicing and accounting employees as required by the LSA. Kosinski Decl. ¶ 18. As such, the information and analysis contained in the Audit Report and Interim Reports were based exclusively on information and analysis obtained from the 777-Leadenhall Audit Records. Kosinski Decl. ¶ 18.

22.     The Final Audit Report concluded that less than 45% of the remaining collateral pledged to Leadenhall was in compliance with the terms often LSA. Kosinski Decl. ¶ 19. It was also apparent that both servicing and accounting personnel contemporaneously initiated and recorded communications with 777 management identifying collateral deficiencies over the prior three years, evidenced in the Interim Reports. Kosinski Decl. ¶ 19. Among the deficiencies, 777 double-pledged collateral and included collateral 777 never actually owned. Kosinski Decl. ¶ 19. This allowed 777 to fraudulently borrow hundreds of millions of dollars more than it otherwise would under the terms of the LSA. Kosinski Decl. ¶ 19.

23.     Throughout the course of the Collateral Audit, Saiph also provided periodic updates by email and in spreadsheet form detailing Saiph's findings and progress. Gillespie Decl. ¶ 18.

24.     On May 24, 2024, Saiph entered an agreement with Noah Davis's company, the Tyler Durden Group. Kosinski Decl. ¶ 25. The Durden Contract represents the sole business relationship between Saiph and Davis, who was never an employee of Saiph. Kosinski Decl. ¶ 25, Ex. H.

8

25.     TDG's sole role with respect to any and all 777 collateral audits was to troubleshoot the access that 777 provided for the NML audit, and to begin building the targeted data extraction tool for Saiph's use in obtaining the NML records. Kosinski Decl. ¶ 25. For this reason only, Davis was supplied with Saiph login credentials, which only provided access to the records in the MP Fin System that Saiph was authorized to review. Kosinski Decl. ¶ 25.

26.     On the afternoon of September 9, 2024, Kosinski learned from another lender auditing its collateral that Davis had physically entered the 777 offices without authorization. Kosinski Decl. ¶ 28. Kosinski promptly confronted and terminated Davis's company, thus halting any further work by Davis on behalf of Saiph. Kosinski Decl. ¶ 28. Shortly thereafter, Kosinski commenced an investigation and instructed counsel to disclose the relevant information to 777, after informing NML and Leadenhall, whose counsel were visibly copied on all such communications from Saiph's counsel to 777 counsel, John McCarthy. Kosinski Decl. ¶ 28.

27.     At no time was Davis ever directed by Kosinski or anyone affiliated with Saiph to access any of 777's systems or other property without authorization. Kosinski Decl. ¶ 29.

28.     Saiph has never directed, induced, or encouraged Davis nor anyone else to access 777's systems or data without authorization, has no intention to or ability to do so, and in fact has no access to working login credentials that would allow it to access any of 777's data. Kosinski Decl. ¶ 30.

## LEGAL STANDARD

To secure the extraordinary remedy of a preliminary injunction the movant must meet an exacting standard: "A district court may grant a preliminary injunction only upon the movant's showing that (1) it has a substantial likelihood of success on the merits, (2) the movant will suffer irreparable injury unless the injunction is issued, (3) the threatened injury to the movant outweighs the possible injury that the injunction may cause the opposing party, and (4) if issued, the injunction would not disserve the public interest. *See Horton v. City of St. Augustine, Fla.,* 272

9

F.3d 1318, 1326 (11th Cir. 2001). Furthermore, the Plaintiffs must make a clear showing that the extraordinary and drastic remedy of a preliminary injunction is warranted. *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) ("In this Circuit, '[a] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the 'burden of persuasion'' as to each of the four prerequisites." (quoting *McDonald's Corp. v. Robertson,* 147 F.3d 1301, 1306 (11th Cir.1998)); *see also Basham v. Freda*, 805 F. Supp. 930, 932 (M.D. Fla. 1992) ("[S]ince an injunction is an extraordinary and drastic remedy, it will not be granted unless the movant clearly carries the burden of persuasion as to all four prerequisites."), *aff'd*, 985 F.2d 579 (11th Cir. 1993); *Lee v. Resor*, 348 F. Supp. 389, 392 (M.D. Fla. 1972) ("In issuing a preliminary injunction, the Court is exercising a very far reaching power which should never be indulged except in a case clearly warranting it.").

## ARGUMENT

**I.      Plaintiff Has Not Established a Substantial Likelihood of Success on the Merits of Their CFAA Claim.**

"[P]roof of a substantial likelihood of success on the merits is an indispensable prerequisite to a preliminary injunction." *Schiavo ex rel. Schindler*, 403 F.3d at 1240 (11th Cir 2005) (Wilson, J., dissenting) (citing *All Care Nursing Serv., Inc. v. Bethesda Mem'l Hosp., Inc.*, 887 F.2d 1535, 1537 (11th Cir. 1989)). In support of their claim relating to Saiph, Plaintiffs present only conclusory allegations, conjecture, and speculation. Plaintiffs have alleged no facts and presented no evidence that would permit a factfinder to attribute Davis's conduct to Saiph.

To prevail on their claim under the CFAA, Plaintiffs must prove that: (1) a defendant intentionally accessed a protected computer; (2) without authorization or exceeding authorized access; and the defendant (3) thereby obtained information; and (4) the plaintiff suffered damage

10

or loss of at least $5,000.00. *Hall v Sergeant*, No. 18-80748-CIV-RKA, 2020 WL 1536435, at *28 (S.D. Fla. Mar. 30, 2020).

## A. Leadenhall and the Saiph Parties Did Not Direct, Encourage, or Induce Unauthorized Access into Plaintiffs' Systems.

Plaintiffs seek to hold Leadenhall and the Saiph Parties (collectively, the Indirect Defendants) liable for "indirect[ly] accessing . . . a protected computer." Motion at 14. While the CFAA may provide liability for persons who did not directly access the computer, to Plaintiffs nonetheless must establish that the Indirect Defendants directed, encouraged, or induced Davis to access a computer that Saiph is not authorized to access. *Teva Pharms. USA. Inc. v. Sandu*, 291 F. Supp. 3d 659, 671 (E.D. Pa. 2018).

Plaintiffs fail to provide any credible evidence that the Indirect Defendants directed, encouraged, or induced to Davis's alleged misconduct. Plaintiffs identify the following as "overwhelming" evidence in support of their claims: 1) Plaintiffs' forensic expert's report regarding Davis's conduct; 2) video surveillance of Davis; 3) the timing of Davis's conduct in accessing emails of 777 employees; and 4) an inconsequential scrivener's error in Saiph's voluntary disclosure regarding the allegations of Davis's unauthorized access to SuttonPark's offices. Mot. at 4. None of this purported evidence ties the Indirect Defendants to Davis's alleged conduct.

While Plaintiffs' expert's forensic analysis may arguably provide some evidence of wrongdoing by Davis, it provides no evidence linking the Indirect Defendants to Davis's alleged misconduct. In fact, it does the opposite. The report concludes that 9 out of 10 of the intrusions were made by Davis using his **old** login credentials that Plaintiffs negligently failed to deactivate for more than three months. (Mazur Decl. Ex. A pgs. 3-8). The one instance of Davis using Saiph's credentials was for the authorized purposes of troubleshooting and creating a tool to improve

11

Saiph's authorized access to data pertaining to Northwestern Mutual Life's receivables, which had nothing to do with Leadenhall. KD at ¶ 26. In addition, Saiph's credentials only provided access to 777 data that Saiph was authorized to view. Furthermore, the Saiph parties had no reason to believe that it was not authorized to provide Davis, as its IT contractor, with brief access to its login credentials for the purposes of allowing him to troubleshoot and improve access to NML's data. KD at ¶27.

Likewise, the video surveillance footage of Davis provides no evidence that the Indirect Defendants did anything to direct, encourage or induce to commit any wrongful acts Plaintiffs allege.

Plaintiffs' third piece of "overwhelming" evidence -- that one of the alleged Davis data intrusions involved access to 777 former managing partner Steve Pasko's ("Pasko") and compliance officer Jennifer Logee's ("Logee") emails "the night before the an Important Hearing in the Leadenhall [NY] Litigation -- is pure speculation and conjecture. Plaintiffs have provided no evidence that the emails were actually obtained. Their own expert even admits that only Pasko's OST[1] file was targeted for transfer, and that the transfer timed out, rendering it impossible to determine if the file was transferred. (See Mazur Decl. Ex. A at pg 12). In addition, Plaintiffs make no attempt to identify any potential information used in the "important hearing" the next day, in which Pasko's name was only mentioned once, and only by Pasko's counsel. See generally RICO Action, ECF No. 148, July 8, 2024 Hr'g Tr. Furthermore, Pasko's emails that were relevant and admissible in the Leadenhall NY Litigation would be obtainable via discovery. The other 777 employee whose emails were alleged allegedly targeted but not obtained, Jennifer Logee, works in as a compliance officer in the insurance segment of 777 partners business (Motion at pg 4), which has nothing whatsoever to do with the Leadenhall NY Litigation. Finally, it also strains

---

[1] An OST file is an offline storage table that contains synchronized copy of a user's mailbox. *Id.*

12

credulity that Leadenhall would jeopardize its nine figure claims by attempting to obtain otherwise discoverable emails, and do so the night before an important hearing. Moreover, and in any event, no evidence links any of these alleged attempts by Davis to Saiph or Koskinsk.

Finally, Plaintiffs assert that Saiph sending a second good faith disclosure letter, revised to remove a scrivener's error, is proof of Saiph's involvement, because it was an "attempt to conceal Leadenhall's involvement." Motion at 5. As an initial matter, the disclosure letter had been revised to eliminate the reference to solely Leadenhall in the subject line of correspondence emailed to Plaintiff's counsel John McCarthy, who also represents the Plaintiffs in the Leadenhall NY Litigation. This revision was made in light of the fact that Saiph had collected all of the information it needed and had provided its final report to Leadenhall before the alleged break in occurred, and that Davis's only tangential involvement in obtaining 777 collateral records was to troubleshoot and improve access to NML's data, not Leadenhall's. Kosinski at ¶26.

In addition, the assertion that Saiph's voluntary disclosure was intended to conceal Leadenhall's alleged involvement makes no sense, because both of the letters emailed to John McCarthy, as well as both transmittal emails, showed a copy to Leigh Nathanson, Lead Counsel for Leadenhall in its NY Litigation. McCarthy, as Lead Counsel for the 777 defendants in the very same Leadenhall NY Litigation, was well aware that Nathanson was Lead Counsel for Leadenhall, and even argued several important motions against her, including Leadenhall's successful Motion for Preliminary Injunction against 777 Partners and its affiliates, which injunction remains in effect. Accordingly, it would be illogical to visibly copy Leadenhall's counsel four separate times on emails and letters to 777 counsel, who knew she was Leadenhall's counsel, if the Indirect Defendants' goal was to "conceal Leadenhall's involvement" as 777 and Mr. McCarthy blithely allege.

Plaintiffs later insinuate impropriety based on "Leadenhall's insistence on retaining Saiph specifically, which possessed significant proprietary knowledge about Plaintiffs' operations and

SBDOCS 405558 8

computer systems, through its founder (Kosinski) and employee (Davis), in spite of Plaintiffs' objections." Motion at 11. As an initial matter, Davis was never an employee of Saiph (Kosinski Decl. at ¶25), and Saiph did not enter into a contract with Davis's employer – the scope of which did not include obtaining data for the Leadenhall Audit – until 9 months after Leadenhall hired Saiph to audit its collateral pledged by 777.

In addition, the idea that it is improper to hire an auditor knowledgeable about the company and its transactions being audited inverts reality. 777's objections to Saiph's involvement – all of which occurred prior to Saiph contracting with Davis's employer – are far more suspicious. Any company with nothing to hide, like Leadenhall, would prefer an auditor who was knowledgeable about its operations and transactions, which would enable the auditor to provide more reliable analysis, in less time, and with less interruption of employees and disruption of operations than an auditor lacking such knowledge. Leadenhall hired Saiph for its expertise; 777 objected for the same reason. Further demonstrating 777's bad faith, 777 objected to Leadenhall's retaining Kosinski ostensibly because 1) "it would violate his severance agreement" and (2) "he is currently a direct competitor." These statements were untrue, pretextual, and subsequently withdrawn. Kosinski Decl. at ¶9.

777's failure to provide evidence that the Indirect Defendants directed, encouraged, induced Davis's alleged misconduct, also means that they cannot prove the Indirect Defendants intentionally exceeded their access. And as argued below, this failure also negates any liability under *respondeat superior*.

> **B. Leadenhall and the Saiph Parties are not liable for independent contractor Davis's alleged misconduct under a theory of *respondeat superior*.**

Having failed to provide any meaningful evidence that the Indirect Defendants directed, encouraged or induced Davis's alleged misconduct, Plaintiffs' erroneously assert that the Indirect Defendants are liable under the doctrine of *respondeat superior*. But Davis was never an employee of Saiph, and Plaintiffs' have not provided any evidence to the contrary, nor could they. In reality, Davis's employer, the Tyler Durden Group, contracted with Saiph, as an independent contractor. Kosinski Dec. at ¶25, Ex. H. Generally speaking, one who hires an independent contractor is "normally is not liable for [their] torts." *Hubbard Const. Co. v. Orlando/Orange Cnty. Expressway Auth.*, 633 So. 2d 1154, 1155 (Fla. 5th DCA 1994). This rule is subject to four exceptions: 1) Inherently Dangerous Activities; 2) Active control or involvement of the hiring party sufficient to effectively control means and methods of the independent contractor; 3) Non-delegable duties; and 4) Failure to warn of concealed dangers. The only exception remotely relevant here is number two. This control exception does not apply here, because neither Saiph, nor anyone affiliated with Saiph, directed, encouraged, or induced Davis, or anyone else, to access any of the Plaintiffs' systems or other property without authorization. Kosinski Decl. ¶¶29,30. In fact, Saiph was not in a position to, and did not, supervise and control the actions of Davis, its independent contractor working in the highly specialized area of systems architecture and administration. *See* Kosinski Dec. at ¶25, Ex. H Accordingly Saiph defined Davis's project objectives, but did not specify or control the means and methods Davis used to complete them, See Id. Furthermore, Davis's alleged network and office intrusions were outside the scope of what his company was hired to do, including all of the objectives Davis was requested to meet. Kosinski Dec. at ¶¶25,26, Ex. H.

Furthermore, Davis's sole role with respect to all of Saiph's 777 collateral audits was to troubleshoot access that Plaintiffs provided for the NML audit, and to begin building the targeted data extraction tool for Saiph's use in obtaining the NML records. Kosinski Dec. at 26. These were the only reasons that Davis was supplied with Saiph login credentials which only provided access

15

to the Leadenhall and NML records in the MP Fin System, records that Saiph was fully authorized to access. Kosinski Dec. at ¶26.

**C.**     **Plaintiffs have failed to identify any data that was obtained during Davis's alleged unlawful intrusions.**

Plaintiffs' CFAA claim requires that information actually be obtained. *See* 18 U.S.C. § 1030(a)(2)(C) (requiring claims involving access without authorization or exceeding authorization to result in information being obtained). However, Plaintiffs have not provided evidence that any information was actually obtained. Indeed, Plaintiffs' computer forensic expert Eric Mazur ("Mazur") mentions only a single file, Plaintiffs' file, but is careful to say only that the file was "accessed" and that the perpetrator "initiated" commands to company (Steve Pasko's) OST file. Mazur Report [DE 11-4 Ex. A pgs 11-12]. But Mazur admits that the alleged attempted transfer timed out, rendering it impossible to say whether the file was actually transferred. *See id*. In addition, Plaintiffs allege that the OST file would provide access to Steve Pasko's emails, and that Leadenhall would want such information for its lawsuit against Plaintiffs. Besides such naked speculation not constituting evidence, it makes little practical sense as well. Steve Pasko is a primary defendant in the Leadenhall NY Litigation. Accordingly, Leadenhall would clearly have access to any such usable emails in discovery, and so would have no reason to attempt to illegally obtain such information for Plaintiffs' computer systems.

**II.**     **Plaintiffs Have Not Established a Substantial Likelihood of Success on the Merits of Their CADRA Claim.**

For essentially the same reasons as stated above in connection with CFAA, Plaintiffs are also unlikely to succeed on their CADRA claim. Indeed, this court has recognized that both statutes have similar elements. *Fla. Atl. Univ. Bd. of Trs.*, 465 F. Supp. 3d 1279, 1289 (S.D. Fla. 2020).

16

III.     **Plaintiffs have not established that a Preliminary injunction is necessary to prevent actual and imminent irreparable harm.**

Plaintiffs have failed to provide evidence that irreparable harm is imminent. To prove entitlement to a preliminary injunction, Plaintiffs must show irreparable harm that is "actual and imminent," as opposed to "remote and speculative". *See Siegel v. LePore*, 234 F.3d 1163, 1176–77 (11th Cir. 2000).

First and foremost, Plaintiffs have failed to show actual and imminent irreparable harm as to the Indirect parties because they have no concrete evidence that these parties directed, encouraged, condoned, otherwise controlled, or even knew about Davis's alleged network and office intrusions. In addition, Plaintiffs provide no evidence that Davis actually obtained any information from his alleged network intrusions, nor that the Indirect Parties possess, much less used, any such information.

Furthermore, Plaintiffs' have failed to demonstrate that misconduct causing actual and imminent irreparable harm is likely to occur, particularly as to the Indirect Parties. In addition to the reasons discussed directly above – no evidence of the Indirect Parties' involvement in Davis's alleged misconduct and no evidence that they have any data obtained during Davis's alleged network intrusions – there are additional compelling reasons that a temporary injunction against the Indirect Defendants is not necessary to prevent actual and imminent irreparable harm, including:

- Saiph has terminated its business relationship with Davis's employer and, as a result, Davis has not performed any work for Saiph since September 9, 2024, the date the contract was terminated. Kosinski Decl. at ¶ 28.

- Saiph no longer has access credentials to 777's data (Kosinski Dec at ¶30);

17

- Saiph has collected all 777 data necessary to complete, and has completed, its work product for the 777-Leadenhall Collateral Audit. (Kosinski Dec at ¶18)

- 777 finally deactivated Davis's original 777 credentials (unrelated to Saiph), as it negligently failed to do for more than three months after Davis resigned. (Mazur Report [DE 11-4] Ex. A pgs. 1,7-8).

- Davis, who, upon information and belief had no prior criminal record, was arrested for the alleged break-in, and 777 is aggressively pressing charges.

- Plaintiffs have provided no evidence that Davis – or any other defendant -- has attempted to access 777 data since August 9, 2024, nor have Plaintiffs provided any evidence that any data was allegedly obtained during Davis's alleged network intrusions. (See Generally Mazur Report [DE 11-4], Ex. A).

- Saiph has represented under oath that it has no intent or ability to access 777's computer system, and, for purposes of avoiding costly preliminary Injunction proceedings, that it will stipulate that if any information that Davis allegedly obtained via the alleged network intrusions is located, Saiph and its employees will neither use nor disseminate such information. Kosinski Decl at ¶3.

Plaintiffs are not even close to presenting evidence that sufficiently supports that they will suffer actual and imminent irreparable harm if their requested injunction is not entered.

## IV.    The Balance of equities weighs against the extraordinary relief of an injunction

In light of the lack of evidence of actual and imminent irreparable harm, the overall lack of evidence linking Saiph or Kosinski to the allegations against Davis, the related unlikelihood of success on the merits, and the likely harm to Saiph and Kosinski's reputation if an injunction is entered against them in this context, the balance of equities weighs heavily against granting the Motion for Preliminary Injunction. This is particularly the case where, as here, the alleged harm resulted in substantial part from Plaintiffs' own negligent failure to take basic steps to secure its

18

network, including by failing to cancel Davis's stale network credentials for more than 90 days after his last day in Plaintiffs' employ.

**V.      A preliminary injunction in favor of 777 is not in the public interest.**

To permit a party with unclean hands (777) to mount a successful collateral attack on a significant claim by an aggrieved party (Leadenhall), where another court has already found that Leadenhall has a substantial likelihood of success on the merits of its claims against 777 and faced irreparable harm, as well as the other necessary factors to grant a preliminary injunction against 777, disserves the public interest. This is especially so where, as here, the moving party has so utterly failed to provide evidence supporting a substantial likelihood of success on the merits, 777's collateral attack on a lender victim and its auditors who uncovered  777's massive fraud is an abuse of the judicial system. And were such ploys to succeed, the chilling effect on victims, experts, and whistleblowers who uncover such fraud would greatly disserve the public interest.

**V.      CONCLUSION**

Plaintiffs' frivolous claims are intended to obfuscate their own criminal conduct and their request for injunctive release rests on an imaginary foundation. No evidence ties Leadenhall, Saiph, or Kosinski to the alleged conduct of Davis, whom Plaintiffs have not even proved actually obtained any information unlawfully from 777's computers. Plaintiffs have failed to present clear evidence of this necessary element of the CFAA and CADRA claims upon which its Motion for Preliminary Injunction is premised. For this reason alone, the Court should deny the Motion. Furthermore, Plaintiffs rely on speculation, innuendo, and minor coincidence in its uncompelling attempt to link Davis's alleged wrongdoing to Saiph or Kosinski. In addition, by the time Davis's alleged unauthorized intrusions occurred, the due diligence portion of Saiph's forensic audit had already occurred, and Saiph had already obtained –with full authorization— 99.8% of the 777 business records used for the information and analysis it provided to Leadenhall. This information

19

helped establish a massive fraud perpetrated by 777, which is why 777 is trying to shoot the messenger with its unsupported Motion for Preliminary Injunction as well as this entire litigation.

Furthermore, according to 777's own expert, Davis's last alleged intrusion occurred on August 9, 2024, more than 60 days ago. Since that time, again as 777's own expert states, 777 has closed the door it left wide open and finally revoked its former employee Davis's login credentials, as it negligently failed to do following his departure from 777. This utter failure to demonstrate imminent irreparable harm, combined with the unfairness to the innocent defendants who helped uncover 777's far reaching fraud – affecting not just Leadenhall, but many other lenders, their stockholders, and ultimately the general public – establishes the balance of equities against 777 as well as the harm to the public interest that granting its specious Motion for Preliminary Injunction would cause.

*/s/ Harold E. Morlan III*
Harold E. Morlan III
Florida Bar No.: 24250
Primary Email: hmorlan@shutts.com
Secondary Email: dbenkert@shutts.com
**SHUTTS & BOWEN LLP**
300 South Orange Avenue, Suite 1600
Orlando, Florida  32801
Telephone:  (407) 423-3200
Facsimile:  (407) 425-8316
*Attorneys for Saiph Consulting LLC and Paul Kosinski*

## REQUEST FOR HEARING

Defendants Saiph Consulting LLC and Paul Kosinski request a hearing on submit Plaintiffs 777 Partners LLC  and SuttonPark Capital LLC's Expedited Motion for a Preliminary Injunction.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this  _25th_  day of October, 2024, I electronically filed Defendants', Saiph Consulting LLC and Paul Kosinki's Response in Opposition to Plaintiffs' Expedited Motion for a Temporary Injunction with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.


/s/ Harold E. Morlan III

Harold E. Morlan III

21

SBDOCS 405558 8