**Declaration of Paul Kosinski, President of SAIPH Consulting LLC ("Saiph")**

1. I, Paul Kosinski ("Kosinski), am over 18 years of age and am authorized to make this declaration based on my personal knowledge of the facts stated herein, and I am competent in all respects to testify about the matters set forth in this Declaration.

2. I am the Chief Executive Officer of Saiph Consulting LLC ("Saiph"), a financial operations consulting company with a particular specialization in structured settlement annuity underwriting and servicing.

3. I submit this Declaration in support of Saiph and Kosinski's Response in Opposition to Plaintiffs, 777 Partners LLC and SuttonPark Capital LLC's Expedited Motion for a Preliminary Injunction.

**Executive Summary**

4. Leadenhall Capital Partners, LLC ("Leadenhall") engaged Saiph in August of 2023 to conduct a forensic audit of the collateral that 777 Partners LLC, SuttonPark Capital LLC, and their affiliates (sometimes collectively referred to herein as "777") pledged to secure loans of hundreds of millions of dollars from Leadenhall. Leadenhall informed Saiph of allegations that 777 fraudulently double pledged the assets securing Leadenhall's loans to 777. I personally performed the onsite due diligence portion of the audit, lawfully obtaining 777's relevant business records using authorized access to its servicing systems and employees, pursuant to the loan contract between 777 and Leadenhall. I obtained almost all of such records used to provide analysis and information to Leadenhall from 777's servicing system by June 21, 2024. Some additional records were provided directly to Saiph from SuttonPark employees, and some additional records were obtained by my partner Lauren Boersig and analysts under her supervision on or before August 9, 2024. Saiph obtained only records it was authorized to access, and did so without assistance from independent contractor, Noah Davis, a systems engineer with the Tyler Durden

1

Group LLC ("TDG"). At no time, did I or Saiph use, review, or know about any 777 records obtained unlawfully or otherwise by Noah Davis, as Plaintiffs alleged. Davis's only role with respect to obtaining any 777 business records on behalf of Saiph was to troubleshoot and develop alternatives to the remote access platform that 777 provided for Saiph to review 777's business records on behalf of a different client (Northwestern Mutual Life "NML") for an audit of a different pool of structured settlement annuities pledged to NML. At no time did I direct, condone, or know about any unauthorized access of 777's computer systems, property or offices by Noah Davis or any other person. I immediately terminated Saiph's relationship with Davis's company, TDG, the same afternoon I first learned of allegations that Davis entered 777's offices without permission in early September 2024. Additionally, I did not learn of the allegations that Mr. Davis infiltrated 777's computer systems using his old 777 login credentials until I read 777's Complaint filed on September 17, 2024.

**Background**

5. I was formerly the Chief Operating Officer of SuttonPark Capital LLC (a subsidiary of 777 Partners LLC ("777 Partners") (777 Partners, SuttonPark, and their affiliates are sometimes referred to collectively as "777").

6. I voluntarily resigned from SuttonPark in October of 2020, after I became concerned about the way that they were structuring transactions, and ignoring/bypassing internal controls implemented to ensure compliance with the various structured settlement facilities in place at that time. It later became apparent that these types of practices likely indicated and facilitated the type of fraudulent conduct Leadenhall has alleged against 777 and others in the case of *Leadenhall Capital Partners v. Josh Wander, Steven Pasko, Kenneth King, 777 Partners LLC*, *et al.*, Case No. 1:24-cv-03453-JGK 777, currently pending in the Southern District of New York

(the "Leadenhall NY Litigation"). (Josh Wander ("Wander") and Steve Pasko ("Pasko") are principals of 777).

7. Following my resignation from SuttonPark, I later founded Saiph Consulting, a financial operations consulting company with a particular specialization in structured settlement annuity underwriting and servicing.

**The Leadenhall Collateral Audit**

8. In August of 2023, Leadenhall contracted with Saiph to provide collateral auditing services in accordance with the terms of the contract attached as Exhibit "A" (the "Initial Audit Contract"). The scope of this initial contract was subsequently updated in December and June of 2024, as reflected in the attached Exhibits "B" and "C" respectively (Exhibits "A", "B", and "C" are collectively referred to as the "Leadenhall Audit Contract")[1].

9. For the first nine months of the Leadenhall Audit Contract, 777 stonewalled Leadenhall's request for access to the systems and information (collectively the "Collateral Documentation") necessary to allow Saiph, as Leadenhall's agent, to perform an audit of 1,130 annuity receivables that 777 pledged to Leadenhall as collateral for two specific financing facilities. I understand from Leadenhall that 777 claimed that it was a violation of my separation agreement with Sutton Park to conduct the Audit and that I was a 777 competitor as ostensible reasons for objecting to my appointment as auditor. Both statements were untrue.

10. Notably, the Loan and Security Agreement between 777 and Leadenhall (the "LSA") required 777 to make such Collateral Documentation available to Leadenhall upon request, and to allow Leadenhall and its agents or representatives access to 777 and affiliated parties premises upon 3 days' notice. See LSA §5.02, attached as Exhibit "D."

---

[1] These exhibits (A-C) are being filed under seal, pending leave of court.

11. Flouting its contractual obligations for 9 months, 777 did not ultimately provide the requested access to information (which was material to the audit) to Saiph until after Leadenhall filed the NY Litigation against 777 on May 3, 2024, and B. Riley took over management of 777 and its affiliates to restructure the companies. 777 principals and Leadenhall NY Litigation Defendants Wander and Pasko were ousted from their leadership roles at 777 and replaced by B. Riley shortly after Leadenhall filed the Leadenhall NY Litigation against them, 777 Partners, and its affiliates.

12. Instead of timely providing the requested information in a bulk file download, 777/SuttonPark provided only partial information in dribs and drabs, in an apparent attempt to conceal evidence of their fraudulent conduct. Indeed, 777/SuttonPark conveniently omitted information needed to trace the assets' chain of title – information that was ultimately critical in surfacing major problems with Leadenhall's collateral.

13. Following the ouster of Pasko and Wander, Leadenhall renewed its efforts to overcome 777's intransigence and requested that B. Riley provide Saiph with access to the 777 servicing system ("MP Fin"). Shawn Taheri ("Taheri"), SuttonPark's Director of IT, provided Saiph with a single set of login credentials to access MP Fin system. At that time, Taheri configured the credentials provided to Saiph with limited access to only the records in MP Fin pertaining to the Leadenhall collateral.

14. This single set of login credentials initially provided to Saiph to access the Leadenhall Collateral Data were only usable from the network at 777/SuttonPark's physical offices.

15. Accordingly, I personally began onsite diligence, in accordance with the Leadenhall Audit Contract and the LSA, on May 28, 2024. My audit protocol consisted of meeting

4

with onsite servicing and accounting personnel and inspecting the servicing system and supporting records via the limited access provided.

16. Three days later, SuttonPark (through B.Riley) announced mass immediate layoffs of the servicing employees; several others left to join a competitor concurrently. This reduction of more than two-thirds of the full-time employees further thwarted Leadenhall's contractual right to audit its collateral.

17. On June 21, 2024 I concluded the onsite portion of the audit and had received all records that 777 was then willing to make available for the collateral audit. Attached as Composite Exhibit "E-1" is list of the filenames of the records I obtained, along with supplemental records missing from my onsite diligence records, which supplemental data were either provided by SuttonPark employees, or from authorized areas of MP Fin by my Partner Lauren Boersig or staff under her direct supervision (all such records obtained are sometimes referred to collectively as the "777-Leadenhall Audit Records"). Composite Exhibit "E-1" identifies the only documents used to complete the audit and related work product Saiph provided to Leadenhall. The actual files themselves will be provided/filed via external hard drive or FTP server to all counsel of record due to file size and are designated as composite Exhibit E-2 for reference purposes[2]. Composite Exhibit E also includes several additional files that servicing employees provided to me or Saiph's Director of Servicing, Lauren Boersig ("Boersig") upon request. Boersig also supervised and directed an analyst on her team to download annuity masters missing from my initial collection. The supplemental data obtained after the June 21, 2024 conclusion of onsite diligence at Sutton Park's office represents approximately one-half of one percent (0.5%) of the documentation obtained for

---

[2] These documents will be filed with the court if requested, but due to the number of files (50,000+) and file size, the Saiph Parties plan to introduce/summarize these documents in a chart summary in Accordance with Fed. R. Civ P. 1006.

the Leadenhall Collateral Audit. Boersig, an analyst reporting directly to her, and I were the only people who obtained documentation from 777 for the Leadenhall Collateral Audit. Saiph did not provide any information to Leadenhall from 777's records, other than that contained within or derived from analysis of the 777-Leadenhall Audit Records.

18.     Boersig and her team in New York completed the subsequent audit analysis and report ultimately provided to Leadenhall on September 5, 2024. A copy of this report and supporting documentation are attached as composite Exhibit "F"[3] (collectively the "Audit Report") and comprise the entirety of the work product and information Saiph provided to Leadenhall, with the exception of interim email reports (the "Interim Reports") Saiph provided to Leadenhall on August 29th, 2024 and September 5th, 2024. These reports are attached as attached as composite Exhibit "G-1A-G1B[4]" and "G2A-G2E", and were based only upon 777 records from MP Fin, and Boersig's and my conversations with, and additional documentation provided by, 777 servicing and accounting employees as required by the LSA. All of the information and analysis contained in the Audit Report and the Interim Reports were based sole on information and analysis gleaned from the 777-Leadenhall Audit Records, previously referenced as Composite Exhibits E-1 and E-2.

19.     The final Audit Report concluded that less than 45% of the remaining collateral pledged to Leadenhall was confirmed to be in compliance with the terms of the LSA.  Furthermore, it was obvious that both servicing and accounting personnel contemporaneously initiated and recorded communications with 777 management identifying collateral deficiencies over the past three years, as evidenced in the Interim Reports. Such deficiencies included collateral that was

---

[3] This exhibit is being filed under seal, pending leave of court.

[4] Composite Exhibit G-1A and G1-B are being filed under seal, pending leave of court.

double pledged and collateral that 777 never actually owned, both of which enabled 777 to fraudulently borrow hundreds of millions of dollars more than was permissible under the terms of the LSA.

20. Noah Davis was never commissioned to do any work on or collect any data from 777's systems for Leadenhall Audit, either by Saiph, myself, or, to my knowledge, Leadenhall.

**The Northwestern Mutual Life Collateral Audit**

21. On July 10, 2024, Northwestern Mutual Life ("NML") designated Saiph as its agent and formally requested that B. Riley provide Saiph with access to the 777 records associated with NML's collateral portfolio. At $\approx$ 6,600 records, the NML collateral portfolio was substantially larger than the Leadenhall portfolio. Remote access was requested so that Saiph could complete the NML audit more efficiently, an option 777 Director of IT Shawn Taheri had previously mentioned. To that same end, Saiph also planned to employ a targeted data extraction tool to more efficiently obtain the targeted NML collateral information from the MP Fin system, to avoid records having to be individually pulled and or abstracted. 777 permitted another secured lender, Credigy, to access its information using the same process, prior to Saiph being provided access.

22. On August 2, 2024, 777 provided me (Paul Kosinski), as well as my partner Lauren Boersig, with updated login credentials that provided remote access to the NML and Leadenhall records contained within the MP Fin system, as I was informed by 777 IT Director Taheri.

23. Unfortunately, the virtual machine 777 provided to Saiph for purposes of accessing the NML records was unstable, and could not allow more than one user to login at a time, and consistently required maintenance and troubleshooting to use.

**The Role of the Tyler Durden Group and its employee Noah Davis**

24. On or about May 1, 2024 I learned that Davis had resigned his position with 777. At the time, Saiph was looking to engage a systems engineer to help create and enhance its underwriting and servicing platforms.

25. Throughout the month of May 2024, Davis and I intermittently discussed Saiph's requirements and objectives for further development of its systems, culminating in the execution of an agreement between Saiph and Davis's Company, the Tyler Durden Group, on May 24, 2024. A copy of this agreement is attached as Exhibit "H" (the "Durden Contract"). The Durden Contract represents the sole business relationship and endeavor between Saiph and Davis, who was never an employee of Saiph.

26. Davis's sole role with respect to any and all 777 collateral audits was to troubleshoot the access that 777 provided for the NML audit, and to begin building the targeted data extraction tool for Saiph's use in obtaining the NML records. These were the only reasons that Davis was supplied with Saiph login credentials, which credentials only provided access to the Leadenhall and NML records in the MP Fin System.

27. When I provided Davis with Boersig's login credentials for the NML data on the MP Fin system, I believed that his use, as an independent contractor for Saiph for IT purposes, was consistent with the access authorization provided to Saiph, based upon my experience as an auditor in this context, the typical scope of audit rights in this context requiring the lender and its agents and representatives to be granted access the lender's collateral data (and premises), the terms of the LSA, and that Davis's involvement was known to Taheri.

28. On the afternoon of September 9th, I received information from another lender auditing its collateral that Davis had physically entered the 777 offices without authorization. When I confronted Davis with these allegations later that same afternoon, he admitted entering

SuttonPark's offices, but denied taking any property. Accordingly, I immediately terminated the contract between Saiph and the Tyler Durden Group, halting any further work by Davis on behalf of Saiph. Shortly thereafter, I commenced an investigation, and instructed my counsel to disclose the relevant information to 777, after informing NML and Leadenhall, whose counsel were visibly copied on all such communications from Saiph's counsel to 777's counsel, John McCarthy. Davis later told me that his alleged misconduct had nothing to do with any of the Indirect Defendants, including any direction they provided to him, and agreed to sign a sworn statement to that effect.

29. At no time was Davis ever directed by me or anyone affiliated with Saiph to access any of 777's systems or other property without authorization. Prior to reading 777's Complaint filed on September 17, 2024, I had no knowledge of the unauthorized system access alleged against Davis.

30. In addition, Saiph has never directed, encouraged, or induced Davis, nor anyone else, to access 777's systems or data without authorization, has no intention or ability to do so, and in fact has no access to working login credentials that would allow it to access any of 777's data.

31. To the extent Saiph discovers any 777 data that Davis wrongfully obtained from the alleged unauthorized system access described in pages 3 through 7 of the Data Intrusion Investigation Initial Report [DE 11-4 at 9-13], Saiph will not use or disseminate such data. After a diligent search of its premises, Saiph has not located any equipment belonging to Plaintiffs, including the laptops and any other equipment other specified, but if Saiph discovers such equipment, it will return it promptly to the Plaintiffs. Saiph has also offered to Plaintiffs stipulate to the foregoing in writing.

[The remainder of this page left intentionally blank]

I, Paul Kosinski, declare under penalty of perjury that the foregoing is true and correct. Executed on this  25th  day of  October                   .

_____
Paul Kosinski, *individually and as CEO of Saiph Consulting LLC*