## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 24-81143-CIV-MIDDLEBROOKS

**777 PARTNERS LLC** and
**SUTTONPARK CAPITAL LLC**,

        Plaintiffs,

v.

**LEADENHALL CAPITAL PARTNERS LLP,
LEADENHALL LIFE INSURANCE LINKED
INVESTMENT FUND PLC, NOAH DAVIS,
SAIPH CONSULTING LLC**, and
**PAUL KOSINSKI**,

        Defendants.

_____/

### AMENDED COMPLAINT AND JURY DEMAND

Plaintiffs 777 Partners LLC and SuttonPark Capital LLC allege against Defendants Leadenhall Capital Partners LLP, Leadenhall Life Insurance Linked Investments Fund PLC, Noah Davis, Saiph Consulting LLC, and Paul Kosinski as follows.

### INTRODUCTION

1.     This action concerns defendants' repeated brazen and unauthorized intrusions into Plaintiffs' proprietary computer networks, in violations of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, as well as the related theft of computer equipment and unauthorized obtainment of Plaintiffs' electronic information. As background context for this action, 777 Partners LLC ("777 Partners") and SuttonPark Capital LLC ("SuttonPark" and collectively with 777 Partners, "Plaintiffs") are currently engaged in litigation initiated by Leadenhall Capital Partners LLP and Leadenhall Life Insurance Linked Investments Fund PLC (collectively "Leadenhall") in the U.S. District Court for the Southern District of New York ("SDNY") regarding a credit facility that

Leadenhall provided to SuttonPark and its affiliates supported by a conditional guaranty from 777 Partners (the "Leadenhall Litigation"). In the Leadenhall Litigation, Leadenhall has made explosive claims against Plaintiffs, including for civil RICO, and which Plaintiffs are vigorously contesting, accusing Plaintiffs of engaging in fraud in connection with that credit facility. The allegations contained herein, however, which are backed up by extensive computer forensic and other evidence, demonstrate that it is defendants that have engaged in fraud and dishonest conduct apparently intended to benefit Leadenhall in its SDNY litigation against Plaintiffs.

2.      Through the terms of the credit facility with SuttonPark, Leadenhall claims to be entitled to certain limited access rights to SuttonPark's business records, in order to audit collateral pledged under the credit facility. When Plaintiffs acquiesced, Leadenhall conveniently chose to hire Saiph Consulting LLC ("Saiph") to perform these audits, which Leadenhall knew was founded and managed by SuttonPark's former senior executive, Defendant Paul Kosinski ("Kosinski"), and which just so happened to also employ 777 Partners' former head of information technology ("IT"), Defendant Noah Davis ("Davis").

3.      During the course of performing this audit work for Leadenhall, and improperly utilizing access credentials as well as extensive knowledge of Plaintiffs' computer systems and their operations and procedures, on multiple occasions Davis illegally and brazenly accessed Plaintiffs' computer networks without permission and obtained electronic files containing proprietary and confidential information. During these intrusions, Davis accessed a variety of computer databases and other repositories of information belonging to 777 Partners that he believed might prove useful to Leadenhall, related to the audit work and the Leadenhall Litigation. Davis further copied information contained on those systems, including information potentially useful in the Leadenhall Litigation, as well as secretly granting himself administrator level access

SGR/71972169.4

to a number of those systems. Davis specifically targeted a file containing the stored electronic communications of Steven W. Pasko—a co-founder and former managing partner of 777 Partners and one of the individual defendants in the Leadenhall Litigation.

4.     Because of Davis's knowledge of Plaintiffs' computer systems and his unauthorized grant to himself of administrator level access, the full extent of his activities within 777 Partners' systems, including the actual number of illegal intrusions, what additional information he may have reviewed, copied, altered, or otherwise interfered with, and for what purposes, is not, and may never be, fully known.

5.     Additionally, not satisfied with merely making virtual intrusions onto Plaintiffs' property, Davis was later captured on video surveillance cameras breaking into SuttonPark's offices, without permission, and stealing several laptop computers belonging to 777 Partners, likely to further access confidential and propriety information belonging to 777 Partners. Saiph subsequently confirmed in writing that Davis had engaged in this improper physical access. Moreover, in doing so, Saiph intriguingly let slip the involvement of Leadenhall by referencing it by name in the first version of this correspondence sent to 777 Partners' counsel, before quickly sending a second version that was otherwise substantively identical but for removal of the reference to Leadenhall.

6.     On information and belief and based on: (i) Leadenhall's aggressive actions and litigation tactics against 777 Partners; (ii) the targeted access to and attempt to transfer the Outlook 365 file saved on Mr. Pasko's laptop; (iii) targeting of a laptop and One Drive folders of an employee of a non-party affiliate likely to have information that Leadenhall had been unsuccessfully seeking; (iv) the timing of at least one intrusion that occurred just prior to an important hearing in the Leadenhall Litigation; (v) Leadenhall's insistence on retaining Saiph

SGR/71972169.4

specifically, which possessed significant proprietary knowledge about 777 Partners' operations and computer systems, through its founder, Kosinski, and other employees or agents, in spite of Plaintiffs' vigorous objections; (vi) the agency relationships between Leadenhall and Saiph, Kosinski, and Davis; (vii) claims concerning a non-existent payment dispute between Davis and Plaintiffs; and (viii) Saiph's inadvertent acknowledgment of Leadenhall's relationship to these intrusions, it is reasonable to conclude that the foregoing acts were performed for Leadenhall's benefit, and with Leadenhall's implicit or explicit encouragement, if not involvement.

<u>**PARTIES**</u>

<u>**Plaintiffs**</u>

7.      Plaintiff 777 Partners is a Miami-based private investment firm organized as a limited liability company under the laws of Delaware, which has its principal place of business at 100 SE 2nd Street, Suite 2000, Miami, Florida 33131. The company is focused on a range of investments in the insurance, aviation, sports, and media sectors.

8.      Plaintiff SuttonPark is a corporate affiliate of 777 Partners, organized as a limited liability company under the laws of Delaware, which had its principal place of business at 2255 Glades Road, Suite 100E, Boca Raton, Florida 33431.  SuttonPark is a wholesale aggregator and servicer of structured settlements with an expertise in sourcing, underwriting, structuring, and servicing of structured settlements, annuities and lotteries, which are considered to be esoteric investment grade assets.

<u>**Defendants**</u>

9.      Defendant Leadenhall Capital is a London-based asset management company which focuses on granting institutional investors access to insurance-related risks. Leadenhall

-4-

Capital is organized as a limited liability partnership under the laws of England and maintains its principal place of business in London, England at Level 15, 70 Mark Lane, London EC3R 7NQ.

10.     Plaintiff Leadenhall Life Insurance Linked Investment Fund PLC is an investment company organized as a public limited company under the laws of Ireland and maintains its principal place of business in Dublin, Ireland.

11.     Defendant Saiph is a consulting firm organized as a limited liability company under the laws of Delaware, which has its principal place of business at 1615 S. Congress Avenue, Suite 103, Delray Beach, Florida 33445. Saiph was formed and is managed by former SuttonPark senior executive Kosinski. According to its website, Saiph offers "bespoke financial, operational and advisory solutions," including "Audit Guidance."

12.     Defendant Kosinski was formerly a senior executive at SuttonPark, and is the founder and managing member of Saiph, and his last known address is 17029 Newport Club Drive, Boca Raton, Florida 33496.

13.     Defendant Davis resides in Boca Raton, Florida and was the head of IT for 777 Partners until he resigned in April 2024. Davis was subsequently hired by Saiph and was employed or contracted to provide services at all relevant times. Upon information and belief, Davis was an architect of the MP Fin System, the primary data system used for servicing by SuttonPark.

## JURISDICTION AND VENUE

14.     This Court has federal question jurisdiction under 28 U.S.C. § 1331 because Plaintiff asserts claims arising under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, and the Stored Communications Act, 18 U.S.C. § 2701. This Court also has supplemental jurisdiction over Plaintiffs' related state-law claims under 28 U.S.C. § 1367.

SGR/71972169.4

15.     This Court has personal jurisdiction over Defendants Saiph, Kosinski, and Davis because they are domiciled in Florida.

16.     This Court has personal jurisdiction over Leadenhall because Leadenhall engaged the services of Saiph, whose principal place of business is in Florida, and those services were to be rendered within the state of Florida. Further, this Court has personal jurisdiction over Leadenhall under Florida's long-arm statute, because Leadenhall, as alleged herein, in its own right and through its agents Saiph, Kosinski, and Davis, committed tortious acts within the state.

17.     Venue is proper under 28 U.S.C. § 1391(b)(2) because the substantial part of the events giving rise to the claims occurred and the property that is the subject of this action are situated in the district.

## FACTUAL BACKGROUND

18.     On May 3, 2024, Leadenhall filed the Leadenhall Litigation in the U.S. District Court for the Southern District of New York, accusing 777 Partners, its former principals, and others of breach of contract and fraud in connection with a secured credit facility provided by Leadenhall to 777 Partners. *Leadenhall Capital Partners LLP, et ano. v. Wander, et al.*, 24 Civ. 3453 (JGK) (S.D.N.Y.).

19.     Beginning with the allegations contained in its original complaint through the date of this amended complaint, Leadenhall has been overly aggressive as to Plaintiffs and their affiliates.

20.     By way of example, while the loans as to which Leadenhall asserts claims of double pledging involved two of four borrowers in the SuttonPark business unit, Leadenhall declared the other two borrowers' loans in default and is now seeking RICO treble damages for the full amount of the borrowings under those loans.

21.     Leadenhall moved for preliminary injunctive relief so broad that it would have frozen the assets of all worldwide affiliates of Plaintiffs, *i.e.*, dozens of operating companies, employing thousands of people on at least four continents.

22.     Prior to May 3, 2024, in connection with these asserted contractual rights, Leadenhall proposed to engage Saiph and its founder, Kosinski, as its agents to perform certain audits of SuttonPark. Concerned that Kosinski was a former senior executive of SuttonPark who had solicited SuttonPark's employees to join a competitor, Plaintiffs forcefully objected to this proposed engagement. In its complaint in the Leadenhall Litigation, Leadenhall asserted that these objections by Plaintiffs were baseless and intended to prevent the uncovering of the fraud Leadenhall has alleged. However, subsequent events would later demonstrate that Plaintiffs' initial impression was the right one, and their concerns justified.

23.     In early May 2024, 777 Partners retained the services of professionals employed with B. Riley Advisory Services to assist it with efforts to restructure the various aspects of its business including Ian Ratner ("Ratner"), Mark Shapiro ("Shapiro") and Jim Howard ("Howard").

24.     Ratner was appointed as a manager of the holding companies, including 777 Partners.

25.     Shapiro was appointed as chief operating officer of the holding companies.

26.     Howard was installed as an independent monitor for the SuttonPark portion of the business.

27.     In mid-May 2024, a representative of Leadenhall reached out to Ratner to discuss Leadenhall's claimed contractual rights under the credit facility entitling it to certain access to SuttonPark's systems to review and audit the collateral pledged by SuttonPark and its affiliates to secure the credit facility.

SGR/71972169.4

28.     In a Sunday, May 19, 2024 letter to Howard, Leadenhall again proposed to engage Saiph's founder, Kosinski, as its representative to perform audits in connection with its asserted contractual rights.

29.     Management of SuttonPark again objected to this proposed engagement due to concerns about having Kosinski perform the audit and encouraged Ratner, Shapiro and Howard to reject the proposal.

30.     Nevertheless, due to the insistence of Leadenhall, and based on assurances that the review of documents would be strictly limited to those directly pertaining to Leadenhall's collateral, the B. Riley professionals eventually relented.

31.     Plaintiffs thus provided Saiph, as Leadenhall's agent, with network credentials allowing limited access to SuttonPark's systems for the limited purpose of a collateral audit.

32.     Importantly, such credentials were only provided to, and for the use of Kosinski, not Davis—and authorized access was limited to the particular database detailing Leadenhall's collateral within MP Fin. MP Fin is the proprietary application used by SuttonPark to manage receivables and other assets securing loans from various lenders as well as receivables owned by third party clients and serviced by SuttonPark on a fee basis but unrelated to Plaintiffs or any of its lenders. Critically, the MP Fin files contain Personal Identifiable Information ("PII") data belonging to various customers and clients of Plaintiffs.

33.     Kosinski began the audit of Leadenhall's collateral catalogued in MP Fin on or about May 28, 2024.

34.     Leadenhall, however, was not satisfied with having Saiph and Kosinski audit its collateral and began demanding additional information from Plaintiffs to which Leadenhall had no contractual entitlement.

SGR/71972169.4

35.     On June 21, 2024, Phil Kane, Principal Trading, Senior Credit Officer for Leadenhall, emailed Shapiro and Howard claiming entitlement pursuant to a Loan and Security Agreement to information about deals and affiliates of 777 Partners that were not involved in the SuttonPark side of the business, the loans advanced by Leadenhall that are the subject of the Leadenhall Litigation including information about Brickell PC Insurance Holdings LLC and Sutton National Insurance Company (both of which are in the Brickell Insurance Group).

36.     Additionally, Leadenhall began to inappropriately demand information relating to collateral that had been pledged to other lenders, which information Plaintiffs refused to provide.

37.     Davis, upon information and belief at the behest of or for the benefit of his employer's client, Leadenhall, used his extensive knowledge of Plaintiffs' systems and its practices and procedures, gained during his time as head of IT for 777 Partners, as well as his prior 777 Partners' access credentials (which he was no longer entitled to use following his resignation from 777 Partners), to gain extensive and unauthorized access into 777 Partners' systems on multiple occasions. However, because of this knowledge, and because of the system authority Davis was able to access and grant himself during these illegal intrusions, it is likely that these are not the only instances in which Davis improperly accessed Plaintiffs' systems. Similarly, Plaintiffs are as yet unsure of the full extent of Davis's activities during any such intrusions, including copying and/or altering important commercial data.

38.     Moreover, all of the systems and information belonging to Plaintiffs that Davis accessed (some of which was likely altered) would clearly be considered by Leadenhall as useful in prosecuting the Leadenhall Litigation against Plaintiffs.

39.     On June 28, 2024, Davis utilized his former 777 Partners' email address and password (login credentials) to access a security appliance that monitors all of the 777 Partners'

SGR/71972169.4

computer systems. Accessing this system allowed Davis full access, via a backdoor, to the web server that runs the front end of the MP Fin system.

40.     In the days following Davis's initial improper access to Plaintiffs' systems, several significant events occurred.

41.     On July 2, 2024, Plaintiffs acquiesced to Saiph's request and issued a second set of credentials to Saiph for use by Lauren Boersig, not Davis.

42.     On July 3, 2024, Roger Schwartz, an attorney representing Leadenhall, claimed that Saiph needed additional information from SuttonPark to validate the remaining/existing collateral with respect to Leadenhall's lending arrangement.

43.     Also on July 3, 2024, Schwartz requested "Updates and information related to 777 Re visibility" under the heading "Brickell." 777 Re referred to 777 Re LTD, an affiliate of 777 Partners, in the reinsurance business that was part of the Brickell Insurance Group.

44.     777 Partners refused to provide this information to Leadenhall, as it had no relationship to Leadenhall's collateral that was being audited and Leadenhall had no contractual right to it.

45.     Next, on July 7, 2024, Davis, without permission or authorization, again utilized his former credentials to remotely access the laptops assigned to two individuals, beginning with Mr. Pasko.

46.     During this intrusion, Davis specifically targeted Mr. Pasko's "Microsoft Outlook" folder and a file in it named "spasko@777part.com.ost".

47.     777 Partners utilizes Outlook 365, a cloud-based email system. An .OST file, which stands for "offline storage table," is a synchronized, archived copy of a users' entire mailbox, including all sent items and received emails, drafts, calendars, and folders containing emails,

-10-

automatically created by Outlook 365 on the user's hard drive. When online, Outlook 365 constantly updates the .OST with archived copies of the emails being sent or received through Outlook 365. When a user is not connected to the internet, Outlook 365 accesses the archived mailbox items saved in the .OST file.

48.    Davis successfully saved a copy of the spasko@777part.com.ost file to another folder on Mr. Pasko's laptop.

49.    Davis then entered instructions to transfer a copy of that .OST file to a remote computer that, upon information and belief, was under his control.

50.    Davis's session remained active for approximately 18 minutes after he entered the command to make a remote copy of spasko@777part.com.ost.

51.    Upon information and belief, during those 18 minutes Davis obtained some or all of the spasko@777part.com.ost file including stored electronic communications contained therein.

52.    There is no apparent reason for Davis to have accessed and obtained a copy of the .OST file for Mr. Pasko's Outlook 365 account other than to gather information that would be useful to Leadenhall in the Leadenhall Litigation.

53.    Davis then also accessed the laptop of Jennifer Logee, the chief compliance officer of the Brickell Insurance Group, who handles contract compliance with respect to asset purchases and dispositions. Ms. Logee had also performed work related to 777 Re, the company about which Leadenhall demanded "visibility" just four days earlier.

54.    During this intrusion, Davis accessed the directory of files contained on Ms. Logee's laptop, as well as certain specific file folders on the laptop.

SGR/71972169.4

55.     Davis also accessed the One Drive-based storage account assigned to Ms. Logee in which he obtained information about the matters on which Ms. Logee had worked and documents saved to folders in One Drive.

56.     Notably, through this access to Ms. Logee's individual laptop, Davis also exploited his knowledge of Plaintiffs' computer systems and their vulnerabilities to gain access to 777 Partners' entire network environment.

57.     These intrusions on July 7th into laptops occurred only one day before an important hearing was held in the Leadenhall Litigation.

58.     Between August 2, 2024 and August 9, 2024, someone using the credentials assigned to Saiph for use by Lauren Boersig accessed the MP Fin System on scores of occasions. User logs reflect that information was altered by either "updates" or "inserts" to the data stored on the MP Fin system adversely affecting the useability, reliability and integrity of such data.

59.     On August 7, 2024, in an email to Kosinski on which Davis was copied at the address "ndavis@saiphllc.com", Plaintiffs' current head of IT warned Kosinski "You shouldn't be sharing credentials with others."

60.     On August 9, 2024, Davis again improperly accessed a variety of Plaintiffs' systems, wrongfully using his former 777 Partners' credentials.

61.     First, Davis once more accessed the front end of the MP Fin system, viewing and seemingly editing data residing in the system.

62.     Second, Davis accessed the web server that runs the back-end database of the MP Fin System.

63.     Third, Davis twice accessed the virtual network of a 777 Partners subsidiary.

64. Fourth, Davis accessed a file server containing accounting and executive data belonging to 777 Partners and several of its affiliated companies.

65. Fifth, Davis accessed the computer records of a former 777 Partners' affiliate to access a SAP database that contained financial data unrelated to Leadenhall's collateral audit.

66. During each of these August 9th intrusions, Davis further set up local administrator accounts in each of these systems, giving him administrator level control over the systems.

67. Davis also accessed the MP Fin system using the credentials that had been provided to Saiph solely for Ms. Boersig's use in accessing SuttonPark's systems. Davis' unauthorized access is confirmed by reference to the IP address affiliated with the intrusion. The IP address was routed to an area in Boca Raton, Florida, where Davis is known to work and reside. If Ms. Boersig was using her own credentials, the IP address would have reflected an address in New York where she is known to work and reside.

68. One of these August 9, 2024 intrusions caused a system alert, which 777 Partners' current head of IT received, notifying him of suspicious activity and access into the network, and he immediately confronted Davis, who falsely denied his involvement.

69. Accordingly, Plaintiffs engaged a forensic cyber investigator and began an investigation into this suspicious activity. That investigation then uncovered the unauthorized and improper intrusions previously alleged, as well as digital forensic evidence firmly supporting the conclusion that these intrusions were attributable to Saiph, including at least one use of Ms. Boersig's credentials on August 9, 2024:

- For all but the intrusions involving Ms. Boersig's credentials, access credentials issued to Davis during his employment with 777 Partners were utilized.

-13-

- After logging in with Davis's credentials, two-factor authentication was necessary in order to access the systems, which in each case involved a text message being sent to a cellular telephone registered to Davis.

- The remote access application used to perpetuate these intrusions would require specific and detailed knowledge of the Plaintiffs' systems and related software, such as that possessed by Davis.

- The first intrusion on June 28 came from the same IP address and IP address location used by Davis to log in when working from home while an employee of 777 Partners, and subsequent intrusions were made from IP addresses located where Davis is known to reside and work.

- The intrusion utilizing Ms. Boersig's credentials is attributable to Davis because it came from the same IP address and location used in connection with several of the prior intrusions that utilized Davis's credentials and cellular telephone for two-factor authentication, whereas Ms. Boersig is known to reside and work in a different region of the country.

70.     As of September 30, 2024, Plaintiffs had incurred approximately $56,000 in fees for the forensic investigation.

71.     In addition to the forensic investigation, Shawn Taheri, Plaintiffs' current head of IT, has devoted dozens of hours addressing Defendants' unauthorized intrusions into Plaintiffs' networks.

72.     By letters dated August 20, 2024 and August 30, 2024, Plaintiffs' counsel notified Leadenhall and Saiph respectively about the illegal intrusion by a Saiph employee into Plaintiffs' network.

73.     On August 23, 2024, Leadenhall's counsel wrote in response:

Indeed, a restriction requiring two individuals to audit thousands of collateral files and all financial records associated with the Borrower's business without help from a team would frustrate Leadenhall's ability to conduct such an audit. ... If your clients would prefer to provide separate credentials for every member of the Saiph team working on the audit, please see that they do so promptly so that Saiph can continue its work.

Based on the information you have provided, there is no indication that Saiph's access to your clients' systems was unauthorized, and your clients' continued efforts to obstruct Leadenhall's ability to conduct the

-14-

audit constitute an independent breach of their obligations under the [credit facility], with respect to which Leadenhall reserves all rights and remedies. In the absence of any evidence to the contrary, **Leadenhall does not intend to designate a different agent to conduct its audit, and we will take the appropriate actions to enforce Leadenhall's right to have Saiph complete its work**.

(Emphasis added.)

74.     Curiously, while Leadenhall was demanding that access be restored in August 2024, it now claims that the vast majority of the records that Saiph needed for the audit were collected by June 21, 2024. Leadenhall has not explained or attempted to justify why it insisted on Saiph's access to Plaintiffs' systems when the information for the authorized audit had been already obtained months earlier.

75.     Not content with merely virtually breaking into Plaintiffs' computer systems, on September 5, 2024, Davis illegally entered SuttonPark's offices to engage in further criminal misconduct. Surveillance footage from that night shows that after entering the offices, Davis went to the office of a former executive whom he knew possessed physical keys for various locks throughout SuttonPark's offices where he retrieved keys including the key to Taheri's desk.

76.     On other footage Davis can be seen filling the two large bags with what is now known to be laptops belonging to SuttonPark, before departing with the stolen laptops and other equipment.

77.     Certain screenshots from this footage showing Davis in SuttonPark's offices with a duffle bag, using a key to enter the server room and leaving that room with computer equipment (namely a laptop docking station) are reproduced below:

SGR/71972169.4







SGR/71972169.4



78.     Davis can also be seen in video footage searching under and around desks.  Upon

information and belief, he was trying to find additional laptop docking stations to take.



SGR/71972169.4

79.     During this time Davis also attempted to disrupt the internet connection needed for the security cameras to record, but only ended up disabling camera 6 and was unsuccessful as to six other cameras.

80.     Moreover, on September 11, 2024, Saiph sent correspondence to counsel for Plaintiffs, acknowledging in writing that Davis had entered SuttonPark's offices and had taken equipment from the premises.

81.     Intriguingly, and perhaps in an effort to obscure the involvement of Leadenhall in the alleged misconduct it had inadvertently revealed, Saiph's initial letter to this effect referenced Leadenhall in the subject line, before being substituted by a second such letter that was identical to first, but for the removal of the reference to Leadenhall.

82.     Leadenhall has since claimed that Davis's actions resulted from his anger over a payment dispute with Plaintiffs.

83.     Upon information and belief, no one at Plaintiffs or their affiliates is aware of any alleged payment dispute with Davis.

84.     In the months that Ratner, Shapiro and Howard have been in control of Plaintiffs' business operations, they have not received any communication from Davis or anyone acting on his behalf concerning an alleged payment dispute.

85.     On November 4, 2024, Saiph and Kosinski advised that they were in possession of files belonging to Plaintiffs that they located on devices that Davis had used while working with Saiph.

86.     It appears from the naming protocol utilized that the files in Saiph's and Kosinski's possession include back-up files of the Plaintiffs' entire MP Fin system consisting of tens of thousands of receivables that were owned and/or serviced by SuttonPark affiliates.

-18-

87.     These files are proprietary, confidential, contain PPI, and are beyond the scope of any information needed by Defendants to conduct the Leadenhall audit but contain information that Plaintiffs refused to provide to Leadenhall.

88.     Accordingly, it is reasonable to infer that Davis, Kosinski and/or Saiph provided these files to Leadenhall to provide it an advantage in the Leadenhall Litigation, pending in the SDNY.

89.     Upon information and belief, these files were obtained by Davis using credentials he was not authorized to use.

90.     On the first business day of each month, one of Plaintiffs' employees manually creates a Zip file containing a back-up copy of the entire MP Fin system for the preceding month.

91.     The naming protocol for this file is "YYYYMM-MPFin", with the MM being the numerical representation of the preceding month.

92.     The only electronic files relating to collateral not included in this Zip file are the underlying documents for the individual transactions that are summarized in the MP Fin system database.

93.     Once created, the Zip file is manually uploaded to an FTP site to satisfy contractual requirements so that a backup servicer has current data to take over servicing if necessary.

94.     Two of the files that have been identified by Saiph and Kosinski as belonging to Plaintiffs are named 202405-MPFin.zip and 202408-MPFin.zip.

95.     While Plaintiffs have not seen the contents of those files yet, Plaintiffs believe that they are the backup files containing all of the MP Fin data as of May 31, 2024 and August 31, 2024 respectively.

SGR/71972169.4

96.     Davis and/or Saiph could have only obtained such files from Plaintiffs' network or the FTP site, neither of which they were authorized to access.

97.     The file named 202405-MPFin.zip has a created date of 8/22/2024, which appears to be the date that Davis downloaded it onto the Saiph computer on which it was "discovered", and it was apparently located in a folder called "\Users\NDavis\Saiph, LLC\Saiph Holdco - Documents\Information Technology\Clear\SQL DB\".

98.     The file named 202408-MPFin.zip was located in "\Work\OldFinServ\" and was created, last modified and last accessed on September 5, 2024, according to the data provided to Plaintiffs by Saiph.

99.     Based on: (i) Leadenhall's aggressive actions and litigation tactics against Plaintiffs and their affiliates in the Leadenhall Litigation; (ii) the targeted access to and instructions to transfer the Outlook 365 file saved on Mr. Pasko's laptop; (iii) the targeting of Logee's laptop and One Drive where information being sought by Leadenhall was likely to have been saved; (iv) the timing of at least one intrusion in occurring just prior to an important hearing in the Leadenhall Litigation; (v) Leadenhall's insistence on retaining Saiph specifically, which possessed significant proprietary knowledge about Plaintiffs' operations and computer systems, through its founder, Kosinski, and employee, in spite of Plaintiffs' vigorous objections; (vi) the agency relationships between Leadenhall and Saiph, Kosinski, and Davis; (vii) Leadenhall's inconsistent claims about when Saiph had finished collecting information on its behalf; (viii) the claim concerning a non-existent payment dispute; and (ix) Saiph's inadvertent acknowledgment of Leadenhall's relationship to these intrusions, it is reasonable to infer that the actions of Saiph and Davis were known to and directed by Leadenhall and were intended to benefit it in the Leadenhall Litigation.

SGR/71972169.4

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### (Computer Fraud and Abuse Act, 18 U.S.C. § 1030, Against All Defendants)

100.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 99 with the same force and effect as if fully set forth herein.

101.    On repeated occasions, Davis intentionally accessed Plaintiffs' computer systems, which are used in interstate commerce, without permission or authority to do so.

102.    In the course of this access, Davis, Kosinksi, and/or Saiph obtained and altered extensive confidential and proprietary data that is contained in these computer systems.

103.    It is reasonable to infer that Davis, Kosinski, and Saiph provided the information from Plaintiffs' systems to Leadenhall.

104.    As a result of this unauthorized access, Plaintiffs have suffered losses aggregating at least $55,000 in value during a one-year period, including in personnel resources, and the cost of engaging professional third parties in connection with the investigation and remediation of the consequences of these intrusions.

105.    Saiph and Kosinski are liable on this claim because, upon information and belief, they implicitly or explicitly directed, encouraged, induced, benefitted from and/or conspired with Davis and, alternatively, are liable for the actions of their employee/agent Davis, pursuant to the doctrine of respondeat superior.

106.    Leadenhall is liable on this claim because, upon information and belief, it directed, encouraged, induced, and/or conspired with Saiph, Kosinski, and/or Davis, or attempted to do so, and, alternatively, is liable for the actions of its agents Saiph, Kosinski and/or Davis, because accessing and reviewing Plaintiffs' computer systems is within the scope of Saiph's responsibilities and authority from Leadenhall, and because these intrusions were made with the

SGR/71972169.4

knowledge of and for the benefit of Leadenhall. Indeed, the facts and surrounding circumstances strongly suggest that the misconduct was done at Leadenhall's direction.

107.    By reason of the foregoing, Plaintiffs have suffered damages, including those caused by Defendants' unauthorized alterations to Plaintiffs' systems, including the "updates" or "inserts" to data stored on Plaintiffs' MP Fin system, which has adversely affected the useability, reliability and integrity of Plaintiffs' systems for which all Defendants are liable, in an amount to be proven at trial (but in no event less than $55,000), plus interest, attorneys' fees, and costs as appropriate.

108.    By reason of the foregoing, Defendants have violated Sections 1030(a)(2)(C), (a)(5)(C) and (b) of the CFAA.

## SECOND CLAIM FOR RELIEF
### (Conversion Against All Defendants)

109.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 99 with the same force and effect as if fully set forth herein.

110.    Davis interfered with Plaintiffs' possession and dominion over their property by: (i) intentionally and without permission accessing Plaintiffs' computer systems to obtain and alter Plaintiffs' confidential and proprietary business records and other information; and (ii) intentionally taking certain laptops containing confidential and proprietary information owned by Plaintiffs without their permission.

111.    By reason of the foregoing, Davis, intentionally and without authority, assumed or exercised control over Plaintiffs' property, in derogation of Plaintiffs' possessory rights or interest in their property.

112.    Saiph and Kosinski are liable on this claim for the actions of their employee/agent Davis, pursuant to the doctrine of respondeat superior.

SGR/71972169.4

113.    Leadenhall is liable on this claim for the actions of its agents, Saiph, Kosinski, and Davis, because, upon information and belief, the misconduct was committed with the knowledge of and at the behest of Leadenhall.

114.    By reason of the foregoing, Plaintiffs have suffered damages for which all defendants are liable, in an amount to be proven at trial.

### THIRD CLAIM FOR RELIEF
### (Replevin Against Davis, Saiph and Kosinski)

115.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 99 with the same force and effect as if fully set forth herein.

116.    Davis has wrongfully detained Plaintiffs' property by intentionally taking certain laptops and data owned by Plaintiffs without their permission.

117.    The value of the wrongfully detained computer equipment is at least $5,600 and is likely being held by Davis at his residence or Saiph's offices.

118.    Plaintiffs are the proper owners of the property. The property has not been taken for any tax, assessment, or fine pursuant to law. Nor has the property been taken under an execution or attachment against Plaintiffs' property.

119.    Upon information and belief, Saiph and Kosinski are liable on this claim for the actions of their employee Davis, pursuant to the doctrine of respondeat superior.

### FOURTH CLAIM FOR RELIEF
### (Trespass to Chattels Against All Defendants)

120.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 99 with the same force and effect as if fully set forth herein.

121.    Davis interfered with Plaintiffs' use and enjoyment of their property by intentionally taking certain laptops owned by Plaintiffs without their permission.

SGR/71972169.4

122.     By reason of the foregoing, Davis, intentionally and without justification or consent, physically interfered with Plaintiffs' use of their property, caused harm to the physical condition, quality, or value of the property, and deprived Plaintiffs' of the use of their property for a substantial time.

123.     Saiph and Kosinski are liable on this claim for the actions of their employee Davis, pursuant to the doctrine of respondeat superior.

124.     Leadenhall is liable on this claim for the actions of its agents, Saiph, Kosinski, and Davis, because, upon information and belief, the misconduct was committed with the knowledge of and at the behest of Leadenhall.

125.     By reason of the foregoing, Plaintiffs have suffered damages for which all Defendants are liable, in an amount to be proven at trial, plus interest, and costs as appropriate, as well as additional equitable and injunctive relief as set forth below.

### FIFTH CLAIM FOR RELIEF
### (Civil Conspiracy Against All Defendants)

126.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 99 with the same force and effect as if fully set forth herein.

127.     Saiph, Kosinski, and their employee, Davis, are the agents of Leadenhall, and as such are directed by, and act with the knowledge of its principal in connection with its consulting services related to Plaintiffs.

128.     Accordingly, Defendants willfully, intentionally, and knowingly agreed to further a shared plan, which included gaining unauthorized access to Plaintiffs' computer systems.

129.     Upon information and belief, each of the Defendants actively participated in the shared civil conspiracy as described above, and therefore each Defendant is responsible for each tortious and otherwise unlawful action of any co-conspirator – in particular, the actions of Davis

SGR/71972169.4

in unlawfully accessing Plaintiffs' computer systems without authority or permission, and in stealing laptop computers from SuttonPark's offices.

130.    By reason of the foregoing, Plaintiffs have suffered damages for which all Defendants are liable, in an amount to be proven at trial, plus interest, and costs as appropriate, as well as additional equitable and injunctive relief as set forth below.

**SIXTH CLAIM FOR RELIEF**
**(Aiding and Abetting Against Defendants Leadenhall, Saiph, and Kosinski)**

131.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 99 with the same force and effect as if fully set forth herein.

132.    As previously alleged, Davis perpetrated a variety of torts against Plaintiffs.

133.    Upon information and belief, Leadenhall substantially assisted Davis's tortious conduct by engaging him and his employer, Saiph, to perform the collateral audit, without which Saiph, and by extension Davis, would not have had access to the log in credentials for SuttonPark's systems, which were provided to Leadenhall pursuant to its purported audit rights. Moreover, the facts and circumstances strongly indicate that Leadenhall directed the actions of Davis.

134.    Saiph and Kosinski substantially assisted Davis's tortious conduct by providing him with the log in credentials they had received from SuttonPark, allowing him to access SuttonPark's systems.

135.    Upon information and belief, at all relevant times, Leadenhall and Saiph were aware of their roles in enabling Davis's tortious conduct.

136.    By reason of the foregoing, Plaintiffs have suffered damages for which Leadenhall, Saiph, and Kosinski are liable, in an amount to be proven at trial, plus interest, and costs as appropriate, as well as additional equitable and injunctive relief as set forth below.

SGR/71972169.4

## SEVENTH CLAIM FOR RELIEF
### (Florida Computer Abuse and Data Recovery Act, §668.801, et seq., Fla. Stat. (2024), Against All Defendants)

137.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 99 with the same force and effect as if fully set forth herein.

138.    On repeated occasions, Davis intentionally accessed Plaintiffs' computer systems, which are protected by passwords and other security measures intended to restrict access, without the authority to do so.

139.    Upon information and belief, in the course of this access, Davis obtained extensive confidential and proprietary data belonging to Plaintiffs that is contained in these computer systems.

140.    As a result of this unauthorized access, Plaintiffs have or will have to expend tens of thousands of dollars in investigating and remediating the consequences of these intrusions.

141.    Saiph and Kosinski are liable on this claim because, upon information and belief, they directed, encouraged and/or induced Davis and, alternatively, are liable for the actions of their employee Davis, pursuant to the doctrine of respondeat superior.

142.    Leadenhall is liable on this claim because, upon information and belief, it directed, encouraged and/or induced Saiph, Kosinski, and/ or Davis and, alternatively, is liable for the actions of its agents, Saiph, Kosinski, and Davis, because accessing and reviewing Plaintiffs' computer systems is within the scope of Saiph's responsibilities and authority from Leadenhall, and because these intrusions were made with the knowledge of and at the behest of Leadenhall. Indeed, the facts and surrounding circumstances strongly suggest that the misconduct was done at Leadenhall's direction.

SGR/71972169.4

143. By reason of the foregoing, Plaintiffs have suffered damages for which all Defendants are liable, in an amount to be proven at trial, plus interest, attorneys' fees, and costs as appropriate, as well as additional equitable and injunctive relief as set forth below.

### EIGHTH CLAIM FOR RELIEF
### (Stored Communications Act, 18 U.S.C. § 2701, et seq., Against All Defendants)

144. Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 99 with the same force and effect as if fully set forth herein.

145. On July 7, 2024, Davis intentionally accessed and attempted to copy and/or transfer information in an archive file created by Outlook 365 on Mr. Pasko's laptop, a facility through which an electronic communication service is provided, without authorization to do so.

146. Upon information and belief, in the course of this access, Davis obtained the electronic communications of Mr. Pasko while in electronic storage in spasko@777part.com.ost.

147. As a result of this unauthorized access, Plaintiffs have or will have to expend tens of thousands of dollars in investigating and remediating the consequences of this intrusion.

148. Saiph and Kosinski are liable on this claim because, upon information and belief, they directed, encouraged and/or induced Davis and, alternatively, are liable for the actions of their employee Davis, pursuant to the doctrine of respondeat superior.

149. Leadenhall is liable on this claim because, upon information and belief, it directed, encouraged and/or induced Saiph, Kosinski, and/ or Davis and, alternatively, is liable for the actions of its agents, Saiph, Kosinski, and Davis, because accessing and reviewing Plaintiffs' computer systems is within the scope of Saiph's responsibilities and authority from Leadenhall, and because these intrusions were made with the knowledge of and at the behest of Leadenhall. Indeed, the facts and surrounding circumstances strongly suggest that the misconduct was done at Leadenhall's direction.

SGR/71972169.4

150.   By reason of the foregoing, Plaintiffs have suffered damages for which all Defendants are liable, in an amount to be proven at trial, plus interest, attorneys' fees, and costs as appropriate, as well as additional equitable and injunctive relief as set forth below.

## **PRAYER FOR RELIEF**

151.   Plaintiffs pray for the following relief:

a)   An award of compensatory damages caused by, *inter alia*, Defendants alterations to Plaintiffs' systems and data in an amount to be determined but in no event less than $55,000;

b)   An award against Defendants for the losses Plaintiffs have or will have to expend for investigating and remediating the consequences of Defendants' unauthorized intrusions in an amount to be determined but in no event less than $55,000;

c)   An order mandating that Defendants return the stolen laptops, data and information taken from Plaintiffs;

d)   A writ of replevin to recover the stolen laptops, data and information;

e)   An award of pre-judgment and post-judgment interest;

f)   An award of all reasonable fees, costs, and expenses, including attorneys' fees;

g)   Punitive damages in an amount to be determined at trial;

h)   Preliminary and permanent injunctive relief to prevent Defendants from continuing to possess, access, use or disseminate data and information misappropriated from Plaintiffs; and

i)   An award of such other and further relief as the Court deems just and proper.

SGR/71972169.4

## <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiffs demand a trial by jury of all claims so triable.

Dated: November 14, 2024

Respectfully submitted,

SMITH, GAMBRELL & RUSSELL, LLP

_____

John G. McCarthy (admitted *pro hac vice*)
David A. Pellegrino (admitted *pro hac vice*)
1301 Avenue of the Americas, 21st Floor
New York, New York 10019
Telephone: (212) 907-9700
Facsimile: (212) 907-9800
Primary Email: Jmccarthy@sgrlaw.com
Primary Email: Dpellegrino@sgrlaw.com

*Attorneys for Plaintiffs 777 Partners LLC and
SuttonPark Capital LLC*

- and –

GUNSTER YOAKLEY & STEWART P.A.

George Lemieux
Florida Bar No. 16403
Brian M. McPherson
Florida Bar No. 735541
777 S. Flagler Dr.
East Tower, Suite 500
West Palm Beach, FL33401
Telephone: (561) 655-1980
Facsimile: (561) 655-5677
Primary Email: Glemieux@gunster.com
Primary Email: Bmcpherson@gunster.com

SGR/71972169.4