**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

**Case No. 24-81143-CIV-DMM**

777 PARTNERS LLC and SUTTONPARK
CAPITAL LLC,

                  Plaintiffs,

     v.

LEADENHALL CAPITAL PARTNERS LLP,
LEADENHALL LIFE INSURANCE
LINKED INVESTMENTS FUND PLC,
NOAH DAVIS, SAIPH CONSULTING LLC,
and PAUL KOSINSKI,

                  Defendants.

**DEFENDANTS LEADENHALL CAPITAL PARTNERS LLP AND**
**LEADENHALL LIFE INSURANCE LINKED INVESTMENTS FUND PLC'S**
**MOTION TO DISMISS AND INCORPORATED MEMORANDUM OF LAW**

Pursuant to Rules 12(b)(2) and 12(b)(6) of the Federal Rules of Civil Procedure, Defendants Leadenhall Capital Partners LLP ("Leadenhall Capital") and Leadenhall Life Insurance Linked Investments Fund PLC ("Leadenhall Life," together with Leadenhall Capital, "Leadenhall") hereby move to dismiss Plaintiffs' Amended Complaint ("AC") with prejudice.

## INTRODUCTION

Plaintiffs[1] seek to hold Leadenhall liable for the acts of Plaintiffs' former employee, Noah Davis, based solely on speculation. The inferences Plaintiffs ask the Court to draw are neither reasonable nor based on well-pled facts: Plaintiffs allege no interactions or communications, no exchange of information, and no employment, agency, or other arrangement between Davis and Leadenhall. Rather, they ask the Court to *assume* some connection between Davis and Leadenhall based on Leadenhall's prosecution of, and lawful pursuit of information from, Plaintiffs in a RICO and fraud litigation in the Southern District of New York, arising from Plaintiffs' scheme to induce Leadenhall to loan them hundreds of millions of dollars on the false pretense that the investment would be secured by collateral. While Plaintiffs refer to Leadenhall's "explosive" allegations in the RICO Action, AC ¶ 1, they omit that they have *admitted* the conduct alleged: double-pledging or failing to own the collateral purportedly securing Leadenhall's investment. Plaintiffs also omit that the New York court has entered a preliminary injunction to prevent the 777 Entities from dissipating assets—reflecting a likelihood that Leadenhall will succeed on the merits.

The frivolous claims Plaintiffs assert here stem from Leadenhall's exercise of its contractual right to audit the collateral Plaintiffs pledged to it. Leadenhall designated Saiph Consulting LLC ("Saiph") as its representative to conduct that audit, and Plaintiffs are well aware that Saiph's work on Leadenhall's behalf was properly limited to examining the relevant collateral. Plaintiffs contend that Davis' alleged unauthorized access to their systems *must have been* at Leadenhall's behest because Davis did (unrelated) work for Saiph and "all of the systems and information" Davis accessed—which they do not describe at all—"would clearly be considered by Leadenhall as useful in prosecuting the [RICO Action]." *Id.* ¶ 38. Plaintiffs have no good-faith basis to allege that Leadenhall was aware of, let alone directed, Davis' alleged acts. In fact, the

---

[1] As used herein, "Plaintiffs" or the "777 Entities" means 777 Partners LLC ("777 Partners") and SuttonPark Capital LLC ("SuttonPark"); the "RICO Action" refers to the lawsuit Leadenhall has filed against Plaintiffs and their alleged co-conspirators in New York, captioned *Leadenhall Capital Partners LLP et ano. v. Wander et al.*, No. 24-cv-3453-JGK (S.D.N.Y., filed May 3, 2024).

only evidence in the record—submitted in response to Plaintiffs' Motion for a Preliminary Injunction—squarely contradicts the legal conclusions Plaintiffs assert to rope Leadenhall into this case. Plaintiffs' claims must be dismissed for at least the following reasons:

*First,* this Court lacks personal jurisdiction over Leadenhall. The Leadenhall entities named are based in the United Kingdom and Ireland, have no presence in Florida, and are alleged to have committed no suit-related conduct in Florida. Plaintiffs' attempt to establish jurisdiction over Leadenhall based on the actions of Davis fall flat, as the uncontroverted evidence confirms that Leadenhall had no connection to Davis and was not even aware of his conduct.

*Second*, there is no basis to hold Leadenhall vicariously liable for Davis' unauthorized access to Plaintiffs' systems and offices because Plaintiffs plead no facts establishing an agency relationship or any direction, authorization, or knowledge by Leadenhall of Davis' acts. Plaintiffs' only attempt to do so comes in the form of pointing out coincidences, like "the timing of at least one intrusion that occurred just prior to an important hearing in the [RICO Action]," *id.* ¶ 6, which does not come close to stating a plausible claim against Leadenhall.

*Third*, the only claims against Leadenhall *not* premised explicitly on vicarious liability— "civil conspiracy" and "aiding and abetting"—still rely on Leadenhall's interactions with Davis, which Plaintiffs do not and cannot allege. These claims cannot survive because Plaintiffs plead no facts to support an agreement between Leadenhall and Davis or that Leadenhall "substantially assisted" Davis' wrongdoing. Indeed, Plaintiffs allege no wrongful conduct by Leadenhall at all. All of Plaintiffs' claims against Leadenhall must be dismissed.

## **BACKGROUND**

### I.       **LEADENHALL REVEALS PLAINTIFFS' FRAUD IN THE RICO ACTION.**

In 2021, Plaintiffs entered a secured credit facility with Leadenhall, memorialized in the May 2021 Loan and Security Agreement ("LSA") and other interrelated contracts. *See* AC ¶¶ 18, 27, 35; RICO Action, ECF No. 187, Corrected Am. Compl. ("RICO Compl.") ¶¶ 49–53.[2] As explained more fully in prior briefing, *see* ECF No. 48 at 3–4, the LSA permitted SuttonPark and several other affiliates of 777 Partners to borrow secured debt from Leadenhall-affiliated lenders;

---

[2] This Court "may take judicial notice of public records, such as a pleading filed in another court, because such documents are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." *Navarro v. City of Riviera Beach*, 192 F. Supp. 3d 1353, 1364 (S.D. Fla. 2016) (citation omitted).

those borrowers' obligations were guaranteed by 777 Partners and its affiliate, 600 Partners LLC, *see* RICO Compl. ¶¶ 49–53, 84–87. In September 2022, Leadenhall received an anonymous tip warning that collateral ostensibly securing Leadenhall's loans was pledged to other creditors (*i.e.*, "double-pledged"). *Id.* ¶ 105. Leadenhall investigated and verified the tip—and in March 2023, the 777 Entities admitted they had double-pledged Leadenhall's collateral. *Id.* ¶¶ 12, 106–28. As Leadenhall's RICO Complaint explains, this double-pledging was part of a fraudulent scheme by Plaintiffs and their co-conspirators, including their "senior lender" Advantage Capital Holdings, LLC ("A-CAP"), to extract financing from Leadenhall. *Id.* ¶¶ 163–74, 198–229.

Leadenhall filed the RICO Action on May 3, 2024, asserting claims for breach of contract, fraud, and RICO violations against Plaintiffs, their principals, certain affiliates, and A-CAP. *Id.* ¶¶ 313–417. Recognizing the strength of Leadenhall's allegations, the New York court granted a TRO that was later converted into a preliminary injunction, RICO Action, ECF Nos. 114, 135, 146, observing that "there are substantial allegations supported by detailed allegations in the complaint and supporting affidavits," ECF No. 128, June 7, 2024 Hr'g Tr. 4:3–8, and that Leadenhall possesses written evidence of Plaintiffs' contractual breaches, *see id.* 48:19–22.

## II.   LEADENHALL RETAINS SAIPH TO PERFORM THE COLLATERAL AUDIT.

The LSA grants Leadenhall the right to "conduct audits of the Receivables, the Collateral, and the related books and records and collection systems of [each] Borrower." Ex. 1 (LSA) § 5.02.[3] After learning of Plaintiffs' double-pledge, Leadenhall exercised its right to audit the collateral (the "Collateral Audit") to assess the extent of the collateral shortfall; Leadenhall proposed to engage Saiph—founded by Paul Kosinski—to conduct the Collateral Audit. AC ¶¶ 22, 28. Plaintiffs initially objected to Leadenhall's retention of Saiph because Kosinski was formerly employed by SuttonPark. *Id.* ¶¶ 11–12, 22, 29. These objections were part of Plaintiffs' broader strategy to obstruct Leadenhall's ability to obtain information about its collateral. *See* RICO Compl. ¶¶ 216–18. Leadenhall asserted that the objections were baseless and "intended to prevent the uncovering of the fraud." AC ¶ 22. Consistent with Leadenhall's position, the objections were withdrawn. *Id.* ¶ 30. To facilitate the Collateral Audit, Plaintiffs provided credentials to Saiph and configured those credentials to have access only to a specific database in the "MP Fin" system—

---

[3] The Court can consider the LSA as a document incorporated by reference in the AC because it is both "(1) central to the [Plaintiffs'] claims and (2) undisputed, meaning that its authenticity is not challenged." *Johnson v. City of Atlanta*, 107 F.4th 1292, 1300 (11th Cir. 2024).

the "proprietary application used by SuttonPark to manage receivables and other assets securing loans from various lenders."  *Id.* ¶¶ 31–32. Plaintiffs allege that they originally provided credentials only to Kosinski but later provided credentials to another member of the Saiph team, Lauren Boersig. *Id.* ¶¶ 32, 41. After months of delay by Plaintiffs, the Collateral Audit commenced on May 28, 2024. *Id.* ¶ 33.

Under Leadenhall's Consulting Agreement with Saiph (the "Saiph Agreement"), Saiph acts independently of Leadenhall and not as a Leadenhall employee. Ex. 2 (Saiph Agmt.) §§ I.1, I.4, IV.1.[4] The Saiph Agreement requires Saiph to perform certain analyses of the collateral, including tracing the chain of title from each receivable's origination to placement in Leadenhall's credit facility and preparing a schedule of payments and cash flows for each receivable. *Id.* at 12. Although Plaintiffs concede that Leadenhall specifically sought to retain Saiph's principal, Kosinski, *see* AC ¶¶ 22, 28, 33, their claims hinge on the acts of Noah Davis, the former head of IT for 777 Partners, whom Saiph subsequently "contracted to provide services." *Id.* ¶ 13.

### III.      PLAINTIFFS TRY TO SCAPEGOAT LEADENHALL FOR DAVIS' ACTIONS.

Plaintiffs allege that their former employee, Davis, (1) gained unauthorized electronic access to SuttonPark's computer systems on June 28, July 7, and unspecified dates between August 2–9, 2024, and (2) entered SuttonPark's physical offices without permission on September 5, 2024. *Id.* ¶¶ 39, 45–68, 75–79. Plaintiffs' allegations confirm that nearly every time Davis gained unauthorized access to their systems, he used "his former 777 Partners' . . . credentials"—not credentials provided to him by Saiph. *Id.* ¶¶ 39, 45–68. On September 19, 2024, Davis was arrested for burglary by the Boca Raton Police Department. *See* Ex. 3 (Davis arrest records). The arrest records filed in state court indicate that Davis gained access to SuttonPark's offices "us[ing] an old key Fob" issued by Plaintiffs when he was an employee. *See id.* at 2. The Florida State Attorney has thus far declined to file formal charges against Davis. *See Florida v. Davis*, Case No. 50-2024-CF-007929 (Fla. 15th Cir. Ct.).

Plaintiffs do not allege Leadenhall ever received any information Davis obtained through these alleged incursions. Ignoring Leadenhall's evidence to the contrary, the AC asserts, citing no

---

[4] The Court may consider the Saiph Agreement in support of Leadenhall's Rule 12(b)(2) challenge to personal jurisdiction, *see infra* § I.A, and because it is incorporated by reference in the AC. Leadenhall further notes that this version of the Saiph Agreement is redacted and was previously filed at ECF No. 48-3. The redacted portions of the document are not relevant to this Motion, but Leadenhall is prepared to file an unredacted version if the Court so requests.

4

facts, that "it is reasonable to infer that Davis . . . provided these files to Leadenhall." AC ¶ 88.

## IV.   PROCEDURAL HISTORY

Plaintiffs filed their initial complaint on September 17, 2024, asserting common-law and statutory claims. ECF No. 1 ¶¶ 32–88. Plaintiffs then moved for a preliminary injunction, in response to which Kosinski and Leadenhall submitted sworn declarations attesting to the lack of connection between Davis and Leadenhall. The evidence submitted by Leadenhall, Saiph, and Kosinski establishes that (1) Davis never performed any work for Leadenhall; (2) the Collateral Audit was conducted by other Saiph personnel; (3) the Collateral Audit (and any work product or data Leadenhall received from it) related only to the legitimate scope of the Audit; and (4) Davis acted alone. *See* Ex. 4, Declaration of Craig Gillespie ("Gillespie Decl.");[5] ECF No. 53-1, Declaration of Paul Kosinski ("Kosinski Decl."). Plaintiffs' motion for a preliminary injunction was denied as moot, based on the parties' stipulation, on October 31, 2024. ECF Nos. 55, 57.

On November 14, 2024, with the benefit of this evidence, Plaintiffs filed the AC. As relevant to Leadenhall, the AC differs from the original complaint in three key respects. First, in the AC, Plaintiffs append the words "upon information and belief" to many of their allegations concerning Leadenhall's purported relationship with Davis. *Compare* AC ¶¶ 106, 113, 124, 129, 133, 135, 142, 149, *with* ECF No. 1 ¶¶ 37, 43, 55, 60, 64, 80, 87; *see also* AC ¶ 6 (alleging "it is reasonable to conclude" that Davis' actions were "performed for Leadenhall's benefit"). Second, Plaintiffs drop their fraud claim altogether, *see* ECF No. 1 ¶¶ 68–74, implicitly conceding they lack the facts to state such a claim with particularity. And third, Plaintiffs drop Leadenhall from their Third Claim of Relief for replevin. *Compare* AC ¶¶ 115–19, *with* ECF No. 1 ¶¶ 45–50.

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Phoenix Ent. Partners, LLC v. Casey Rd. Food & Beverage, LLC*, 728 F. App'x 910, 912 (11th Cir. 2018). While courts assume the truth of a plaintiff's factual allegations under Rule 12(b)(6), it need not accept "[c]onclusory allegations, unwarranted deductions of fact or legal conclusions masquerading as facts." *McClain v. Iradimed Corp.*, 111 F. Supp. 3d 1293, 1301 (S.D. Fla. 2015). When a defendant moves to dismiss for lack of personal jurisdiction under Rule 12(b)(2), a court may consider defendant's

---

[5] Leadenhall previously filed the Gillespie Declaration, *see* ECF No. 48-1, but refiles it here as Exhibit 4, omitting its exhibits, for ease of reference.

"affidavits or other competent evidence," and a plaintiff must come forward with "evidence of its own." *Peruyero v. Airbus S.A.S.*, 83 F. Supp. 3d 1283, 1286–87 (S.D. Fla. 2014).

## ARGUMENT

### I.     THIS COURT LACKS PERSONAL JURISDICTION OVER LEADENHALL.

#### A.     Leadenhall Is Not Subject to Jurisdiction Under Florida's Long-Arm Statute, and Exercising Jurisdiction Would Offend Due Process.

A plaintiff seeking the exercise of personal jurisdiction over a nonresident "bears the initial burden" of establishing "a prima facie case of jurisdiction." *Prunty v. Arnold & Itkin LLP*, 753 F. App'x 731, 734 (11th Cir. 2018). "If both Florida law and the United States Constitution permit, the federal district court may exercise jurisdiction over the nonresident defendant." *Pandeosingh v. Am. Med. Response, Inc.*, No. 09-60776, 2009 WL 2780884, at *1 (S.D. Fla. July 8, 2009).

Florida's long-arm statute provides for both specific and personal jurisdiction, but Plaintiffs do not (and cannot) allege that the Court has general jurisdiction over Leadenhall, which exists only where a party's "affiliations with [Florida] are so continuous and systematic as to render it essentially at home in [Florida]." *Humana Inc. v. St. Jude Med., LLC*, 2020 WL 13369049, at *3 (S.D. Fla. July 14, 2020) (citation omitted).[6] As to specific jurisdiction, Florida's long-arm statute provides for jurisdiction where a cause of action arises from defendant's operation of a business in Florida or from its commission of "a tortious act" in Florida. Fla. Stat. § 48.193(1)(a), (2). Plaintiffs cannot establish personal jurisdiction under either subsection.

#### 1.     Plaintiffs Do Not Allege That Leadenhall Engaged in a "General Course of Business Activity" or Committed a "Tortious Act" in Florida.

Plaintiffs assert two bases for exercising specific personal jurisdiction over Leadenhall: (1) "because Leadenhall engaged the services of Saiph, whose principal place of business is in Florida," to render services in Florida and (2) because "Leadenhall . . . in its own right and through its agents Saiph, Kosinski, and Davis, committed tortious acts within the state." AC ¶ 16.

If Plaintiffs' first theory is an attempt to invoke the long-arm statute's "conducting business" provision, Fla. Stat. § 48.193(1)(a)(1), then it fails. Conducting business in Florida requires demonstrating "a general course of business activity in the state for pecuniary benefit." *RMS Titanic, Inc. v. Kingsmen Creatives, Ltd.*, 579 F. App'x 779, 783 (11th Cir. 2014). Relevant

---

[6] Leadenhall Capital is a London-based limited liability partnership organized under the laws of England. AC ¶ 9. Leadenhall Life is a public limited company organized under the laws of Ireland and based in Dublin. *Id.* ¶ 10.

factors include "the presence and operation of an office in Florida; the possession and maintenance of a license to do business in Florida; the number of Florida clients served; and the percentage of overall revenue obtained from those clients." *Borchers v. Amazon.com, Inc.*, 2019 WL 5196117, at *3 (S.D. Fla. Jan. 30, 2019). None of these factors are alleged here. And Plaintiffs certainly cannot show the necessary "nexus, or substantial connection between the basis for the cause of action and [Leadenhall's non-existent] business activity." *Id.*[7] The only affirmative action Leadenhall allegedly took was engaging Saiph to conduct the Collateral Audit, prompted by Leadenhall's discovery of Plaintiffs' misconduct. *See* Ex. 2 (Saiph Agmt.). The Saiph Agreement— which is governed by New York law, *id.* § IX.5—confined Saiph's work to performing specific analyses on specific files related to specific assets pledged as collateral. And hiring an independent contractor "is not sufficient to confer personal jurisdiction" under the long-arm statute. *Pals Grp., Inc. v. Lacaye Bev. Corp.*, 2010 WL 11504805, at *6 (S.D. Fla. 2010).

Nor can Plaintiffs establish that Leadenhall committed a tortious act in Florida that would subject it to specific personal jurisdiction. While Plaintiffs plead the legal conclusion that Leadenhall "in its own right and through its agents . . . committed tortious acts within the state," AC ¶ 16, the only *facts* they allege confirm that Davis—and Davis alone—gained unauthorized access to their systems and offices. *See, e.g.*, AC ¶¶ 3–5 (alleging that Davis "illegally . . . accessed Plaintiffs' computer networks" and "br[oke] into SuttonPark's offices"); *id.* ¶¶ 39, 45–68 (detailing alleged intrusions). Plaintiffs' agency theory is thus their sole jurisdictional hook. But there are no allegations or evidence that Leadenhall ever formed an agency relationship with Davis.

### 2.      Davis' Acts Cannot Be Imputed to Leadenhall.

To begin, Davis never worked for Leadenhall in any capacity. *See* Gillespie Decl. ¶ 15; Kosinski Decl. ¶ 20. The Collateral Audit was performed primarily by Kosinski and Boersig. Gillespie Decl. ¶ 15; Kosinski Decl. ¶¶ 4, 15, 17–18. The majority of Saiph's Collateral Audit work was done either by Kosinski on site or with credentials Plaintiffs issued and configured to have access only to specific databases within MP Fin. AC ¶ 32; Kosinski Decl. ¶¶ 13–14, 22. Davis was never an employee of Saiph—he was retained (through his own company) as an independent contractor on May 24, 2024, Kosinski Decl. ¶¶ 24–25, which occurred nearly a year *after* Leadenhall first engaged Saiph, Gillespie Decl. ¶ 6. In July 2024, Saiph was engaged by another

---

[7] Simply "communicat[ing] with Florida entities from outside the state is not enough to constitute 'carrying on a business' in Florida." *Borchers*, 2019 WL 5196117, at *3.

creditor of the 777 Entities—Northwestern Mutual Life ("NML")—to audit a pool of annuities pledged to NML. Kosinski Decl. ¶¶ 4, 21–22. As Kosinski testified, Davis' "sole role with respect to any" auditing work Saiph performed on the 777 Entities was for "the NML Audit." *Id.* ¶ 26.

Underscoring the disconnect between Leadenhall and Davis, Plaintiffs' allegations confirm that the vast majority of Davis' alleged intrusions—electronic and physical alike—were accomplished through means Davis possessed by virtue of his former employment. Davis used his own 777 Partners access credentials for virtually every alleged "intrusion" into Plaintiffs' systems. *See* AC ¶¶ 39, 45–68; *see also id.* ¶ 69 ("For all but the intrusions involving Ms. Boersig's credentials, access credentials issued to Davis during his employment with 777 Partners were utilized.").[8] As for Davis' alleged break-in, the contemporaneous police report indicates that Davis accessed SuttonPark's offices "us[ing] an old key Fob" issued by Plaintiffs when he was an employee. *See* Ex. 3 (Davis arrest records) at 2.[9] Accordingly, Plaintiffs' contention that Davis "would not have had access to the log in credentials for SuttonPark's systems" but for Leadenhall's Collateral Audit, AC ¶ 133, is false, and certainly does not show that Leadenhall's "activities in Florida were essential to the success of the tort," as required. *Borchers*, 2019 WL 5196117, at \*4.

Neither Leadenhall (nor its counsel) directed, encouraged, induced, or assisted Davis in gaining unauthorized access to Plaintiffs' systems or offices. Gillespie Decl. ¶ 17; Ex. 5 (9/17/24 Nathanson Ltr.) at 1–2. Nor, for that matter, did Saiph or Kosinski. Kosinski Decl. ¶¶ 4, 29–30. And Leadenhall never received any information or property, directly or indirectly, from Davis—let alone any information or property he is alleged to have misappropriated. Gillespie Decl. ¶ 16. The information Leadenhall did receive from Saiph—which includes a final report, interim reports (provided by email and in spreadsheet form), and the data underlying such reports—falls squarely within the scope of the Collateral Audit, access for which was authorized by Plaintiffs. *See id.* ¶ 18 (Leadenhall's Managing Partner stating that the "information provided by Saiph in connection with the collateral audit" pertains to "the legitimate scope of Saiph's work: analyzing the status of

---

[8] Although Plaintiffs now allege Davis used credentials issued to Boersig during an unspecified number of intrusions in early August, the forensic analysis Plaintiffs submitted indicated that Davis used his own former login credentials for nine out of ten intrusions and used Boersig's credentials only once, on August 9, 2024. *See* ECF No. 11-4, Mazur Decl. Ex. A at 3–7, 9–16.

[9] That police report does not mention Leadenhall, *see* Ex. 3, and Plaintiffs have alleged no facts suggesting that Davis' alleged burglary was related to Leadenhall. In fact, the alleged burglary occurred almost a month after Plaintiffs had revoked Saiph's access, *see* Ex. 6 (August 2024 emails), so Davis could not have been on the premises to perform work for Saiph or Leadenhall.

Leadenhall's collateral"). The evidence submitted by Saiph—including a "list of filenames of the records" accessed for the Collateral Audit and copies of reports provided to Leadenhall—corroborates Leadenhall's declaration. *See* Kosinski Decl. ¶¶ 17, 18, n.2 & Exs. E, G.

Under Florida law, "general agency principles apply when determining personal jurisdiction." *UnitedHealthcare of Fla., Inc. v. Am. Renal Assocs. Holdings, Inc.*, 2017 WL 1832436, at *6 (S.D. Fla. May 8, 2017). To establish actual agency, Plaintiffs must show "(1) acknowledgment by the principal that the agent will act for him, (2) the agent's acceptance of the undertaking, and (3) control by the principal over the actions of the agent." *Vax-D Med. Techs., LLC v. Allied Health Mgmt., Ltd.*, 2006 WL 4847740, at *3 (M.D. Fla. Mar. 14, 2006). The facts described above foreclose any finding of an actual agency relationship between Leadenhall and Davis here—as Leadenhall never allowed Davis to act on its behalf and certainly did not "control" his actions. *See MeterLogic, Inc. v. Copier Sols., Inc.*, 126 F. Supp. 2d 1346, 1356 (S.D. Fla. 2000) (dismissing for lack of personal jurisdiction where defendant "submitted undisputed affidavits to establish that they never authorized [the alleged agents] to act on their behalf"). Nor can Plaintiffs rely on "apparent agency," the elements of which are "a representation by the principal to the plaintiff, which . . . causes the plaintiff reasonably to believe that the alleged agent is authorized to act for the principal's benefit," and "induces the plaintiffs' detrimental, justifiable reliance[.]" *Honig v. Kornfeld*, 339 F. Supp. 3d 1323, 1347–48 (S.D. Fla. 2018). Plaintiffs do not allege that Leadenhall made *any* representation to Plaintiffs about Davis (or to Davis), much less one that would "create[] the appearance of an agency relationship." *MeterLogic*, 126 F. Supp. 2d at 1355.

In sum, not a single fact suggests that Davis acted on behalf of or at the direction of Leadenhall. And because Plaintiffs rely exclusively on the acts of a purported agent to satisfy the long-arm statute, there is no basis for personal jurisdiction over Leadenhall. Accordingly, the court need not proceed to the due process inquiry, which "imposes a more restrictive requirement than does Florida's Long-Arm Statute." *Borchers*, 2019 WL 5196117, at *4 (citation omitted).

### 3.   Plaintiffs Allege No Tortious Acts by Leadenhall—in Florida or Elsewhere—to Support Jurisdiction.

In addition to failing to allege that Leadenhall directed or otherwise authorized Davis to commit acts in Florida on Leadenhall's behalf, the AC fails to allege any *other* tortious conduct by Leadenhall to support jurisdiction. First, because none of Plaintiffs' tort claims can survive Leadenhall's Rule 12(b)(6) motion, *see infra*, Plaintiffs lack a predicate tort on which to base personal jurisdiction under Fla. Stat. § 49.193(1)(a)(2). *See PVC Windoors, Inc. v. Babbitbay*

9

*Beach Constr., N.V.*, 598 F.3d 802, 808 (11th Cir. 2010). Nor can Plaintiffs' (inadequately pled) conspiracy count bring Leadenhall within this Court's jurisdiction. A plaintiff "must do more than simply allege a conspiracy in a conclusory fashion for a court to exercise personal jurisdiction over a non-resident defendant based on the actions of co-conspirators." *Taylor v. Moskow*, 2017 WL 5239503, at *4 (S.D. Fla. Jan. 26, 2017), *aff'd*, 717 F. App'x 836 (11th Cir. 2017).

Second, Plaintiffs' jurisdictional allegations "indiscriminately lump[]" defendants together, failing to distinguish between the two Leadenhall entities named as defendants. *Flava Works, Inc. v. Roje on Holiday Inc.*, 2012 WL 1535684, at *5 (S.D. Fla. May 1, 2012). "[T]hat won't do: Each defendant's contacts with the forum State must be assessed individually rather than simply viewing them collectively." *Covenant Imaging LLC v. Viking Rigging & Logistics, Inc.*, 2020 WL 12442002, at *6 (S.D. Fla. Feb. 14, 2020) (citation omitted). Plaintiffs allege that "Leadenhall" (a) engaged Saiph to render (lawful) services in Florida and (b) that "Leadenhall's" agents committed tortious acts in Florida. AC ¶ 16. But Leadenhall Life is not even a party to the Saiph Agreement. *See* Gillespie Decl. ¶ 13; Ex. 2 (Saiph Agmt). Thus, at minimum, these allegations fail as to Leadenhall Life. *See Borislow v. Canaccord Genuity Grp. Inc.*, 2014 WL 12580259, at *5 (S.D. Fla. June 27, 2014) (rejecting allegations that failed to distinguish between corporate affiliates).

**B.      Plaintiffs' Service of Leadenhall under the LSA Does Not Give Rise to Jurisdiction in Florida.**

"Valid service of process is a prerequisite for a federal court to assert personal jurisdiction over a defendant." *Laster v. City of Albany, Georgia, Water, Gas & Light Co.*, 517 Fed. App'x. 777, 777 (11th Cir. 2013). Here, after waiting weeks to attempt service, *see* ECF No. 14; ECF No. 27 at 2, Plaintiffs effectuated service through Law Debenture—the agent designated for Leadenhall under the LSA for disputes "arising out of or relating to" the LSA. *See* Gillespie Decl. ¶ 23, Ex. 1 (LSA) § 10.09; ECF Nos. 34, 35. By serving Leadenhall through Law Debenture, Plaintiffs conceded that this case "arise[s] out of" the LSA, breaches of which Leadenhall and Plaintiffs are actively litigating in the Southern District of New York, where all parties but Davis have consented to jurisdiction. *See* Ex. 1 (LSA) § 10.09; Ex. 2 (Saiph Agmt.) § IX.16. If Plaintiffs contest that this dispute arises from the LSA, then Plaintiffs' service efforts were ineffective, as Law Debenture was authorized as a service agent only for disputes relating to the LSA. That independently defeats personal jurisdiction as to Leadenhall. *See Laster*, 517 F. App'x at 777; *Mirasco, Inc. v. Am. Nat. Fire Ins. Co.*, 2000 WL 34440850, at *5 (N.D. Ga. July 5, 2000) (transferring action where "a related action involving the same issues is currently pending in the . . . Southern District of New

York."). Leadenhall has not consented to jurisdiction in Florida, nor does it accept through Law Debenture service of process for disputes that do not arise from the LSA.

## II.  PLAINTIFFS FAIL TO STATE ANY CLAIMS AGAINST LEADENHALL.

Plaintiffs assert seven separate claims against Leadenhall. Five of these—Plaintiffs' First, Second, Fourth, Seventh, and Eighth Claims (for violation of the federal Computer Fraud and Abuse Act ("CFAA"), conversion, trespass to chattels, and violations of the Computer Abuse and Data Recovery Act ("CADRA") and the Stored Communications Act ("SCA")—are based on a theory of vicarious liability and are referred to herein as "Indirect Claims." *See* AC ¶¶ 106, 113, 124, 142, 149. The other two claims—Plaintiffs' Fifth and Sixth claims for "civil conspiracy" and "aiding and abetting"—are premised on Leadenhall "directing" or "substantially assisting" Davis' alleged intrusions. *Id*. ¶¶ 128, 133. Thus, although these are "Direct Claims," they still depend upon linking Leadenhall to Davis' conduct. None of these claims can survive dismissal.

### A.  Plaintiffs Allege No Facts to Support Leadenhall's Vicarious Liability for Davis' Acts.

For each Indirect Claim, Plaintiffs assert that Leadenhall is liable "for the actions of its agents . . . and because, upon information and belief, the misconduct was committed with the knowledge of and at the behest of Leadenhall," *id.* ¶¶ 113, 124, or because, "upon information and belief, [Leadenhall] directed, encouraged, induced, and/or conspired with Saiph, Kosinski, and Davis," *id.* ¶¶ 106, 142, 149. These legal conclusions "are not entitled to an assumption of truth" and must be "supported by factual allegations." *Randall v. Scott*, 610 F.3d 701, 709–10 (11th Cir. 2010). Plaintiffs instead draw *inferences* from the following circumstantial "facts," which are themselves laden with Plaintiffs' unwarranted presumptions:

> (i) Leadenhall's aggressive actions and litigation tactics against 777 Partners; (ii) the targeted access to and attempt to transfer the Outlook 365 file saved on Mr. Pasko's laptop; (iii) targeting of a laptop and One Drive folders of an employee of a non-party affiliate likely to have information that Leadenhall had been unsuccessfully seeking; (iv) the timing of at least one incursion in occurring just prior to an important hearing in the Leadenhall Litigation; (v) Leadenhall's insistence on retaining Saiph specifically, which possessed significant proprietary knowledge about 777 Partners' operations and computer systems, through its founder, Kosinski, and other employees or agents, in spite of Plaintiffs' vigorous objections; (vi) the agency relationships between Leadenhall and Saiph, Kosinski, and Davis; (vii) claims concerning a non-existent payment dispute between Davis and Plaintiffs; and (viii) Saiph's inadvertent acknowledgment of Leadenhall's relationship to these intrusions . . . .

AC ¶¶ 6, 99. None of these facts nudges Plaintiffs' Indirect Claims across the line of plausibility.

**1.** **Plaintiffs' "Factual" Allegations Do Not Support Vicarious Liability.**

*First*, the "facts" relating to the RICO Action do not prove anything. Leadenhall's "aggressive actions and litigation tactics" are not unusual given that Plaintiffs and their affiliates owe Leadenhall more than $600 million and appear to be on the brink of insolvency—as confirmed by, *inter alia*, the appointment of restructuring professionals from B. Riley to take over the 777 Entities' management. AC ¶¶ 23–26. There should be little wonder that Leadenhall wants its money back. Plaintiffs cite as evidence of "aggression" Leadenhall's request in the RICO Action for an asset-freezing injunction. AC ¶ 21. But they neglect to mention that the New York court *granted* that injunction, noting the 777 Entities "do not dispute any of Leadenhall's allegations of breaches." RICO Action, ECF Nos. 114, 135, 146; *id.* ECF No. 128, June 7, 2024 Hr'g Tr. 54:25–55:2.[10] Plaintiffs' reliance on coincidental timing—*i.e.*, that the "alleged intrusions on July 7th into [Pasko's and Logee's] laptops occurred only one day before an important hearing was held"—is absurd. AC ¶ 57. The July 8, 2024 hearing related to the preliminary injunction, and no new evidence was presented or contemplated to be presented because the court had already determined Leadenhall was entitled to injunctive relief. *See* RICO Action, ECF No. 148, July 8, 2024 Hr'g Tr. 22:10–12 ("A preliminary injunction is warranted for all of the reasons that I explained on the record on June 7, 2024[.]"). Nor was anything related to Pasko (or Logee) discussed at the hearing. Logee was not mentioned at all, and Pasko's name was mentioned exactly once—by his own counsel. *See generally id.* The implication of this allegation—that counsel for Leadenhall directed Davis to commit federal crimes the night before a hearing—is not only implausible but defamatory.

*Second*, Davis' alleged targeting of Pasko's Outlook 365 email files (using his own 777 credentials) has nothing to do with Leadenhall. *See* AC ¶¶ 45–46. Plaintiffs attempt to suggest a Leadenhall connection by (1) noting that Pasko is "one of the individual defendants" in the RICO Action" and (2) making the conclusory assertion that there "is no apparent reason for Davis to have accessed and obtained a copy of . . . Mr. Pasko's Outlook 365 account other than to gather information that would be useful to Leadenhall in the [RICO Action]." *Id.* ¶¶ 3, 52. But of course, Pasko is also the "co-founder and former managing partner of 777 Partners"—making him Davis'

---

[10] As that court observed, zealous advocacy cannot give rise to an inference that Leadenhall committed federal crimes to obtain information from its adversary—particularly while Leadenhall is already pursuing discovery through litigation. *See* RICO Action, ECF No. 201 Oct. 2, 2024, Hr'g Tr. 31:17-20 ("THE COURT: I take it that Leadenhall wouldn't sanction unauthorized hacking of one of the other parties in this case. MS. NATHANSON: Absolutely not.").

former boss. *Id.* ¶ 3. It is more than plausible that Pasko possesses information useful to Davis in his personal capacity. Pasko has also been named as a defendant along with the 777 Entities in numerous other lawsuits, including arbitrations brought by former employees seeking unpaid compensation.[11] In any event, Plaintiffs never identify any specific information in Pasko's email files that Davis obtained or explain why such information would be relevant to the RICO Action.

*Third*, Plaintiffs cite Davis' intrusion into a laptop belonging to "an employee of a non-party affiliate likely to have information that Leadenhall had been unsuccessfully seeking." *Id.* ¶¶ 6, 53–55. Plaintiffs are referring to written requests made by a Leadenhall Managing Partner, Phil Kane, and its restructuring counsel, Roger Schwartz, for information pertaining to 777 Partners affiliates Brickell Insurance Holdings LLC ("Brickell") and 777 Re LTD. *Id.* ¶¶ 35, 43. While Leadenhall disagrees that it "ha[s] no contractual right to" information about these affiliates, *id.* ¶ 44, the requests in question are innocuous. Kane's email (*id.* ¶ 35) merely asks for "current debts outstanding" and "the most recent financial accounts" at several subsidiaries, Ex. 7 at 1, while Schwartz' email seeks "[u]pdates and information related to 777 Re visibility," Ex. 8 at 2. Plaintiffs seek to draw a connection between those requests and Davis' actions by alleging that the laptop that was "targeted" belonged to Jennifer Logee, Brickell's chief compliance officer, who "had also performed work related to 777 Re." AC ¶ 53. But Plaintiffs do not specify what information on Logee's laptop was accessed, why it would be relevant to Leadenhall, the nature of her "work related to 777 Re," or the nexus between her role and the RICO Action.

*Fourth*, Leadenhall's "insistence on retaining Saiph" over Plaintiffs' objections does not support vicarious liability. AC ¶ 6. As Plaintiffs acknowledge, Kosinski was a "former senior executive of SuttonPark" who possessed "proprietary knowledge about 777 Partners' operations and computer systems." *Id.* ¶¶ 6, 22. Kosinski's understanding of SuttonPark's processes for allocating and pledging assets to creditors made him a logical choice to perform the Collateral Audit. And Plaintiffs' supposed objections—that Kosinski had "solicited SuttonPark's employees to join [his] competitor [company]"—have nothing to do with the unauthorized intrusions at issue

---

[11] *See, e.g.*, *Obra Cap. Mgmt., LLC v. 777 Partners LLC*, Index No. 651220/2024 (Sup. Ct. N.Y. Cty.); *Malt Family Trust v. 777 Partners LLC*, C.A. No. 2022-0652 (Del. Ch.); *Arciniegas v. 777 Partners LLC*, AAA Case No. 01-24-0005-6264 (AAA) (Arb. Demand attached as Compl. Ex. A in *Advantage Cap. Holdings, LLC v. Arciniegas*, No. 24-cv-22621 (S.D. Fla.) (ECF 1-1); *Beruff v. 777 Partners LLC*, AAA Case No. 01-24-0005-6643 (AAA)) (Arb. Demand attached as Compl. Ex. A in *Advantage Cap. Holdings, LLC v. Beruff*, No. 24-cv-22620 (S.D. Fla.) (ECF 1-1).

here anyway. *Id.* ¶ 22. Plaintiffs tellingly do not allege that Davis—the only alleged wrongdoer—was affiliated with Saiph at the time Leadenhall proposed retaining Saiph for the Collateral Audit, which further undermines the inference Plaintiffs urge the Court to draw.

*Fifth*, Plaintiffs rely on the "agency relationships between Leadenhall and Saiph, Kosinski, and Davis," *id.* ¶¶ 6, 99, but there is no such relationship between Leadenhall and Davis—and only Davis is alleged to have intruded into Plaintiffs' systems or property. Plaintiffs allege no facts connecting Leadenhall to Davis whatsoever: no communication, direct or indirect, between Davis and Leadenhall; no facts reflecting Leadenhall's knowledge of or involvement in Davis' conduct; and no facts suggesting that Leadenhall received any information from Davis. The only agency relationship here—between Saiph and Leadenhall—is set forth in the Saiph Agreement, pursuant to which Saiph was retained to perform financial analyses on specific receivables. Ex. 2 (Saiph Agmt) at 12. That contractual directive defines the scope of the agency relationship between Leadenhall and Saiph, and Plaintiffs allege no facts to show that this scope was ever enlarged. *Rafer v. Internal Credit Sys., Inc.*, 2021 WL 2554048, at *10 (M.D. Fla. June 22, 2021) (looking to parties' contract to determine the scope of agency relationship). Even if Davis had performed any work on Leadenhall's Collateral Audit,[12] his unlawful conduct would fall outside of the scope of Saiph's authority—and therefore would not subject Leadenhall to liability. *See Koehler v. Treasure Coast Carwash, LLC*, 2016 WL 3878464, at *2 (S.D. Fla. July 18, 2016) ("There is no liability where the agent has stepped aside from his employment to commit a tort which the principal neither directed in fact, nor . . . authorized or expected the agent to do.").

*Sixth*, Plaintiffs point to Leadenhall's "claim[] that Davis's actions resulted from his anger over a payment dispute," a dispute they say does not exist. AC ¶¶ 6, 82, 99. It is not clear how this allegation—even if true —would make it "reasonable to infer" the proposition for which they cite it: that Davis' actions "were known to and directed by Leadenhall." *Id*. ¶¶ 6, 99. Regardless, Leadenhall has never professed to know why Davis did what he allegedly did. *See, e.g.*, ECF No. 48 at 7 ("Leadenhall lacks information about exactly what Davis did or why he did it beyond his representation to Saiph that he acted alone out of animus against his former employer over a payment dispute."). Additionally, Plaintiffs allege "[u]pon information and belief" that no payment

---

[12] The Court need not accept the truth of Plaintiffs' conclusory allegation that Davis' intrusions occurred "[d]uring the course of performing this audit work for Leadenhall." AC ¶ 3; *see Honig*, 339 F. Supp. 3d at 1348 (rejecting similar conclusory allegations).

dispute exists, but their allegation is based only on "the months that [B. Riley] ha[s] been in control of Plaintiffs' business operations." *See* AC ¶¶ 82–84. That period would not be probative since Davis resigned in April 2024, the month before B. Riley took over. *Id*. ¶¶ 13, 23

*Seventh*, Plaintiffs make much of the fact that Saiph's September 11, 2024 letter notifying them of Davis' alleged entry into their offices referenced Leadenhall in the subject line. *See* ECF No. 11-1, McCarthy Decl. ¶ 6 & Ex A; AC ¶¶ 5–6, 80–81, 99. But it requires a massive leap to assume that a purportedly erroneous subject line reveals a secret scheme to hack into Plaintiffs' systems. *See* AC ¶ 81. As Plaintiffs know, the reference to Leadenhall was occasioned by the fact that *Leadenhall* requested that Saiph disclose to Plaintiffs its discovery of Davis' entry into Plaintiffs' offices, which was the purpose of the letter. *See* Ex. 5 (9/17/24 Nathanson Ltr.) at 2.

In addition to these deficiencies, Plaintiffs never say what information was taken or explain its relevance to Leadenhall. Plaintiffs assert that "all of the systems and information" that "Davis accessed . . . would clearly be considered by Leadenhall as useful in prosecuting the [RICO Action] against Plaintiffs." AC ¶ 38; *see also id*. ¶ 3 (alleging that Davis "copied information" that would be "potentially useful in the [RICO Action]"); *id*. ¶ 52 (similar). But Plaintiffs never specifically identify the information Davis accessed or how it would help Leadenhall.

### 2. Plaintiffs' Indirect Claims Fail Without Vicarious Liability.

Plaintiffs' failure to muster any *factual* allegations to support an agency relationship (or other basis for vicarious liability) is fatal to their claims for conversion and trespass to chattels— both of which are explicitly based on Davis' conduct. *See id*. ¶ 110 ("Davis interfered with Plaintiffs' possession and dominion over their property"); *id*. ¶ 121 ("Davis . . . intentionally t[ook] certain laptops owned by Plaintiffs."). Leadenhall is unaware of any case law holding that CADRA allows for vicarious liability, but even if it did, that claim is also based solely on the allegation that "Davis obtained extensive confidential and proprietary data belonging to Plaintiffs" and is asserted only vicariously against Leadenhall. *Id*. ¶¶ 139, 142. It therefore fails for the same reasons.

A similar analysis applies to Plaintiffs' federal claims for violation of the CFAA and SCA. Common-law agency principles do not apply to those claims. "[W]ether a federal statute embraces such principles is a matter of statutory interpretation based upon *congressional* intent." *Doe v. Dartmouth-Hitchcock Med. Ctr.*, 2001 WL 873063, at *5 (D.N.H. July 19, 2001) (citation omitted). And some federal courts have held that "neither the language nor the purpose of the CFAA are consistent with holding . . . defendants vicariously liable." *Id.* at *6; *see also QVC, Inc.*

15

*v. Resultly, LLC*, 159 F. Supp. 3d 576, 589 (E.D. Pa. 2016) ("The CFAA does not . . . make reference to vicarious liability."). But even courts that allow for vicarious liability under the CFAA hold that a third party *cannot* be vicariously liable where it had no involvement in or knowledge of the violation and did not derive any benefit from it. *See Agilysys, Inc. v. Hall*, 258 F. Supp. 3d 1331, 1343–44 (N.D. Ga. 2017) (dismissing CFAA claim based on actions of former employee where complaint contained "no facts showing that [his new employer] induced or even directed" the former employee to commit the violation); *SolarCity Corp. v. Pure Solar Co*., 2016 WL 11019989, at *9 (C.D. Cal. Dec. 27, 2016) (similar). Said differently, a party that did not directly access a protected computer may only be vicariously liable if it "direct[ed] a person to exceed authorized access," *Enhanced Recovery Co., LLC v. Frady*, 2015 WL 1470852, at *11 n.10 (M.D. Fla. Mar. 31, 2015), or "affirmatively urged" a person to access a "computer system . . . for [its] benefit," *Charles Schwab & Co. v. Carter*, 2005 WL 2369815, at *6–7 (N.D. Ill. Sept. 27, 2005).[13]

Likewise, a party may be held liable under the SCA only if it "directed or ratified the conduct," which is not alleged here. *Cardinal Health 414, Inc. v. Adams*, 582 F. Supp. 2d 967, 978 (M.D. Tenn. 2008); *Larson v. Hyperion Int'l Techs., L.L.C*., 494 F. App'x 493, 497 (5th Cir. 2012) (affirming dismissal of CFAA and SCA claims asserted vicariously and noting that the statutes "require intentional conduct by the defendant"). All of Plaintiffs' Indirect Claims therefore fail.

### B.      Even if Plaintiffs Could Establish Vicarious Liability, They Fail to Plead the Requisite Elements of Their Indirect Claims.

Even if Plaintiffs could plead *any* facts to support vicarious liability, their Indirect Claims fail because the AC does not allege facts to establish the requisite elements of those claims.

#### 1.      Plaintiffs Fail to Plead Conversion Because They Do Not Allege They Were "Deprived" of Their Property.

To plead a conversion claim, Plaintiffs must allege: (1) a "taking of chattels" (2) "with intent to exercise over them an ownership inconsistent with the real owner's right of possession." *Utah Power Sys., LLC v. Big Dog II, LLC*, 352 So. 3d 504, 508 (Fla. 1st DCA 2022). The "essential element of conversion is the wrongful *deprivation* of the property of the owner." 12 Fla. Jur 2d Conversion and Replevin § 13 (emphasis added). Plaintiffs' conversion claim is premised on two separate acts of Davis: accessing Plaintiffs' computer systems and stealing laptops. AC ¶¶ 109-13.

---

[13] To the extent Plaintiffs contend Leadenhall formed a conspiracy to violate the CFAA under 18 U.S.C. § 1030(b), the claim fails because Plaintiffs allege no facts supporting "an agreement and common activities in furtherance of the" violation. *Agilysys*, 258 F. Supp. 3d at 1344.

Davis' "accessing" Plaintiffs' computer systems does not state a claim for conversion against Leadenhall because conversion requires a "wrongful deprivation" of property, *Star Fruit Co. v. Eagle Lake Growers*, 160 Fla. 130, 132 (1948), and Plaintiffs do not allege that Davis' mere access to their systems deprived them of the use of those systems.[14] Independently, to the extent Plaintiffs' conversion claim is premised on Davis' "obtain[ing]" confidential and proprietary data from their systems, AC ¶ 110, the claim is preempted by Florida's Uniform Trade Secrets Act ("FUTSA"), which displaces "conflicting tort . . . law . . . providing civil remedies for misappropriation of a trade secret." Fla. Stat. § 688.008; *see also Taubenfeld v. Lasko*, 324 So. 3d 529, 542 (Fla. 4th DCA 2021) (distinguishing between conversion of "intellectual property," which was preempted by FUTSA, and "conversion of hard assets, including five tractor-trailers").

Consequently, only Davis' misappropriation of Plaintiffs' laptops could support a claim for conversion, but Plaintiffs cannot state a claim against Leadenhall on that basis because "a party which does not personally receive property which is the subject of an alleged conversion or civil theft cannot be held liable for such action." *Transcapital Bank v. Shadowbrook at Vero, LLC*, 226 So. 3d 856, 864 (Fla. 4th DCA 2017). Plaintiffs do not allege that Leadenhall received any misappropriated property from Davis. Indeed, Plaintiffs dropped Leadenhall altogether from their claim for replevin. *Compare* AC ¶ 115–19, *with* ECF No. 1 ¶¶ 45–50, acknowledging that Leadenhall never had possession of the "laptops and data" Plaintiffs seek to replevy. AC ¶ 116.

### 2.    Plaintiffs Fail to State a Claim under the SCA.

The SCA imposes liability on one who "intentionally accesses without authorization a facility through which an electronic communication service is provided . . . and thereby obtains, alters, or prevents authorized access to a wire or electronic communication while it is in electronic storage in such system." 18 U.S.C. § 2701(a). The SCA was not designed as a bulwark against the harms Plaintiffs allege—it was intended only to "protect[] individual privacy rights in electronic communications" that are "stored by network or internet service providers ['ISPs'] in remote centralized facilities, or by similar entities." *Trump v. Clinton*, 626 F. Supp. 3d 1264, 1315–16

---

[14] While Plaintiffs allege that Davis "alter[ed]" their systems, AC ¶ 110, they do not allege what alterations were made or whether those alterations rendered their systems unusable. *See* Am. Jur. 2d, Conversion § 50; AC ¶ 4 ("[T]he full extent of [Davis'] activities within 777 Partners' systems, including . . . what additional information he may have . . . altered, or otherwise interfered with, and for what purposes, is not, and may never be, fully known.").

17

(S.D. Fla. 2022); *see also Garcia v. City of Laredo*, 702 F.3d 788, 791 (5th Cir. 2012) ("Congress passed the SCA . . . to protect potential intrusions on individual privacy that the Fourth Amendment did not address."). Plaintiffs' attempts to shoehorn their grievances into an SCA claim fail.

To start, Plaintiffs cannot establish unauthorized access to a "facility." Plaintiffs allege Davis used his 777 credentials to access "information in an archive file created by Outlook 365 on Mr. Pasko's laptop." AC ¶ 145. According to Plaintiffs, Davis specifically targeted an ".OST" file, which is an "archived copy of a users' entire mailbox, including all sent items and received emails . . . automatically created by Outlook 365 on the user's *hard drive*." AC ¶ 47 (emphasis added). Although the SCA does not define "facility," "[n]umerous courts of appeal have interpreted this to mean equipment and structures of [ISPs] and . . . [to exclude] personal devices." *Trump*, 626 F. Supp. 3d at 1316 (collecting cases). So, the SCA applies to "information stored with a phone company, [ISP], or electronic bulletin board system," but not "information stored on [a] hard-drive." *United States v. Steiger*, 318 F.3d 1039, 1049 (11th Cir. 2003). This makes sense, as "the relevant facilities that the SCA is designed to protect are not computers that *enable* the use of an electronic communication service, but instead are facilities that are *operated by* electronic communication service providers and used to store and maintain electronic storage." *Garcia*, 702 F.3d at 792 (emphasis in original) (citation omitted).

Additionally, Plaintiffs' allegations about the information on the .OST file do not satisfy the SCA's "electronic storage" element, defined as (1) "any temporary, intermediate storage of a . . . communication incidental to the electronic transmission thereof"; or (2) "any storage of such communication by an electronic communication service for purposes of backup protection[.]" 18 U.S.C. § 2510(17). Information stored on a "hard drive . . . is not in electronic storage under the statute." *Garcia*, 702 F.3d at 793. Even if it were, Pasko's "sent items and received emails," AC ¶ 47, do not qualify because "[t]he clear weight of case law holds that once an email has been delivered and opened by the intended recipient, the email is not in temporary, intermediate storage." *Satori v. Schrodt*, 424 F. Supp. 3d 1121, 1132 (N.D. Fla. 2019) (collecting cases). Likewise, "a clear majority of courts have held that emails opened by the intended recipient (but kept on a web-based server like Gmail) do not meet the second definition of 'electronic storage' either." *Id*. Said differently, although opened emails "may, when not deleted, be 'stored' in common parlance," the SCA restricts storage to "backup protection"—which means that emails "the intended recipient has opened, but not deleted (and thus which remain available for later re-

18

opening) are not being kept for the purposes of backup protection." *Lazette v. Kulmatycki*, 949 F. Supp. 2d 748, 758 (N.D. Ohio 2013) (citations omitted).

**3.      Plaintiffs Fail to State a Claim under the CFAA.**

If Plaintiffs contend, as an alternative to vicarious liability, that Leadenhall "obtained" information from Davis under 15 U.S.C. § 1030(a)(2) or "conspired" with Davis to violate the CFAA under § 1030(b), such claims must also be dismissed. Plaintiffs never allege that Leadenhall received any misappropriated information—they make only the half-hearted suggestion that it "is reasonable to infer that Davis . . . provided the information from Plaintiffs' systems to Leadenhall." AC ¶ 103. That allegation is inadequate. *Compare Shurgard Storage Ctrs., Inc. v. Safeguard Self Storage, Inc.*, 119 F. Supp. 2d 1121, 1123 (W.D. Wash. 2000) (sustaining CFAA claim where defendant had plaintiff's employee "sen[d] e-mails to the defendant containing various trade secrets and proprietary information"). The conspiracy claim likewise fails because there is no allegation that Leadenhall and Davis "entered into an agreement for [Davis] to commit the unlawful act of accessing information"—much less any "common activities in furtherance of the unlawful act." *Agilysys*, 258 F. Supp. 3d at 1344.[15]

**C.      Plaintiffs Do Not State a Claim for Conspiracy or Aiding and Abetting.**

Plaintiffs' only Direct Claims (*i.e.*, claims that do not rely on a vicarious liability theory) are for civil conspiracy and aiding and abetting. These claims are also subject to dismissal.

**1.      Plaintiffs Do Not State a Claim for Civil Conspiracy.**

Plaintiffs' civil conspiracy claim fails at the outset because "[t]here is no freestanding cause of action in Florida for 'civil conspiracy.'" *Tejera v. Lincoln Lending Servs., LLC*, 271 So. 3d 97, 103 (Fla. 3d DCA 2019). Instead, a "conspiracy is merely the vehicle by which the underlying tort was committed." *Id.* While Plaintiffs allege that Leadenhall "willfully, intentionally, and knowingly agreed to further a shared plan, which included gaining unauthorized access to Plaintiffs' computer systems," AC ¶ 128, they do not identify the specific tort or statutory violation that was purportedly advanced by the alleged conspiracy. *See Posner v. Essex Ins. Co.*, 178 F.3d 1209, 1218 (11th Cir. 1999) (holding allegation that defendants "conspired to cause harm," without listing an actionable tort insufficient). Accordingly, Plaintiffs have failed to identify "an actionable underlying tort or wrong." *Raimi v. Furlong*, 702 So. 2d 1273, 1284 (Fla. 3d DCA 1997)*.* Nor have

---

[15] Because Plaintiffs' federal claims fail, this Court should decline to exercise supplemental subject-matter jurisdiction. *See Arnold v. Tuskegee Univ.*, 212 F. App'x 803, 811 (11th Cir. 2006).

Plaintiffs pled the elements of civil conspiracy, which are: "(1) an agreement between two or more parties; (2) to do an unlawful act or a lawful act by unlawful means; (3) the execution of some overt act in pursuance of the conspiracy; and (4) damage[.]" *Plastiquim S.A. v. Odebrecht Constr., Inc.*, 337 So. 3d 1270, 1273 (Fla. 3d DCA 2022) (citation omitted). As explained above, Plaintiffs plead *zero* nonconclusory factual allegations to satisfy the "agreement" or "overt act" requirements. Plaintiffs' generic assertion that "Defendants . . . agreed to further a shared plan" AC ¶ 128, is insufficient. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556–57 (2007).

### 2.   Plaintiffs Do Not State a Claim for Aiding and Abetting.

Plaintiffs' aiding and abetting claim fails for similar reasons. *See Birmingham v. Doe*, 2022 WL 18134962 at *27 (S.D. Fla. 2022) (noting the similarity between civil conspiracy and aiding and abetting). To state a claim for aiding and abetting, a plaintiff must allege: "(1) an underlying violation on the part of the primary wrongdoer; (2) knowledge of the underlying violation by the alleged aider and abettor; and (3) the rendering of substantial assistance [to] the wrongdoing by the alleged aider and abettor." *Taubenfeld*, 324 So. 3d at 543–44. Plaintiffs' allegations are insufficient for two reasons. *First*, Plaintiffs do not allege any facts—as opposed to conclusions— that Leadenhall had actual knowledge of Davis' conduct. *See* AC ¶ 135 ("[A]t all relevant times, Leadenhall and Saiph were aware of their roles in enabling Davis's tortious conduct."). Nor do Plaintiffs' allegations "allow the fair inference" that Leadenhall "had actual knowledge" of Davis' conduct. *Isaiah v. JPMorgan Chase Bank, N.A.*, 2017 WL 5514370, at *3 (S.D. Fla. 2017). The AC alleges next to nothing about Leadenhall's awareness (or lack thereof) of the dispute between Plaintiffs and their former employee, Davis. *Second*, Plaintiffs do not allege that Leadenhall provided "substantial assistance"—or any assistance—to Davis. Plaintiffs' allegations *contradict* the notion altogether. While Plaintiffs assert (with no support) that Davis would not have had the credentials he used to access Plaintiffs' systems were it not for the Collateral Audit, AC ¶ 133, their factual allegations disprove that contention because Davis allegedly used his *own* former 777 Partners credentials for virtually every alleged intrusion, *see id.* ¶¶ 39, 45–69. "Substantial assistance requires the plaintiff to allege that the actions of the aidor/abettor proximately caused the harm on which the primary liability is predicated[.]" *Gilison v. Flagler Bank*, 303 So. 3d 999, 1003–04 (Fla. 4th DCA 2020). None of Plaintiffs' facts even approach that standard.[16]

---

[16] To the extent Plaintiffs rely on Davis' alleged misuse of Boersig's credentials, *see* AC ¶¶ 67–69, they allege no facts to tie that conduct to Leadenhall.

Dated:   December 13, 2024

KING & SPALDING LLP

By:   *Brian P. Miller*
  Brian P. Miller
  Florida Bar No. 0980633
  Ross E. Linzer
  Florida Bar No. 0073094
  Southeast Financial Center
  200 S. Biscayne Boulevard, Suite 4700
  Miami, FL 33131
  Telephone: (305) 462-6000
  Fascimile: (305) 462-6100
  bmiller@kslaw.com
  rlinzer@kslaw.com

  Peter Starr (*pro hac vice*)
  Georgia Bar No. 648453
  1180 Peachtree Street, Suite 1600
  Atlanta, GA 30309
  Telephone: (404) 572-2767
  Facsimile: (404) 572-5100
  pstarr@kslaw.com

  Leigh M. Nathanson (*pro hac vice*)
  New York Bar No. 4900106
  Brian Donovan (*pro hac vice*)
  New York Bar No. 5433669
  1185 Avenue of the Americas
  New York, NY 10036-4003
  Telephone: (212) 556-2100
  Fascimile: (212) 556-2222
  lnathanson@kslaw.com
  bdonovan@kslaw.com

  *Attorneys for Leadenhall Capital Partners*
  *LLP and Leadenhall Life Insurance Linked*
  *Investments Fund PLC*