# Exhibit 1

EXECUTION VERSION

# LOAN AND SECURITY AGREEMENT

Dated as of May 7, 2021

by and among

the Borrowers from time to time party hereto

And

the Lenders from time to time party hereto

And

**LEADENHALL CAPITAL PARTNERS LLP,**
as the Administrative Agent

And

**LEADENHALL LIFE INSURANCE LINKED INVESTMENTS FUND PLC,**
as the initial Collateral Agent

And

the Servicers from time to time party hereto

And

the Sellers party hereto from time to time

# TABLE OF CONTENTS

<u>Page</u>

## ARTICLE I

## DEFINITIONS

Section 1.01    Certain Defined Terms........................................................................... 1
Section 1.02    Other Terms ...................................................................................... 25
Section 1.03    Computation of Time Periods............................................................ 25
Section 1.04    Interpretation.................................................................................... 25

## ARTICLE II

## AMOUNTS AND TERMS OF THE LOANS

Section 2.01    The Commitments.............................................................................. 26
Section 2.02    Loans and Borrowings ...................................................................... 27
Section 2.03    Requests for Borrowings.................................................................. 27
Section 2.04    Funding of Loans ............................................................................. 28
Section 2.05    Repayment of Loans; Evidence of Indebtedness .............................. 28
Section 2.06    Repayment of Loans ........................................................................ 30
Section 2.07    Prepayment of Loans; Substitution of Receivables ......................... 30
Section 2.08    Interest.............................................................................................. 31
Section 2.09    Increased Costs ................................................................................ 32
Section 2.10    Break Funding Payments .................................................................. 33
Section 2.11    Servicing Fee ................................................................................... 34
Section 2.12    Taxes................................................................................................ 34
Section 2.13    Payments Generally; Pro Rata Treatment; Sharing of Setoffs......... 37
Section 2.14    Mitigation Obligations ..................................................................... 38
Section 2.15    Security Interest ............................................................................... 38
Section 2.16    Right of Setoff.................................................................................. 39
Section 2.17    Accounts of the Borrower................................................................. 40
Section 2.18    Settlement Procedures with respect to the SPLCSS Borrower......... 40
Section 2.19    Settlement Procedures with respect to the Signal Borrower............. 43
Section 2.20    Settlement Procedures with respect to the Insurety Borrower.......... 45
Section 2.21    Settlement Procedures with Respect to the Dorchester Borrower..... 47
Section 2.22    Settlement Procedures with Respect to Each Joining Borrower........ 49

(x)     Agreed Upon Actuarial Models. With respect to the Insurety Borrower, each Agreed Upon Actuarial Model, together with the related persistency rates provided by the Independent Actuary, will be updated no less frequently than once per annum or at any time that the Administrative Agent reasonably believes that the underlying persistency rates have changed (as evidenced by a written notice provided by the Administrative Agent to the Insurety Borrower) and an Agreed Upon Actuarial Model should be updated as a result of such change; provided, that the initial models applied as of the Closing Date are described on Schedule XV.

(y)     Dispute Resolution. If the Administrative Agent provides the Insurety Borrower and any Independent Actuary with written notice that it disputes the Valuation Amount of an Eligible Receivable, the Insurety Borrower shall cause such Independent Actuary to deliver a redetermined Valuation Amount within twenty (20) Business Days following receipt of such notice.

(z)     Membership Interests in Lottery Holding SPVs. The SPLCSS Borrower shall not vote to enable, or take any other action to permit, any Lottery Holding SPV to issue any additional membership interests or other equity securities of any nature or to issue any other membership interests or other ownership interests convertible into or granting the right to purchase or exchange for any membership interests or other ownership interests of any nature of any Lottery Holding SPV. Whenever any membership interest of a Lottery Holding SPV is an uncertificated security, the SPLCSS Borrower shall, or shall cause such Lottery Holding SPV to, take all steps as are reasonably necessary to give exclusive control over such membership interest to the Collateral Agent in a manner reasonably satisfactory to the Collateral Agent.

Section 5.02     Financial Records; Access to Information. Such Borrower shall maintain its books and records in accordance with GAAP. Until the Commitments have expired or been terminated and the Principal Amount of and Interest on each Loan and all other Obligations owed by such Borrower have been paid in full, such Borrower, the Related Servicer and the Related Seller shall, at their respective expense, from time to time during regular business hours as requested by the Administrative Agent, permit the Administrative Agent or its agents or representatives (including independent public accountants, which may be such Borrower's or an Affiliate's independent public accountants), with reasonable out-of-pocket costs and expenses associated therewith reimbursable to the Administrative Agent by such Borrower (subject to the limitations set forth in Section 9.02), (a) to conduct audits of the Receivables, the Collateral and the related books and records and collections systems of such Borrower, the Related Servicer or the Related Seller, as the case may be (which may, in the case of the SPLCSS Borrower and the Dorchester Borrower, include a fee of up to $50 per Eligible Receivable owned by such Borrower payable by such Borrower to a third party selected by the Administrative Agent for initial due diligence of the Receivables), (b) to examine and make copies of and abstracts from all books, records and documents (including computer tapes and disks) in the possession or under the control of such Borrower, the Related Servicer or the Related Seller, as the case may be, relating to Receivables and Collateral, including the Receivable Files and Related Contracts, and (c) to visit the offices and properties of such Borrower, the Related Servicer or the Related Seller, as the case may be, for the purpose of examining such materials described in clause (b) above, and to discuss matters relating to Receivables and the Collateral or such Borrower's, the Related Servicer's or the Related Seller's performance under the Transaction Documents or under the Related Contracts with any of the officers or employees of such Borrower, the Related Servicer or the Related Seller,

68

as the case may be, having knowledge of such matters; provided that prior to a Default or an Event of Default with respect to such Borrower, the same is done with three (3) Business Days' advance written notice during normal business hours to the extent access to such Borrower's, the Related Servicer's or the Related Seller's premises is required and such Borrower shall be obligated to pay for only two (2) such audits per annum (excluding the initial due diligence audit referenced in clause (i) above); provided that, with respect to the SPLCSS Borrower and the Dorchester Borrower if, following any Borrowing by such Borrower, the aggregate Valuation Amount for all Eligible Receivables owned by such Borrower increases by twenty five percent (25%) or more, then such Borrower shall be obligated to pay for two (2) audits in the twelve-month period following such Borrowing (notwithstanding the per-annum limitation above). In conjunction with such audits, examinations and visits, the Administrative Agent and its agents, representatives, advisors or consultants shall have full access during regular business hours to premises, books and records and members of management as may be reasonably requested by the Administrative Agent or any such agent, representative, advisor or consultant in connection with a review of the business and operations of such Borrower (including budgets, records, projections, financial information, reports and turnaround plans) and such Borrower shall at all times cooperate with the reasonable requests of the Administrative Agent and its agents, representatives, advisors or consultants subject to the limitations set forth in the preceding sentence.

Section 5.03   Financial Reports. All financial statements, schedules and reports required to be provided under this Agreement shall be in a form consistent in all material respects with the historical statements provided to Lenders, and each statement and report provided by such Borrower shall be prepared in accordance with GAAP (subject, in the case of unaudited financial statements, to normal year-end adjustments and absence of footnote disclosure), certified, on behalf of such Borrower in his or her capacity as an officer of such Borrower or the Related Seller, as being true and correct to the knowledge and belief by the chief financial officer of such Person.

ARTICLE VI

ADMINISTRATION AND COLLECTION OF RECEIVABLES

Section 6.01   Designation of Servicers. The servicing, administration and collection of the Receivables and any Health Care Provider Loan Receivables shall be conducted by each Servicer so designated hereunder or pursuant to a Joinder Agreement from time to time. Until the Administrative Agent gives notice to any Borrowers of the designation of a new Servicer in accordance with the terms hereof, (a) Sutton Park Servicing LLC is hereby designated as, and hereby agrees to perform the duties and obligations of, (i) the SPLCSS Servicer pursuant to the terms hereof with respect to the Receivables owned by the SPLCSS Borrower and (ii) the Dorchester Servicer pursuant to the terms hereof with respect to the Receivables owned by the Dorchester Borrower, (b) Insurety Servicing LLC is hereby designated as, and hereby agrees to perform the duties and obligations of, the Insurety Servicer pursuant to the terms hereof with respect to the Receivables owned by the Insurety Borrower and (c) Signal Servicing LLC is hereby designated as, and hereby agrees to perform the duties and obligations of, the Signal Servicer pursuant to the terms hereof with respect to the Receivables owned by the Signal Borrower. At any time after the (x) date in which a Controlling Interest in a Seller or a Servicer is acquired by a party that does not hold a Controlling Interest in such Person as of the Closing Date, or (y) occurrence and during the continuance of a Servicer Default or Event of Default with respect to

69

applicable law or regulation or by any court, regulatory body or agency having jurisdiction over such party and (v) to the respective officers, directors, employees, accountants and advisors of each of the parties referred to in clause (ii) above; and provided further that such party shall have no obligation of confidentiality in respect of any information which may be generally available to the public or becomes available to the public (including by a third party) through no fault of such party.

(b)    Each Lender and the Administrative Agent agrees to maintain the confidentiality of all information with respect to the Borrowers, the Lottery Holding SPVs, the Sellers, the Servicers or the Receivables (including the Compliance Reports) furnished or delivered to it pursuant to this Agreement and all information with respect to this Agreement; provided that such information may be disclosed (i) to potential and current funds under management and advisory and managed account clients and their respective administrators and advisors, (ii) to such party's legal counsel and auditors and to such party's assignees and participants and potential assignees and participants and their respective counsel if they agree to hold it confidential, (iii) in connection with any litigation with the Borrowers, the Lottery Holding SPVs, the Servicers or the Sellers, (iv) to the extent required by applicable law or regulation or by any court, regulatory body or agency having jurisdiction over such party and (v) to the respective officers, directors, employees, accountants and advisors of each of the parties referred to in clause (ii) above; and provided further that such party shall have no obligation of confidentiality in respect of any information which may be generally available to the public or becomes available to the public (including by a third party) through no fault of such party.

Section 10.06 GOVERNING LAW. THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK (WITHOUT REFERENCE TO ITS CONFLICT OF LAWS PROVISIONS (OTHER THAN §§5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW)).

Section 10.07 Execution in Counterparts. This Agreement may be executed in any number of counterparts, each of which when so executed shall be deemed to be an original and all of which when taken together shall constitute one and the same agreement.

Section 10.08 Termination; Survival. The provisions of Sections 6.06, 9.01, 10.04, 10.05, 10.06, 10.09 and 10.12 shall survive any termination of this Agreement. This Agreement shall terminate on the first day after the Commitment Termination Date on which all Obligations due and owing to the Administrative Agent and the Lenders hereunder and under the Transaction Documents have been paid in full.

Section 10.09 CONSENT TO JURISDICTION.

(a)    EACH PARTY HERETO HEREBY IRREVOCABLY SUBMITS TO THE NON-EXCLUSIVE JURISDICTION OF ANY NEW YORK STATE OR FEDERAL COURT SITTING IN NEW YORK CITY IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE OTHER TRANSACTION DOCUMENTS, AND EACH PARTY HERETO HEREBY IRREVOCABLY AGREES THAT ALL CLAIMS IN RESPECT OF SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN

SUCH NEW YORK STATE COURT OR, TO THE EXTENT PERMITTED BY LAW, IN SUCH FEDERAL COURT. THE PARTIES HERETO HEREBY IRREVOCABLY WAIVE, TO THE FULLEST EXTENT THEY MAY EFFECTIVELY DO SO, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING. EACH OF THE BORROWERS AND LOTTERY HOLDING SPVS HEREBY IRREVOCABLY APPOINTS THE RELATED SELLER (EACH, A "BORROWER PROCESS AGENT"), EACH WITH AN OFFICE ON THE DATE HEREOF AT 600 BRICKELL AVE, SUITE 1638, MIAMI, FLORIDA 33131, AS ITS AGENT TO RECEIVE, ON BEHALF OF SUCH BORROWER OR LOTTERY HOLDING SPV, AND ITS RESPECTIVE PROPERTY, SERVICE OF COPIES OF THE SUMMONS AND COMPLAINT AND ANY OTHER PROCESS WHICH MAY BE SERVED IN ANY SUCH ACTION OR PROCEEDING. SUCH SERVICE MAY BE MADE BY MAILING OR DELIVERING A COPY OF SUCH PROCESS TO THE APPLICABLE BORROWER OR LOTTERY HOLDING SPV IN CARE OF THE RELATED BORROWER PROCESS AGENT AT SUCH BORROWER PROCESS AGENT'S ABOVE ADDRESS, AND EACH BORROWER AND LOTTERY SPV IRREVOCABLY AUTHORIZES AND DIRECTS THE RELATED BORROWER PROCESS AGENT TO ACCEPT SUCH SERVICE ON ITS BEHALF. EACH OF THE LENDERS AND THE ADMINISTRATIVE AGENT HEREBY IRREVOCABLY APPOINTS LAW DEBENTURE CORP. (THE "LEADENHALL PROCESS AGENT"), WITH AN OFFICE ON THE DATE HEREOF AT 400 MADISON AVE #4D, NEW YORK, NY 10017, AS ITS AGENT TO RECEIVE, ON BEHALF OF THE LENDERS, THE ADMINISTRATIVE AGENT AND THEIR RESPECTIVE PROPERTY, SERVICE OF COPIES OF THE SUMMONS AND COMPLAINT AND ANY OTHER PROCESS WHICH MAY BE SERVED IN ANY SUCH ACTION OR PROCEEDING. THE ADMINISTRATIVE AGENT MAY APPOINT ANOTHER AGENT TO RECEIVE, ON BEHALF OF THE LENDERS, THE ADMINISTRATIVE AGENT AND THEIR PROPERTY (IN EACH CASE, THE "SUCCESSOR LEADENHALL PROCESS AGENT"), SERVICE OF COPIES OF THE SUMMONS AND COMPLAINT AND ANY OTHER PROCESS WHICH MAY BE SERVED IN ANY SUCH ACTION OR PROCEEDING AT ANY TIME WITH PRIOR WRITTEN NOTICE TO THE BORROWERS AND THE SERVICERS. SUCH SERVICE MAY BE MADE BY MAILING OR DELIVERING A COPY OF SUCH PROCESS TO THE LENDERS AND THE ADMINISTRATIVE AGENT IN CARE OF THE LEADENHALL PROCESS AGENT AT THE LEADENHALL PROCESS AGENT'S ABOVE ADDRESS OR IF APPLICABLE, TO THE SUCCESSOR LEADENHALL PROCESS AGENT AT THE SUCCESSOR LEADENHALL PROCESS AGENT'S ADDRESS INDICATED IN THE NOTICE OF THE APPOINTMENT OF SUCH SUCCESSOR, AND EACH OF THE LENDERS AND THE ADMINISTRATIVE AGENT HEREBY IRREVOCABLY AUTHORIZES AND DIRECTS THE LEADENHALL PROCESS AGENT OR IF APPLICABLE, THE SUCCESSOR LEADENHALL PROCESS AGENT TO ACCEPT SUCH SERVICE ON ITS BEHALF. THE PARTIES HERETO AGREE THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.

(b) EACH BORROWER, EACH SERVICER, EACH SELLER, EACH LENDER AND THE ADMINISTRATIVE AGENT CONSENTS TO THE SERVICE OF ANY AND ALL PROCESS IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES OF SUCH PROCESS TO IT AT ITS ADDRESS SPECIFIED IN SECTION 10.02.

NOTHING IN THIS SECTION 10.09 SHALL AFFECT THE RIGHT OF ANY LENDER, THE ADMINISTRATIVE AGENT, ANY BORROWER, ANY SERVICER OR ANY SELLER TO SERVE LEGAL PROCESS IN ANY OTHER MANNER PERMITTED BY LAW.

(c)     TO THE EXTENT THAT ANY BORROWER HAS OR HEREAFTER MAY ACQUIRE ANY IMMUNITY FROM JURISDICTION OF ANY COURT OR FROM ANY LEGAL PROCESS (WHETHER THROUGH SERVICE OR NOTICE, ATTACHMENT PRIOR TO JUDGMENT, ATTACHMENT IN AID OF EXECUTION, EXECUTION OR OTHERWISE) WITH RESPECT TO ITSELF OR ITS PROPERTY, SUCH BORROWER HEREBY IRREVOCABLY WAIVES SUCH IMMUNITY IN RESPECT OF ITS OBLIGATIONS UNDER THIS AGREEMENT OR ANY OTHER TRANSACTION DOCUMENT.

Section 10.10  WAIVER OF JURY TRIAL. EACH PARTY HERETO HEREBY WAIVES, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, TRIAL BY JURY IN ANY JUDICIAL PROCEEDING INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER (WHETHER SOUNDING IN TORT, CONTRACT OR OTHERWISE) IN ANY WAY ARISING OUT OF, RELATED TO, OR CONNECTED WITH THIS AGREEMENT OR ANY DOCUMENT EXECUTED OR DELIVERED PURSUANT HERETO.

Section 10.11  USA Patriot Act. Each Lender hereby notifies each Borrower that pursuant to the requirements of the USA Patriot Act, it is required to obtain, verify and record information that identifies such Borrower, which information includes the name and address of each Borrower and other information that will allow such Lender to identify such Borrower in accordance with its requirements. The Borrowers shall promptly, following a request by the Administrative Agent or any Lender provide all documentation and other information that the Administrative Agent or such Lender reasonably requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the USA Patriot Act.

Section 10.12  Leadenhall as Administrative Agent. It is expressly understood and agreed by the parties hereto that (i) this Agreement is executed by Leadenhall Capital Partners LLP, not in its individual capacity but solely as agent on behalf of the Lenders, (ii) in no event shall Leadenhall Capital Partners LLP, in its individual capacity have any liability for the representations, warranties, covenants, agreements or other obligations of the Lenders hereunder, and (iii) except as expressly set forth herein, in no event shall Leadenhall Capital Partners LLP have any obligation to perform any of the obligations and covenants of the Lenders under this Agreement or any other Transaction Document.

Section 10.13  Joinder.

(a)     At any time, at the sole discretion of the Administrative Agent, the Administrative Agent may enter into a Joinder Agreement with one or more Joining Borrowers, Joining Servicers, Joining Sellers or Joining Lenders. Such Joinder Agreement shall set forth the terms on which such parties may join this Agreement and may, with the consent of the Administrative Agent, amend any terms in this Agreement, solely with respect to such joining

95

parties; provided, that if any such amendment materially and adversely effects the rights of any Lender Group, the consent of the Required Lenders in such Lender Group shall be required.

(b)     With respect to any Joining Borrower, Joining Seller or Joining Servicer, on or before the date that any Joinder Agreement becomes effective, the Administrative Agent and each Lender in the Related Lender Group shall have received:

(i)     (A) a general corporate and enforceability opinion or opinions of outside counsel of the Joining Borrower; (B) a security interest opinion covering the perfection of the Administrative Agent for the benefit of the Secured Parties in such Joining Borrower's interest in the Receivables together with the Related Security and Collections with respect thereto; (C) a true sale opinion with respect to the receivables of such Joining Borrower, (D) a non-consolidation opinion with respect to such Joining Borrower and its parent entity, and (E) a tax opinion with respect to such Joining Borrower;

(ii)     Officer's certificates of such Joining Borrower, Joining Servicer and Joining Seller;

(iii)     UCC and tax lien search reports with respect to such Joining Borrower and Joining Seller;

(iv)     UCC-1 Financing Statements with respect to such Joining Borrower and Joining Seller;

(v)     if required by any Lender in the Related Lender Group, Notes in favor of each Lender in the Related Lender Group;

(vi)     One or more Account Control Agreements or confirmation that all Obligors with respect to such Joining Borrower have been directed to remit payments to an account governed by an existing Account Control Agreement;

(vii)     a pro forma Monthly Report, substantially in the form of Annex A-2, together with a Compliance Report signed by the Related Servicer, in substantially the form of Annex A-1; and

(viii)     the Organizational Documents of such Joining Borrower, Joining Servicer and Joining Seller, the IRS Form W-9 (or any successor form) of such Joining Borrower, Joining Servicer and Joining Seller and any other documentation that the Administrative Agent shall reasonably request.

(c)     On or before the date that any Joinder Agreement becomes effective, upon reasonable notice and at the sole cost of the Joining Borrower, such Joining Borrower shall permit a third party reasonably acceptable to the Lenders to perform a review, which review is satisfactory to the applicable Lenders.

*[Signature Pages Follow]*

DocuSign Envelope ID: EEA9AA04-ABCA-4A7B-9D9D-4D8DBB0D18B4

IN WITNESS WHEREOF, the parties have caused this Loan and Security Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

BORROWERS:

SPLCSS III LLC

By: *Steven W. Pasko*
—DF9B492F396A415..
Name: Steven W. Pasko
Title: President

SIGNAL SML 4 LLC

By: *Steven W. Pasko*
—DF9B492F396A415..
Name: Steven W. Pasko
Title: President

INSURETY AGENCY SERVICES LLC

By: *John Richard Zirkelbach*
—1A0518B8DE884ED...
Name: John R. Zirkelbach
Title: Authorized Signatory

DORCHESTER RECEIVABLES II LLC

By: *Steven W. Pasko*
—DF9B492F396A415...
Name: Steven W. Pasko
Title: President

[Signature Page to Loan and Security Agreement]