Case 9:24-cv-81143-DMM   Document 76-4   Entered on FLSD Docket 12/13/2024   Page 1 of 6

# Exhibit 4

*Note:* Leadenhall previously filed this Declaration (ECF No. 48-1) in opposing Plaintiffs' Motion for Preliminary Injunction. For ease of reference, Leadenhall is refiling this Declaration while omitting the exhibits referenced therein.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

**Case No. 24-81143-CIV-DMM**

|  |
|---|
| 777 PARTNERS LLC and SUTTONPARK CAPITAL LLC, <br><br>        Plaintiffs, <br><br>    v. <br><br> LEADENHALL CAPITAL PARTNERS LLP, LEADENHALL LIFE INSURANCE LINKED INVESTMENTS FUND PLC, NOAH DAVIS, SAIPH CONSULTING LLC, and PAUL KOSINSKI, <br>        Defendants. |

<u>**DECLARATION OF CRAIG GILLESPIE**</u>

I, Craig Gillespie, declare as follows:

1. I am a Managing Partner at Leadenhall Capital Partners LLP ("Leadenhall"), and my title is Head of Life and Alternative Credit Portfolio Management. I have personal knowledge of the matters described in this Declaration, and if called as a witness, I could and would testify competently to the matters discussed in this declaration.

2. I submit this Declaration in support of Leadenhall's Response to Plaintiffs 777 Partners LLC ("777 Partners") and SuttonPark Capital LLC's ("SuttonPark" and together with 777 Partners, "Plaintiffs'") Expedited Motion for a Preliminary Injunction.

3. On May 7, 2021, Leadenhall entered into a secured credit facility with 777 Partners, SuttonPark, and certain of their affiliates, which was memorialized in a Loan and Security Agreement (the "LSA") and related agreements. I executed the LSA on behalf of Leadenhall. Pursuant to the LSA, Plaintiffs were able to access financing provided by Leadenhall. Plaintiffs' debt was secured by assets pledged as collateral.

4. On September 19, 2022, I received an anonymous email from sender noreply@anonymousemail.me stating as follows: "The assets you are lending against at

1

SuttonPark do not exist. Josh Wander either never bought them or already pledged them to another lender. You are at great risk... your investment is unsecured. What he is doing is criminal."

5. After receiving this anonymous tip, Leadenhall began investigating and learned that Plaintiffs and their affiliates had, in fact, double-pledged collateral or had never owned or no longer owned assets that had been pledged to Leadenhall as collateral. Presented with this risk, Leadenhall exercised its right under the LSA to audit the collateral securing its loans.

6. In August 2023, Leadenhall advised Plaintiffs that it intended to retain Paul Kosinski, SuttonPark's former Chief Operating Officer, to conduct an audit of the collateral (the "Collateral Audit"). Leadenhall chose Mr. Kosinski to conduct the Collateral Audit because Mr. Kosinski has detailed knowledge of SuttonPark's operations and processes for allocating and pledging assets to creditors like Leadenhall. Leadenhall therefore believed that Mr. Kosinski would be capable of interpreting SuttonPark's records to determine which assets pledged as collateral still existed and whether they were free and clear of other security interests.

7. This was particularly important to Leadenhall because, at the time the Collateral Audit was initiated, Plaintiffs were unable to determine the amount of eligible collateral that was still securing Leadenhall's loans under the LSA.

8. Leadenhall first entered into a Consulting Agreement with Mr. Kosinski's company, Saiph Consulting LLC ("Saiph"), in August 2023, for the purpose of retaining Saiph to perform the Collateral Audit. At that time, Plaintiffs and Leadenhall were in the process of scheduling an on-site visit to conduct due diligence on the assets pledged as collateral under the LSA. Plaintiffs refused to allow Mr. Kosinski to participate, and therefore, the on-site visit was cancelled.

9. The objections to Mr. Kosinski were initially made directly by Plaintiffs, but as time went on, Plaintiffs attributed the objections to their "senior lender" and alleged co-conspirator, Advantage Capital Holdings, LLC ("A-CAP"). In November 2023, the co-founder and managing partner of 777 Partners, Steven Pasko, sent an email to me stating: "At the request of A-CAP, I wanted to reiterate our original concerns regarding your request to use Paul Kosinski to perform an asset review of SuttonPark. Our objection is for two primary reasons: first, it would violate his severance agreement and, second and more importantly, he is currently a direct competitor." A true and correct copy of this email is attached hereto as Exhibit 1.

2

10. These objections had the effect of delaying the completion of the Collateral Audit, which required on-site access to Plaintiffs' systems, for months.

11. On May 3, 2024, Leadenhall filed an action in New York federal court asserting RICO, fraud, and breach of contract claims against Plaintiffs and A-CAP, among other defendants. *See generally Leadenhall Capital Partners LLP et al. v. Wander et al.*, No. 1:24-cv-03453-JGK (S.D.N.Y., filed May 3, 2024).

12. On May 19, 2024, counsel for Leadenhall sent a letter to 777 Partners' management reiterating its request for access to Plaintiffs' records for the purpose of the Collateral Audit. The parties subsequently agreed upon the scope of the Audit, and on June 7, 2024, Leadenhall entered into an Amended Consulting Agreement with Saiph. A true and correct copy of the Amended Consulting Agreement is attached hereto as Exhibit 2.

13. The parties to the Amended Consulting Agreement are Saiph and Leadenhall Capital Partners LLP. Leadenhall Life Insurance Linked Investments Fund PLC is not a party to that Agreement.

14. As set forth in the Amended Consulting Agreement, Saiph's work on the Collateral Audit was limited to performing specific analyses on specific files, all of which pertain to specific assets pledged as collateral. *See* Ex. 1, Amended Consulting Agreement, at Schedule A.

15. The Collateral Audit was performed primarily by two individuals at Saiph: Mr. Kosinski and Lauren Boersig. I understand that Defendant Noah Davis was an independent contractor who performed work for Saiph. To my knowledge, Mr. Davis never worked for Leadenhall in any capacity, including on the Collateral Audit.

16. Leadenhall never received any information from Mr. Davis in connection with the Collateral Audit. In particular, Leadenhall never received or had possession of any of the information or property Mr. Davis is alleged to have misappropriated from Plaintiffs.

17. Leadenhall has never had a direct relationship with Mr. Davis, such as an employer-employee or principal-agent relationship. Leadenhall did not direct Mr. Davis to gain unauthorized access to Plaintiffs' computer systems, offices, or other property. For the avoidance of doubt, Leadenhall does not and would not condone any attempt to gain unauthorized access to Plaintiffs' systems or property.

18. In connection with the Collateral Audit, Saiph provided to Leadenhall a report dated September 5, 2024 summarizing its analysis of Leadenhall's collateral. A true and correct copy

3

of Saiph's September 5, 2024 Report is attached hereto as Exhibit 3. Saiph also provided the data underlying the report in spreadsheet form. Throughout the course of the Collateral Audit, Saiph also provided periodic updates and information by email and in spreadsheet form detailing Saiph's findings and progress. I have reviewed the information provided by Saiph in connection with the collateral audit and can confirm that it appears to pertain to the legitimate scope of Saiph's work: analyzing the status of Leadenhall's collateral.

19.     Leadenhall has no independent knowledge about Mr. Davis' actions and how or why he obtained unauthorized access to Plaintiffs' computer systems, offices, and/or information.

20.     As Saiph's work is now complete, Saiph's engagement in connection with the Collateral Audit has been terminated. Accordingly, there will be no further exchange of data obtained from Plaintiffs between Leadenhall and Saiph regarding Leadenhall's collateral. To the extent any further discussions regarding the Collateral Audit occur between Saiph and Leadenhall, such discussions will be limited to the work Saiph has already performed.

21.     Leadenhall has no access to or means of accessing the computer systems of 777 Partners or SuttonPark.

22.     I understand that in their Proposed Order, Plaintiffs have asked the Court to enjoin Leadenhall from (a) "accessing or attempting to access Plaintiffs' computer systems"; (b) "making use of the data or other information that was acquired through the unauthorized intrusions"; (c) "destroying" or "disposing of" any "records that relate to Plaintiffs' Computers" and to require Leadenhall to (d) "return any and all copies of the data . . . acquired through the unauthorized incursions"; and (e) "[r]eturn any and all equipment belonging to Plaintiffs, including the laptops." *See* ECF No. 11-5 at 9–10. Leadenhall is unable to "make use" of, destroy, or return any of Plaintiffs' property because it does not have possession of such property. For the avoidance of doubt, however, I can confirm that Leadenhall has no intention of engaging in any of the conduct Plaintiffs seek to enjoin other than preserving its contractual rights to access information relating to its collateral under the LSA.

23.     Plaintiffs served Leadenhall with the summons and complaint in the above-captioned case on October 21, 2024. They did so by effecting service upon Law Debenture Corporate Services Inc., which is Leadenhall's designated process agent under Section 10.09 of the LSA. A true and correct copy of that provision of the LSA is attached hereto as Exhibit 4.

4

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and that this declaration was executed this 24th day of October, 2024.

Dated: October 24, 2024

_____
Craig Gillespie