**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

**Case No. 24-81143-CIV-DMM**

777 PARTNERS LLC and SUTTONPARK
CAPITAL LLC,

                        Plaintiffs,

        v.

LEADENHALL CAPITAL PARTNERS LLP,
LEADENHALL LIFE INSURANCE
LINKED INVESTMENTS FUND PLC,
NOAH DAVIS, SAIPH CONSULTING LLC,
and PAUL KOSINSKI,

                        Defendants.

**DEFENDANTS LEADENHALL CAPITAL PARTNERS LLP AND**
**LEADENHALL LIFE INSURANCE LINKED INVESTMENTS FUND PLC'S**
**<u>MOTION FOR SANCTIONS AND INCORPORATED MEMORANDUM OF LAW</u>**

Pursuant to Rule 11 of the Federal Rules of Civil Procedure, Leadenhall hereby moves for sanctions against Plaintiffs 777 Partners LLC and SuttonPark Capital LLC.[1]

## INTRODUCTION

Plaintiffs make the extraordinary claim that Leadenhall and its counsel directed Plaintiffs' former employee, Noah Davis, to commit burglary and violate federal law to gain an advantage in the RICO and fraud litigation Leadenhall is prosecuting against Plaintiffs in the Southern District of New York, where Leadenhall has already obtained an asset-freezing injunction. Leadenhall's RICO Action revealed a fraudulent scheme by which 777 Partners, SuttonPark, and their co-conspirators induced Leadenhall to loan hundreds of millions of dollars on the false pretense that the investment would be fully secured by collateral. Plaintiffs have admitted—on recorded phone calls and in writing—that they breached their contracts with Leadenhall by double-pledging or falsifying the collateral securing Leadenhall's financing. Plaintiffs then tried to cover up their fraud by forging bank statements and other documents.

This case is the latest of Plaintiffs' efforts to frustrate Leadenhall's contractual right to audit what remains of the collateral pledged to it by SuttonPark, following over a year of obfuscation and delay to prevent Leadenhall's designated auditor, Saiph Consulting LLC ("Saiph") (owned by Plaintiffs' former COO, Paul Kosinski), from conducting the audit. After Plaintiffs withdrew their pretextual objections to the audit under threat of litigation and Saiph's *fully authorized* review began to reveal more evidence of Plaintiffs' fraud, Plaintiffs shut the audit down under the guise of "technological issues." Now, Plaintiffs have contrived another pretext to conceal their scheme: conveniently blaming Leadenhall for acts of alleged theft by Davis, Plaintiffs' own disgruntled former employee, despite his admission that he acted alone.

If Plaintiffs hoped, after filing their initial complaint, that they would uncover some kernel of evidence in support of their baseless allegations that Leadenhall directed, or was even aware of, Davis' acts, they were wrong: the uncontroverted evidence submitted in response to Plaintiffs' motion for a preliminary injunction definitively *contradicted* their claims. Sworn declarations and documentary evidence submitted by Saiph, Kosinski, and Leadenhall make clear that (1) there was

---

[1] "Leadenhall" refers to Defendants Leadenhall Capital Partners LLP and Leadenhall Life Insurance Linked Investments Fund PLC; the "777 Entities" or "Plaintiffs" refers to Plaintiffs 777 Partners LLC and SuttonPark Capital LLC; and the "RICO Action" refers to *Leadenhall Capital Partners LLP et ano. v. Wander et al.*, No. 1:24-cv-03453-JGK (S.D.N.Y., filed May 3, 2024).

no employment or agency relationship between Leadenhall and Davis; (2) to the extent Saiph engaged Davis as an independent contractor, he never performed any work on Leadenhall's behalf, and Leadenhall's collateral audit work was conducted only by Saiph personnel; (3) all data collected by Saiph in connection with Leadenhall's collateral audit, and all work product or data Leadenhall received from Saiph, was within the agreed-upon scope of the audit; and (4) Davis admitted to Saiph that he acted alone—as corroborated by Plaintiffs' own evidence that, almost every time Davis purportedly accessed Plaintiffs' systems, he did so with his own 777 Partners credentials, which Plaintiffs inexplicably left active after Davis' resignation.

Plaintiffs nonetheless chose to double down in an Amended Complaint (ECF No. 68, the "AC") that does not even address, let alone allege facts to rebut, this evidence, demonstrating reckless disregard for the truth and revealing the case against Leadenhall for what it is: a frivolous attempt to harass an adversary and force it to incur unnecessary litigation costs to gain leverage in the RICO Action. Plaintiffs' conclusory assertions—*e.g.*, that "all of the systems and information" Davis accessed "would clearly be considered by Leadenhall as useful in prosecuting the [RICO Action]," AC ¶ 38—cannot meet even Rule 11's pleading standard. Plaintiffs fail to allege any *facts* connecting Leadenhall to Davis: no communication, direct or indirect, between Davis and Leadenhall; no facts reflecting Leadenhall's knowledge of or involvement in Davis' conduct; and no facts suggesting Leadenhall received any information from Davis. Plaintiffs' express reliance on inferences—for instance, the tepid suggestion that "it is reasonable to *infer* that Davis . . . provided these files to Leadenhall," *id.* ¶ 88 (emphasis added)—is facially *un*reasonable in light of the controverting evidence submitted by multiple defendants.

Because *any* sincerely held belief that the factual contentions underlying Plaintiffs' claims against Leadenhall "have evidentiary support or … will likely have evidentiary support after . . . discovery," Fed. R. Civ. P. 11(b), was put to rest by the uncontroverted evidence corroborated by multiple Defendants, their decision to pursue the claims anyway is sanctionable.

On December 12, 2024 Leadenhall served upon Plaintiffs a copy of this motion and a letter explaining that Plaintiffs' allegations as to Leadenhall misrepresent the facts and ignore the law and providing 21 days' notice of Leadenhall's intent to seek sanctions unless the claims were withdrawn. Plaintiffs' refusal to withdraw their claims against Leadenhall in light of the unrebutted evidence contradicting their unsupported "inferences" can only be viewed as a bad-faith litigation tactic to harass and malign Leadenhall, distract from the RICO Action, and inflate litigation costs.

## FACTUAL BACKGROUND

### I.      LEADENHALL REVEALS PLAINTIFFS' FRAUD IN THE RICO ACTION AND WINS AN ASSET-PRESERVING INJUNCTION.

In 2021, the 777 Entities entered into a secured credit facility with Leadenhall, memorialized in a May 2021 Loan and Security Agreement ("LSA") and other contracts. *See* RICO Action, ECF No. 187, Corrected Am. Compl. ("RICO Compl.") ¶¶ 49–53. The LSA permitted SuttonPark and several other affiliates of 777 Partners to borrow secured debt from Leadenhall-affiliated lenders. *Id*. 777 Partners and its affiliate, 600 Partners LLC, guaranteed the borrowers' obligations to Leadenhall, including the obligation to maintain sufficient collateral. *Id.* ¶¶ 84–87. In September 2022, Leadenhall received an anonymous tip warning that collateral ostensibly securing Leadenhall's loans was pledged to other creditors (*i.e.*, "double-pledged"). *Id.* ¶ 105. Leadenhall investigated and verified the tip—and in March 2023, the 777 Entities admitted they had double-pledged Leadenhall's collateral (while claiming that it was merely the result of a recording glitch that could be remedied). *Id.* ¶¶ 12, 106–28. Over the next year, Leadenhall's investigation confirmed that the double pledge resulted not from a "mistake," but from a fraudulent scheme by Plaintiffs and their co-conspirators, including their "senior lender" Advantage Capital Holdings, LLC ("A-CAP"). *Id.* ¶¶ 12–13, 163–74, 198–229.

On May 3, 2024, Leadenhall filed the RICO Action, asserting claims for breach of contract, fraud, and RICO violations against Plaintiffs, their principals, certain affiliates, and A-CAP. *Id.* ¶¶ 313–417. The court granted a temporary restraining order ("TRO") and then a preliminary injunction, recognizing Leadenhall's "substantial allegations supported by detailed allegations in the complaint and supporting affidavits."  RICO Action, ECF No. 128, June 7, 2024 Hr'g Tr. 4:3–8. The purpose of this injunctive relief was to prevent the dissipation of assets while the RICO Action is pending. *Id.* 28:4–7 (finding that "assets couldn't be stripped … or distributed to other parts of a complex corporate structure at less than fair value"); *see also id.* ECF Nos. 114, 135, 146 (orders on TRO and preliminary injunction). There is no serious dispute that the 777 Entities breached the LSA. *See*, *e.g.*, *id.,* ECF No. 128, June 7, 2024 Hr'g Tr. 48:19–22 (court noting that defendants issued "reports confirm[ing] that SuttonPark . . . borrowed hundreds of millions of dollars in excess of contractual limitations"). In October 2024, the court denied a motion to modify the preliminary injunction—once again crediting Leadenhall's allegations that the 777 Entities "were dissipating or preparing to dissipate assets in which [Leadenhall] holds a security interest." *Id.*, ECF No. 201, Oct. 2, 2024 Hr'g Tr. 55:22–24.

## II.    PLAINTIFFS ATTEMPT TO THWART LEADENHALL'S RIGHT TO AUDIT ITS COLLATERAL WHILE THE RICO ACTION IS PENDING.

The LSA grants Leadenhall (and its consultants) the right to audit "the Receivables, the Collateral and the related books and records and collection systems of [each] Borrower." ECF 53-2, LSA § 5.02. After learning of Plaintiffs' double-pledge, Leadenhall exercised its right to audit the collateral (the "Collateral Audit"). *See* ECF No. 48-1, Declaration of Craig Gillespie ("Gillespie Decl.") ¶ 5. In August 2023, Leadenhall notified Plaintiffs it intended to retain Saiph, owned by SuttonPark's former Chief Operating Officer Paul Kosinski, to perform the Collateral Audit. *Id.* ¶ 6. Plaintiffs initially objected to having Kosinski perform the Collateral Audit, citing pretextual competition concerns although Saiph is not a competitor. *See id.* ¶¶ 8–9 & Ex. 1 (Nov. 29, 2023 Email from S. Pasko to C. Gillespie); *see also* ECF No. 11-2, Declaration of Ian Ratner ("Ratner Decl.") ¶ 13; ECF No. 53-1, Declaration of Paul Kosinski ("Kosinski Decl.") ¶ 9 (explaining that "777 stonewalled" the audit for "nine months"). But Plaintiffs eventually acknowledged that they had no basis to object under the LSA and granted Saiph access to SuttonPark's MP Fin system. Ratner Decl. ¶ 14; AC ¶ 32. MP Fin is "the proprietary application used by SuttonPark to manage receivables and other assets securing loans from various lenders." AC ¶ 32.

Pursuant to Leadenhall's Amended Consulting Agreement with Saiph (the "Saiph Agreement"), Saiph acts independently of Leadenhall and is not an employee of Leadenhall. Gillespie Decl., Ex. 2 (Saiph Agmt.) §§ I.1, I.4, IV.1. The Saiph Agreement requires Saiph to perform certain analyses of the collateral, including tracing the chain of title from each receivable's origination to placement in Leadenhall's credit facility and preparing a schedule of all payments due and cash flows for each receivable. *Id.* at 12. During the same period, Saiph was separately engaged by another creditor of the 777 Entities—Northwestern Mutual Life ("NML")—to audit a pool of annuities pledged to NML. Kosinski Decl. ¶¶ 4, 21–22.

In August 2024, while the Collateral Audit was underway, Plaintiffs revoked Saiph's access due to "technological issues." ECF No. 48-6, Declaration of Leigh Nathanson ("Nathanson Decl.") ¶ 5 & Ex. 2 (Aug. 14, 2024 Email from J. McCarthy to L. Nathanson). Plaintiffs' counsel later admitted that this statement was untrue—and was merely a pretext for the 777 Entities to "investigate" Saiph's work. *Id.* ¶ 7 & Ex. 4 (Aug. 23, 2024 Ltr. from L. Nathanson to J. McCarthy) at 1. On August 20, Plaintiffs' counsel advised that an unnamed "member of the Saiph Consulting team" had gained unauthorized access to "portions of our clients' computer systems" and that

SuttonPark would not allow Saiph to continue the Collateral Audit. *Id.* ¶ 6 & Ex. 3 (Aug. 20, 2024 Ltr. from J. McCarthy to L. Nathanson) at 1–2. Leadenhall relayed to Plaintiffs Saiph's representation "that none of its employees physically accessed any laptop or computer belonging to your clients in connection with Saiph's engagement for Leadenhall" and that "[a]ll information accessed and/or extracted by Saiph pursuant to [LSA] Section 5.02 was within the scope of what was provided to Saiph by your clients." *Id.* ¶ 8 & Ex. 4 at 3. Plaintiffs' revocation of Saiph's access came on the heels of Saiph's discovery of records associated with assets pledged as collateral to Leadenhall—information Leadenhall was squarely authorized to access—documenting that the 777 Entities *knew* the collateral was double-pledged, did not exist, or had been sold, *and nonetheless kept them allocated to Leadenhall. See* RICO Compl. ¶ 363(a); Kosinski Decl. ¶ 19.

## III.   PLAINTIFFS EXPLOIT THEIR FORMER EMPLOYEE'S CONDUCT TO MALIGN LEADENHALL.

In September 2024, Leadenhall was informed by Saiph that Noah Davis—777 Partners' former head of IT who then served as an independent contractor for Saiph—had apparently entered SuttonPark's offices on September 5 without permission. Kosinski Decl. ¶ 28; Nathanson Decl., Ex. 6 (Sept. 17, 2024 Ltr. from L. Nathanson to J. McCarthy) at 1. Saiph did not inform Leadenhall of any unauthorized electronic access into Plaintiffs' systems. Nathanson Decl., Ex. 6 at 2. Leadenhall requested that Saiph inform Plaintiffs of the incident, Nathanson Decl. ¶ 9, which Saiph did by letter dated September 11, 2024, *see* ECF No. 11-1, Declaration of John McCarthy ("McCarthy Decl."), Ex. B. On September 19, Davis was arrested for burglary by the Boca Raton Police Department. Nathanson Decl., Ex. 7 (Noah Davis Arrest Records). Plaintiffs now allege that, in addition to Davis' physical intrusion on September 5, Davis gained unauthorized electronic access to SuttonPark's computer systems on June 28, July 7, and unspecified dates between August 2-9, 2024. AC ¶¶ 39, 45–68. Plaintiffs' allegations confirm that nearly every time Davis gained *unauthorized* access to their systems, he used "his former 777 Partners' . . . credentials"—*not* credentials provided to him by Saiph. *Id.*

Plaintiffs plead no factual allegation that Leadenhall ever received or used any information Davis obtained through these alleged intrusions. Nor could they—Leadenhall has not received any information or property from Davis whatsoever, much less any information he is alleged to have misappropriated. Gillespie Decl. ¶ 16. In fact, Davis had no involvement with Leadenhall's Collateral Audit at all. *Id.* ¶ 15; Kosinski Decl. ¶¶ 4, 20; Nathanson Decl., Ex. 6 at 1–2. According to Kosinski, Davis' sole role in any 777-related work pertained to a separate, unrelated audit Saiph

was conducting for NML. Kosinski Decl. ¶¶ 25–26. The Collateral Audit work Saiph performed for Leadenhall was done by Kosinski and his colleague, Lauren Boersig. *Id.* ¶¶ 17–18; Gillespie Decl. ¶ 15. Leadenhall lacks information about what Davis did or why he did it beyond his representation to Saiph that he acted alone out of animus against his former employer over a payment dispute. Nathanson Decl., Ex. 6 at 1; Kosinski Decl. ¶ 28.

Saiph has confirmed that the vast majority of records it collected from Plaintiffs and used to provide work product or information to Leadenhall were obtained by June 21, 2024, with the exception of records provided manually to Saiph by 777 employees and a few supplemental "annuity masters" that were missing. *See* Kosinski Decl. ¶ 17. In other words, Saiph's collection of records for Leadenhall's Collateral Audit was complete at the time of Davis' alleged intrusions in between June 28 and August 9. The information Leadenhall received from Saiph in connection with its audit work all falls within the scope of the Collateral Audit—namely, Saiph's analysis of records pertaining to the collateral Plaintiffs pledged to Leadenhall, including information on the MP Fin System. *See* Kosinski Decl. ¶¶ 4, 17–18; Gillespie Decl. ¶ 18 & Ex. 2 at 12; *see also* AC ¶ 32 (noting that Plaintiffs configured Saiph's credentials to access the "database detailing Leadenhall's collateral" within MP Fin). The same is true of Saiph's final report—which confirms that Saiph's work was limited to its analysis of Leadenhall's collateral. *See* Gillespie Decl., Ex. 3.

## IV.   PROCEDURAL HISTORY

Plaintiffs filed their initial complaint on September 17, 2024, asserting common-law claims and statutory claims under the federal Computer Fraud and Abuse Act ("CFAA") and the Florida Computer Abuse and Data Recovery Act ("CADRA"), among others. ECF No. 1 ¶¶ 32–88. Plaintiffs then moved for a preliminary injunction, ECF No. 11, in response to which Kosinski and Leadenhall submitted sworn declarations attesting to the lack of connection between Davis and Leadenhall. Plaintiffs' motion for a preliminary injunction was denied as moot on October 31, 2024, as the parties entered into a stipulation on the basis that Defendants "have no intention of engaging in the unlawful and wrongful conduct that Plaintiffs seek to enjoin." ECF Nos. 55, 57.

Leadenhall's response to the motion for preliminary injunction put Plaintiffs on notice of its intent to seek sanctions over Plaintiffs' bad-faith allegations and claims. *See* ECF No. 48 at 1. Plaintiffs responded by filing an Amended Complaint attempting to couch the falsity of some of their unfounded allegations with the phrase "upon information and belief." *See, e.g.*, AC ¶¶ 106, 113, 124. That hedging language does not mitigate the fact that the AC continues to plead the

impermissible and unfounded conclusion that Leadenhall is vicariously liable for Davis' alleged conduct despite Plaintiffs' knowledge that Leadenhall had no employment or agency relationship, or any interaction, with Davis. For the reasons below, counsel lacks any good-faith basis to certify that the claims asserted against Leadenhall have any foundation in fact or law, as required by Rule 11(b) of the Federal Rules of Civil Procedure. Sanctions are warranted.

## LEGAL STANDARD

Rule 11(b) of the Federal Rules of Civil Procedure requires litigants to certify that (1) their pleadings are not "presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;" (2) their claims are "warranted by existing law or by a nonfrivolous argument for extending . . . existing law;" and (3) any "factual contentions have evidentiary support" or "will likely have evidentiary support after . . . discovery." Fed. R. Civ. P. 11(b). Importantly, Rule 11 imposes continuing obligations, and forbids a party from "insisting upon a position after it is no longer tenable." *See Battles v. City of Ft. Myers*, 127 F.3d 1298, 1300 (11th Cir. 1997). If a party violates Rule 11, and does not cure the violation after receiving notice, the Court may impose sanctions. Fed. R. Civ. P. 11(c). When deciding whether to impose sanctions, a court must determine whether the party's claims are objectively frivolous and whether the person who signed the pleadings should have known as much. *Baker v. Alderman*, 158 F.3d 516, 524 (11th Cir. 1998). A factual claim is frivolous when it has no reasonable factual basis, and a legal claim is frivolous when it has no reasonable chance of succeeding. *See id.*

## ARGUMENT

Plaintiffs' only basis for tying Leadenhall to this suit—the assertion that Leadenhall directed, assisted, or is vicariously liable for Davis's actions—is demonstrably false, making Plaintiffs' legal and factual contentions frivolous. Plaintiffs know they lack a good-faith basis to assert these claims, particularly after reviewing the evidence submitted by Leadenhall, Saiph, and Kosinski in connection with Plaintiffs' motion for a preliminary injunction. In addition to that overarching, fatal flaw, the AC contains other significant shortcomings—including basic pleading failures and contradictory allegations. Those deficiencies not only mandate dismissal of Plaintiffs' claims against Leadenhall, but also evince a lack of good faith. It is clear that Plaintiffs have attempted to embroil Leadenhall in their unrelated dispute with Davis for improper purposes, including to increase litigation costs, to harass Leadenhall with an objectively frivolous lawsuit in retaliation for the RICO Action, and as a pretext for further obstructing Leadenhall's contractual

right to information. This conduct is sanctionable.

## I.    PLAINTIFFS' CLAIMS REST ON FACTUAL ALLEGATIONS THAT ARE KNOWINGLY FALSE OR RECKLESSLY DISREGARD THE TRUTH.

Plaintiffs' allegations establish that their former employee Davis—and only Davis—gained unauthorized access to their systems and offices. *See, e.g.*, AC ¶¶ 3–5 (alleging that Davis "illegally and brazenly accessed Plaintiffs' computer networks" and "br[oke] into SuttonPark's offices"). Accordingly, Plaintiffs attempt to plead Leadenhall's liability only by alleging that Leadenhall is vicariously liable for Davis' conduct or that Leadenhall assisted or directed Davis. In particular, Plaintiffs' First, Second, Fourth, Seventh, and Eighth Claims (for violation of the CFAA, conversion, trespass to chattels, and violations of CADRA and the Stored Communications Act, respectively) are asserted against Leadenhall solely on a theory of vicarious liability. *See* AC ¶¶ 106, 113, 124, 142, 149. And Plaintiffs' Fifth and Sixth claims—"civil conspiracy" and "aiding and abetting"—are premised on the notion that Leadenhall "directed" or "substantially assisted" Davis' alleged intrusions. *Id.* ¶¶ 127, 133. These assertions are patently false.

### A.    Plaintiffs Know There Is No Evidence That Leadenhall Directed, Benefitted from, or Knew of Davis' Actions.

The falsity of Plaintiffs' allegations is borne out by the following facts: *First*, Davis never worked for Leadenhall in any capacity, including even as an independent contractor. *See* Gillespie Decl. ¶ 15; Kosinski Decl. ¶ 20. Instead, the Collateral Audit was performed primarily by Kosinski and Boersig. Gillespie Decl. ¶ 15; Kosinski Decl. ¶¶ 4, 15, 17–18. And the bulk of that work was done either by Kosinski on site or with credentials Plaintiffs issued and configured to have access only to specific databases within MP Fin—namely, those that pertained to Leadenhall's collateral or the records Saiph was analyzing on behalf of NML. Kosinski Decl. ¶¶ 13–14, 22. Davis was not engaged on Leadenhall's Collateral Audit; he worked on the NML audit. *Id.* ¶ 26. Indeed, in seeking a preliminary Injunction, Plaintiffs repeatedly emphasized that the systems Davis accessed were "unrelated" to Leadenhall's Collateral Audit. *See, e.g.*, ECF No. 11 at 8 ("Davis . . . accessed a variety of Plaintiffs' systems unrelated to Leadenhall's collateral audit."); *Id.* at 9 ("Davis twice accessed the virtual network of a 777 Partners subsidiary unrelated to Leadenhall's collateral audit"). Nor was Davis a Saiph "employee," as Plaintiffs allege. *See* AC ¶¶ 13, 99. He was an independent contractor of Saiph. *See* Kosinski Decl. ¶¶ 24–26.

*Second*, the majority of Davis' alleged unauthorized intrusions—electronic and physical—were accomplished through means Davis possessed by virtue of his former employment. Davis

used his own 777 Partners access credentials for virtually every alleged "intrusion" into Plaintiffs' systems. *See* AC ¶¶ 39, 45–68; *see also id.* ¶ 69 ("[F]or all but the intrusions involving Ms. Boersig's credentials, access credentials issued to Davis during his employment with 777 Partners were used."). Curiously, although Plaintiffs now allege that Davis used Boersig's credentials for an unspecified number of intrusions in early August, the forensic analysis Plaintiffs previously submitted indicated that Davis used his own former login credentials for nine out of ten intrusions and used Ms. Boersig's credentials only once, on August 9, 2024. *See* Dkt. 11-4 at 3–7, 9–16.[2] As for Davis' alleged break-in, the police report indicates that Davis gained access to SuttonPark's offices "us[ing] an old key Fob" issued by Plaintiffs when he was an employee. *See* Nathanson Decl., Ex. 7 at 2. That police report makes no mention of Leadenhall, and Plaintiffs have alleged no facts suggesting Davis' alleged burglary was related to Leadenhall. In fact, the alleged burglary occurred almost a month after Plaintiffs had revoked Saiph's access, *see* Nathanson Decl. ¶ 5 & Ex. 2, so Davis could not have been on the premises to perform work for Saiph or Leadenhall.

*Third*, Leadenhall never received any information or property, directly or indirectly, from Davis. Gillespie Decl. ¶ 16. And the information Leadenhall did receive from Saiph—which includes a final report, several interim reports (provided by email and in spreadsheet form), and the data underlying such reports—falls squarely within the scope of the Collateral Audit, access for which was expressly authorized by Plaintiffs. *See id.* ¶ 18 (Leadenhall's Managing Partner confirming that the "information provided by Saiph in connection with the collateral audit" pertains to "the legitimate scope of Saiph's work: analyzing the status of Leadenhall's collateral"). Evidence submitted by Saiph corroborates and confirms Leadenhall's position. In response to Plaintiffs' motion for preliminary injunction, Saiph submitted a "list of filenames of the records" used for the Collateral Audit, copies of the interim reports provided to Leadenhall, and even offered to provide the "actual files" obtained for the Audit—all 50,000+ of them. *See* Kosinski Decl. ¶¶ 17, 18, n.2 & Exs. E, G. Although Saiph offered to provide the files used for the Collateral Audit, Plaintiffs' counsel has not, to Leadenhall's knowledge, taken them up on that offer.

*Fourth*, neither Leadenhall (nor Leadenhall's counsel) ever directed, encouraged, induced or assisted Davis in gaining unauthorized access to Plaintiffs' systems or offices, as its counsel stated in open court in the RICO Action *before* the AC was filed. Gillespie Decl. ¶ 17; Nathanson

---

[2] These details are also immaterial, as they have no connection to Leadenhall—regardless of whose credentials were used. *See* Gillespie Decl. ¶¶ 16–17.

Decl., Ex. 6 at 1–2; RICO Action, ECF No. 201 Oct. 2, 2024, Hr'g Tr. 31:17-20. Nor, for that matter, did Saiph or Kosinski. Kosinski Decl. ¶¶ 4, 29–30. Further, it was Leadenhall's counsel who requested that Saiph report Davis' alleged break-in to Plaintiffs. Nathanson Decl. ¶ 9.

In light of the foregoing, it is clear that no agency relationship ever existed between Leadenhall and Davis. Plaintiffs' attempt to plead vicarious liability is therefore baseless. To state a claim based on vicarious liability, a plaintiff must plead "facts that establish either actual or apparent agency." *Goldschmidt v. Holman*, 571 So. 2d 422, 423 (Fla. 1990). "Essential to the existence of an actual agency relationship is (1) acknowledgment by the principal that the agent will act for him, (2) the agent's acceptance of the undertaking, and (3) control by the principal over the actions of the agent." *Marchisio v. Carrington Mortg. Servs., LLC*, 919 F.3d 1288, 1311 (11th Cir. 2019) (applying Florida law). None of these prerequisites is satisfied here. Plaintiffs allege no facts supporting that Leadenhall gave Davis authority to act on its behalf, let alone that Leadenhall "controlled" his actions. Nor can Plaintiffs plead "apparent agency," the elements of which are "a representation by the principal to the plaintiff, which . . . causes the plaintiff reasonably to believe that the alleged agent is authorized to act for the principal's benefit," and which "induces the plaintiffs' detrimental, justifiable reliance upon the appearance of agency." *Honig v. Kornfeld*, 339 F. Supp. 3d 1323, 1347–48 (S.D. Fla. 2018). Plaintiffs do not allege that Leadenhall ever made *any* representation to Plaintiffs about Davis. As a result, Plaintiffs' First, Second, Fourth, Seventh, and Eighth claims are entirely without merit.[3]

Plaintiffs' claims for "civil conspiracy" and "aiding and abetting" are frivolous for similar reasons. Setting aside that "civil conspiracy" is not a standalone claim in Florida (*see infra* § II), Plaintiffs have no basis to plead the basic elements of a conspiracy: "(1) an agreement between two or more parties; (2) to do an unlawful act[;] (3) the execution of some overt act in pursuance of the conspiracy; and (4) damage to the plaintiff as a result of said acts." *Plastiquim S.A. v. Odebrecht Constr., Inc.*, 337 So. 3d 1270, 1273 (Fla. 3d DCA 2022) (citation omitted). Plaintiffs

---

[3] It is doubtful that common-law agency principles apply to Plaintiffs' federal statutory claims because "whether a federal statute embraces such principles is a matter of statutory interpretation based upon congressional intent." *Doe v. Dartmouth-Hitchcock Med. Ctr.*, 2001 WL 873063, at *5 (D.N.H. July 19, 2001). Regardless, a third party cannot be vicariously liable for a violation of the CFAA if it had no involvement in or knowledge of the violator's conduct. *See Agilysys, Inc. v. Hall*, 258 F. Supp. 3d 1331, 1343–44 (N.D. Ga. 2017). And a party may be held vicariously liable under the Stored Communications Act only if it "directed or ratified the conduct." *Cardinal Health 414, Inc. v. Adams*, 582 F. Supp. 2d 967, 978 (M.D. Tenn. 2008).

do not make any *factual* allegations in this direction anyway, instead alleging, with no supporting facts, that "Defendants . . . agreed to further a shared plan" and that Leadenhall "directed" Davis and "actively participated in the shared civil conspiracy." AC ¶¶ 127–29. As explained above, Plaintiffs allege no details of an "agreement" between Leadenhall and Davis because there was no such agreement, and certainly no "direction" or "active participation" on Leadenhall's part. *See Trump v. Clinton,* 640 F. Supp. 3d 1321, 1330–32 (S.D. Fla. 2022) (Middlebrooks, J.) (sanctions warranted where plaintiff made conclusory claims that volunteer was part of a conspiracy). Likewise, the aiding and abetting claim is baseless because Leadenhall had no "knowledge of the underlying violation" and did not "render [] . . . substantial assistance"—or any assistance—to Davis' alleged wrongdoing. *See Taubenfeld v. Lasko,* 324 So. 3d 529, 543–44 (Fla. 4th DCA 2021) (citation omitted); AC ¶¶ 133–35. The AC points to no facts suggesting otherwise, let alone facts sufficient to meet federal pleading standards.

The only relevant agency relationship here is set forth in the Saiph Agreement between Leadenhall and Saiph—*not* Leadenhall and Davis—pursuant to which Saiph conducted the Collateral Audit. Under the Saiph Agreement, Saiph was retained to perform financial analyses on specific receivables—namely, "those 777 collateral files received by [Leadenhall] on November 28, 2023 and the 353 collateral files received by [Leadenhall] on November 29, 2023." Gillespie Decl., Ex. 2 at 12. That contractual directive defines the scope of the agency relationship between Leadenhall and Saiph, and Plaintiffs allege no facts to show that this scope was ever enlarged. *Rafer v. Internal Credit Sys., Inc.*, 2021 WL 2554048, at *10 (M.D. Fla. June 22, 2021) (looking to parties' contract to determine the scope of agency relationship). Accordingly, even assuming (counterfactually) that Davis *had* performed any work on Leadenhall's Collateral Audit, his unlawful alleged conduct would fall outside of the scope of Saiph's authority—and thus, the scope of any vicarious liability Leadenhall could have incurred. *See Marchisio*, 919 F.3d at 1311.

### B.   Plaintiffs' "Inferences" Are Directly Contradicted by Uncontroverted Facts.

The inadequacy of Plaintiffs' attempts to plead a connection between Leadenhall and Davis is thrown into sharp relief when compared to the factual record, including uncontroverted evidence presented in response to Plaintiffs' own motion for a preliminary injunction. As noted, each claim Plaintiffs assert against Leadenhall contains a variation of the conclusory statement that Leadenhall is liable because, (i) "upon information and belief, the misconduct was committed with the knowledge of and at the behest of Leadenhall," *see, e.g.,* AC ¶¶ 113, 124, (ii) "upon information

and belief," Leadenhall "substantially assisted" Davis, *id.* ¶ 133, or "directed, encouraged, induced, and/or conspired with Saiph, Kosinski, and/or Davis," *see, e.g.*, *id.* ¶¶ 106, 142, 149, or (iii) "because these intrusions were made with the knowledge of and for the benefit of Leadenhall," *id.* Making an allegation "upon information and belief" does not insulate counsel from their obligations under Rule 11. *See, e.g.*, *Estate of Valentine v. South Carolina*, 2022 WL 943062, *24 (D. S.C. March 29, 2022). And of course, these legal conclusions "are not entitled to an assumption of truth" but must be "supported by factual allegations." *Randall v. Scott*, 610 F.3d 701, 709–10 (11th Cir. 2010). Here, the facts contradict, rather than support, Plaintiffs' legal conclusions.

Plaintiffs' only effort to provide factual support for these conclusions comes in the form of speculative "inferences" contrived from a jigsaw puzzle of eight "facts":

> (i) Leadenhall's aggressive actions and litigation tactics against 777 Partners; (ii) the targeted access to and attempt to transfer the Outlook 365 file saved on Mr. Pasko's laptop; (iii) targeting of a laptop and One Drive folders of an employee of a non-party affiliate likely to have information that Leadenhall had been unsuccessfully seeking; (iv) the timing of at least one intrusion in occurring just prior to an important hearing in the Leadenhall Litigation; (v) Leadenhall's insistence on retaining Saiph specifically, which possessed significant proprietary knowledge about 777 Partners' operations and computer systems, through its founder, Kosinski, and other employees or agents, in spite of Plaintiffs' vigorous objections; (vi) the agency relationship between Leadenhall and Saiph, Kosinski, and Davis; (vii) claims concerning a non-existent payment dispute between Davis and Plaintiffs; and (viii) Saiph's inadvertent acknowledgment of Leadenhall's relationship to these intrusions . . . .

*Id.* ¶¶ 6, 99. None of these "facts" justifies a good-faith belief that Leadenhall was responsible for Davis' actions. And Plaintiffs conveniently ignore the common denominator explaining the actions Leadenhall has taken to enforce its rights against them: Plaintiffs' own fraud.

*First*, Leadenhall's "aggressive actions and litigation tactics" in the RICO Action are not unusual or suggestive of anything. Plaintiffs and their affiliates owe Leadenhall more than $600 million that they obtained by fraud, and, as the Court in the RICO action noted, Plaintiffs "do not dispute any of Leadenhall's allegations of breaches." RICO action, ECF No. 128, June 7, 2024 Hr'g Tr. 54:25–55:2. Furthermore, Plaintiffs' business is likely already insolvent, as evidenced by their inability to make even a $15 million payment on the $600 million plus that they owe, *see* RICO Action, ECF No. 58 ¶¶ 18–21, and by the appointment of restructuring professionals from B. Riley to run Plaintiffs' business, AC ¶¶ 23–26. Leadenhall's efforts to vindicate its rights after Plaintiffs stole hundreds of millions of dollars, including obtaining an asset-preserving injunction

to protect against Plaintiffs' fire sale of their remaining assets, are entirely appropriate. As alluded to by the court in the RICO Action, zealous advocacy does not give rise to a "reasonable inference" that a party has committed a crime against its adversary to get information—particularly while that party is already pursuing discovery through litigation. *See* RICO Action, ECF No. 201 Oct. 2, 2024, Hr'g Tr. 31:17-20 ("THE COURT: I take it that Leadenhall wouldn't sanction unauthorized hacking of one of the other parties in this case. MS. NATHANSON:  Absolutely not.").

      *Second*, that Davis allegedly accessed Steven Pasko's Outlook 365 email files (using his own 777 credentials) has nothing to do with Leadenhall. Pasko was the "co-founder and former managing partner of 777 Partners," AC ¶ 3, until he was purportedly replaced by B. Riley personnel earlier this year. Although Plaintiffs note that Pasko is a defendant in the RICO Action, they neglect to mention that he—Davis' former employer—is also named as a defendant in numerous other lawsuits against Plaintiffs, including arbitrations brought by former employees seeking unpaid compensation.[4]  *See, e.g.*, *Obra Cap. Mgmt., LLC v. 777 Partners LLC*, Index No. 651220/2024 (Sup. Ct. N.Y. Cty.); *Malt Family Trust v. 777 Partners LLC*, C.A. No. 2022-0652 (Del. Ch.); *Arciniegas v. 777 Partners LLC*, AAA Case No. 01-24-0005-6264 (Am. Arb. Ass'n) (Arbitration Demand attached as Complaint Exhibit A in *Advantage Cap. Holdings, LLC v. Arciniegas*, No. 24-cv-22621 (S.D. Fla.) (ECF 1-1); *Beruff v. 777 Partners LLC*, AAA Case No. 01-24-0005-6643 (Am. Arb. Ass'n) (Arbitration Demand attached as Complaint Exhibit A in *Advantage Cap. Holdings, LLC v. Beruff*, No. 24-cv-22620 (S.D. Fla.) (ECF 1-1). The threadbare allegation that there "is no apparent reason for Davis to have accessed and obtained a copy of . . . Mr. Pasko's Outlook account other than to gather information that would be useful to Leadenhall in the [RICO Action]," AC ¶ 52, is unpersuasive given that he is Davis' former boss and just as likely to possess information useful to *Davis* in his personal capacity. And in any event, Plaintiffs never identify any specific information in Pasko's email files that Davis obtained or explain its relevance to the RICO Action. To the extent Plaintiffs' counsel are aware of, and concealing, evidence of fraud or other misconduct that would be "useful" to Leadenhall in the RICO Action, concocting baseless claims against Leadenhall to conceal such evidence raises ethical concerns.

---

[4] As explained below, Leadenhall was informed by counsel for Saiph that Davis' actions were reportedly motivated by a payment dispute he had with his former employer. *See* Nathanson Decl. Ex 6 at 1. Leadenhall does not know whether that is true, but Kosinski has likewise testified that Davis told him that Davis' "alleged misconduct had nothing to do with [Leadenhall or Saiph]," confirming that he acted alone. *See* Kosinski Decl. ¶ 28.

*Third*, Plaintiffs rely on Davis' alleged "targeting of a laptop and One Drive folders of an employee of a non-party affiliate likely to have information that Leadenhall had been unsuccessfully seeking." *Id.* ¶ 6. Plaintiffs are referring to requests made by a Leadenhall Managing Partner, Phil Kane, and its restructuring counsel, Roger Schwartz, for information pertaining to 777 Partners affiliates Brickell Insurance Holdings LLC ("Brickell") and Brickell's subsidiary, 777 Re LTD. *Id.* ¶¶ 35, 43. Although Plaintiffs allege that they "refused to provide this information" because "Leadenhall had no contractual right to it," *id.* ¶ 44, Plaintiffs know the latter statement is false. Leadenhall has a separate credit facility with Brickell, and the agreements governing it—much like the LSA—give Leadenhall broad rights to inspect the books and records of Brickell and 777 Re. Indeed, Plaintiffs did not dispute—until the AC—Leadenhall's right to make the requests referenced therein.  Even setting that aside, the connection Plaintiffs attempt to draw is tenuous. They allege the laptop that was "targeted" belonged to Jennifer Logee, Brickell's chief compliance officer, who "had also performed work related to 777 Re." *Id.* ¶ 53. But Plaintiffs do not specify what information on Logee's laptop was accessed, why it would be relevant to Leadenhall, the nature of her "work related to 777 Re," or the nexus between her role and the dispute between Leadenhall and Plaintiffs. While Leadenhall named ten different affiliates of 777 Partners as defendants in the RICO Action, Brickell and 777 Re are not defendants.  Logee's name has never come up in the RICO Action.

*Fourth*, the allegation that "these intrusions on July 7th into laptops occurred only one day before an important hearing was held" in the RICO Action, AC ¶ 57, is knowingly misleading and does not support vicarious liability. The hearing in question was a July 8, 2024 hearing regarding the preliminary injunction. *See generally* RICO Action, ECF No. 148, July 8, 2024 Hr'g Tr. As Plaintiffs know—but neglected to inform the Court—no new evidence was presented or contemplated to be presented at that hearing because the court simply converted a TRO that had already been issued on June 7, 2024, into a preliminary injunction. *See id.* at 22:10–12 ("A preliminary injunction is warranted for all of the reasons that I explained on the record on June 7, 2024[.]"); *see also* RICO Action, ECF No. 132, June 14, 2024 Hr'g Tr. 12:21-24 ("The parties don't want an evidentiary hearing on the preliminary injunction."). Nothing related to Pasko (or Logee) was discussed at the July 8 hearing. Neither Logee nor Brickell nor 777 Re was mentioned, and Pasko's name was mentioned exactly once—by his own counsel. *See generally* RICO Action, ECF No. 148, July 8, 2024 Hr'g Tr. Setting that aside, the implication of Plaintiffs' allegation is

14

that counsel for Leadenhall directed Davis to commit *federal crimes* in hopes of gaining information Leadenhall could use at the July 8 hearing. That contention is defamatory and sanctionable, especially since the court in the RICO Action had clearly signaled its intent to convert the TRO into a preliminary injunction given that Plaintiffs had never seriously disputed their $600 million liability to Leadenhall or their imminent insolvency.

*Fifth*, Plaintiffs cite "Leadenhall's insistence on retaining Saiph specifically," AC ¶¶ 6, 99, but they acknowledge that Leadenhall had an entirely legitimate reason for doing so and was transparent about it from the start: Leadenhall told Plaintiffs that it selected Kosinski, SuttonPark's former Chief Operating Officer, to perform the Collateral Audit *because* of his knowledge of SuttonPark's processes for allocating and pledging assets to creditors, which made him uniquely positioned to interpret the records regarding that collateral. Gillespie Decl. ¶ 6. During the same period, and presumably for similarly benign reasons, another business partner of the 777 Entities, NML, also hired Saiph to audit annuities pledged to NML. Kosinski Decl. ¶¶ 4, 21–22. It is telling that Plaintiffs' "forcefully objected," AC ¶ 22, to *Leadenhall's* retention of Saiph—they wanted to avoid scrutiny by a well-versed expert into collateral they knew was fraudulent. As Kosinski attested, Plaintiffs' pretextual objections—that hiring Kosinski "would violate his severance agreement" and that "he is currently a direct competitor," *see* Gillespie Decl., Ex. 1 (Nov. 29, 2023 Email from S. Pasko to C. Gillespie); AC ¶ 22—"were untrue," and were begrudgingly withdrawn by Plaintiffs, *see* Kosinski Decl. ¶ 9; Gillespie Decl. ¶ 9; Ratner Decl. ¶ 14; AC ¶ 30.

Plaintiffs' allegation about Leadenhall's "insistence" on retaining Saiph is doubly implausible when the timeline is considered. When Leadenhall sought to retain Saiph in August 2023, Davis was still Plaintiffs' head of IT. *See* AC ¶ 13 (noting that Davis was 777 Partners' head of IT until April 2024); Gillespie Decl. ¶ 8 (noting that Leadenhall signed a consulting agreement with Saiph in August 2023); *id.*, Ex. 1 (November 2023 email from Pasko objecting to the retention of Saiph). The only reason that the Collateral Audit was delayed until 2024 was that *Plaintiffs* refused and delayed access for months; if the audit had begun when Leadenhall initially requested it (in 2023), Davis would not have been involved with Saiph at all. Thus, to credit Plaintiffs' allegation, one would have to infer—with no supporting facts whatsoever—that Leadenhall's secret motive for retaining Kosinski's services was the hope that Kosinski would subsequently hire Davis as a subcontractor to hack into Plaintiffs' computer systems. This absurd allegation, which is the crux of Plaintiffs' case against Leadenhall, falls woefully short of the Rule 11 standard.

*Sixth*, Plaintiffs repeatedly reference "agency relationships between Leadenhall and Saiph, Kosinski, and Davis," but as explained above, no agency relationship between Leadenhall and Davis existed, and Plaintiffs know there will be no evidence to support one. To establish an agency relationship, Plaintiffs have to show: "(1) acknowledgment by [Leadenhall] that [Davis] will act for [it], (2) [Davis'] acceptance of the undertaking, and (3) control by [Leadenhall] over the actions of [Davis]." *Marchisio*, 919 F.3d at 1311. Plaintiffs' failure to set forth any factual allegations on those elements confirms that Plaintiffs either did not investigate or disregarded the facts and legal requirements for such a claim before filing suit. *See Cook-Benjamin v. MHM Correctional Servs., Inc.*, 571 Fed. App'x 944, 949 (11th Cir. 2014). Plaintiffs' claims cannot be salvaged by the fact that Leadenhall engaged Saiph (via written agreement) to perform financial analyses on specific receivables. *See* Gillespie Decl., Ex. 2 at 12. Any unauthorized access to systems unrelated to the Collateral Audit would fall outside of the scope of Saiph's authority and the scope of any vicarious liability incurred by Leadenhall. *See, e.g.*, *Koehler v. Treasure Coast Carwash, LLC*, No. 2:16-CV-14106, 2016 WL 3878464, at *2 (S.D. Fla. July 18, 2016) ("There is no liability where the agent has stepped aside from his employment to commit a tort which the principal neither directed in fact, nor . . . authorized or expected the agent to do."); *Gibbs v. Air Canada*, 810 F.2d 1529 (11th Cir. 1987) (airline not vicariously liable for goods stolen by airline employee). As discussed above, Plaintiffs identify no facts suggesting that Leadenhall "directed" Davis to do anything. And, with the benefit of the contract governing the relationship between Leadenhall and Saiph, they know Saiph was not authorized to do anything beyond performing the collateral audit. In short, Plaintiffs' vicarious liability theory is not "warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law." Fed. R. Civ. P. 11(b)(2); *see Baker*, 158 F.3d at 524 ("Sanctions may be appropriate when the plain language of an applicable statute and the case law preclude relief.").

*Seventh*, Plaintiffs point to Leadenhall's "claim[] that Davis's actions resulted from his anger over a payment dispute," a dispute they say does not exist. AC ¶¶ 6, 82, 99. It is not clear how this allegation—even if true[5]—would make it "reasonable to infer" the proposition they cite

---

[5] Plaintiffs allege "[u]pon information and belief" that no payment dispute exists, but it appears that allegation is based only on "the months that [B. Riley's] Ratner, Shapiro, and Howard have been in control of Plaintiffs' business operations." *See* AC ¶¶ 82–84. That period would not be probative since Davis resigned in April 2024, the month *before* B. Riley took over. *Id.* ¶¶ 13, 23.

it for: that Davis' actions "were known to and directed by Leadenhall" or "performed for Leadenhall's benefit, and with Leadenhall's . . . encouragement, if not involvement." *Id.* ¶¶ 6, 99. Regardless, Leadenhall has never professed to know why Davis did what he allegedly did. *See* Gillespie Decl. ¶ 19 ("Leadenhall has no independent knowledge about Mr. Davis' actions and how or why he obtained unauthorized access to Plaintiffs' computer systems"); ECF No. 48 at 7 ("Leadenhall lacks information about exactly what Davis did or why he did it beyond his representation to Saiph that he acted alone out of animus against his former employer over a payment dispute."). Leadenhall's references to a payment dispute were based on information received from Saiph. *See* Nathanson Decl., Ex. 6 at 1 ("Saiph informed Leadenhall . . . that, according to Mr. Davis, he acted alone out of anger at his former employer arising from a payment dispute."). Kosinski's sworn testimony is also that Davis, by his own admission, acted alone. Kosinski Decl. ¶ 28 ("Davis later told me that his alleged misconduct had nothing to do with any of the Indirect Defendants, including any direction they provided to him, and agreed to sign a sworn statement to that effect."). It is thus clear that, even if there were no payment dispute, Davis was a rogue actor with his own independent history with Plaintiffs.  This evidence, which the AC identifies no facts to refute, contradicts, rather than supports, vicarious liability.

*Eighth*, Plaintiffs' breathless allegation regarding "Saiph's inadvertent acknowledgment of Leadenhall's relationship to these intrusions" is not the smoking gun Plaintiffs pretend it to be. AC ¶¶ 6, 80–81, 99. Here, Plaintiffs rely on a letter Saiph sent to Plaintiffs on September 11, 2024 that notified Plaintiffs of Davis' actions (at which point Saiph was aware only of Davis' alleged entry into SuttonPark's physical offices). *See* McCarthy Decl. ¶ 6 & Ex. A. As Leadenhall has explained, Saiph sent Plaintiffs this letter *at Leadenhall's request*, as soon as Saiph made Leadenhall aware of Davis' conduct, which explains why Saiph mentioned Leadenhall in that correspondence. *See* Nathanson Decl. ¶ 9. Leadenhall's request that Saiph disclose Davis' conduct cuts *against* any nefarious inference Plaintiffs seek to draw. Plaintiffs again rely on a leap in logic that they know is unjustified. *See* AC ¶ 81 ("Intriguingly, and perhaps in an effort to obscure the involvement of Leadenhall in the alleged misconduct . . . , Saiph's initial letter to this effect referenced Leadenhall in the subject line[.]"). Saiph's letter confirmed that none of the "equipment Mr. Davis allegedly took from SuttonPark ever came into the possession of Saiph," so it, too, cuts against Plaintiffs'

theory. McCarthy Decl., Ex. B, at 1.[6]

The fact that Plaintiffs never identify any specific information taken by Davis that suggests a connection to Leadenhall further underscores the lack of a good-faith basis for claims against Leadenhall. Plaintiffs' reliance on unsupported generalizations that "all of the systems and information" that "Davis accessed . . . would clearly be considered by Leadenhall as useful in prosecuting the [RICO Action] against Plaintiffs," AC ¶ 38, fails to meet even Rule 11's lenient requirements for good-faith investigation and pleading.

In sum, Plaintiffs' misguided attempt to harass Leadenhall with this lawsuit is based on speculation and extrapolation from a series of "facts" that—individually and collectively—would not justify a reasonable belief that Leadenhall had anything to do with Davis' conduct. The absence of any factual underpinning for Plaintiffs' claims demonstrates that counsel did not fulfill its obligation to "conduct a reasonable inquiry into both the facts and the law before filing [its] pleading." *Gulisano v. Burlington, Inc*, 34 F.4th 935, 942 (11th Cir. 2022). Plaintiffs were "warned about the lack of foundation for their factual contentions, turned a blind eye towards information in their possession, and misrepresented the [facts] they claim as their primary support … and have continued to advance [] false claims based upon nothing but conjecture, speculation, and guesswork." *Trump*, 640 F. Supp. 3d at 1329.

## II. PLAINTIFFS' EVASIVE PLEADING EVINCES BAD FAITH AND REVEALS THEIR IMPROPER PURPOSE OF DEFAMING LEADENHALL REGARDLESS OF THE TRUTH.

Plaintiffs' allegations are sanctionable for the reasons above. But here, the bad faith is compounded by the fact that Plaintiffs *reaffirmed* such allegations after Defendants submitted evidence demonstrating the absence of any connection between Davis and Leadenhall. Plaintiffs amended their complaint on November 14, 2024, with the benefit of Defendants' evidence submitted in connection with the preliminary injunction motion and the opportunity to investigate, and attempt to rebut, those facts. But the AC contains the same baseless allegations as the original complaint. *Compare* AC *with* ECF No. 1. Only two changes warrant further discussion.

*First*, Plaintiffs append the words "upon information and belief" to many of their

---

[6] Plaintiffs allege Leadenhall has made "inconsistent claims about when Saiph had finished collecting information on its behalf," AC ¶ 99; *see also id.* 74, but that is false.  The letter in question, Nathanson Decl. Ex. 4, does not make any claim about when Saiph completed its collection of documents; it merely asserts that Plaintiffs had no basis to withhold access.

allegations concerning Leadenhall's purported relationship with Davis or otherwise expressly concede that the allegations are based on inferences rather than facts. *See, e.g.*, AC ¶¶ 106, 113, 124, 129, 133, 135, 142, 149; *see also id.* ¶ 6 ("[I]t is reasonable to conclude that the foregoing acts were performed for Leadenhall's benefit, and with Leadenhall's implicit or explicit encouragement, if not involvement."). These changes only highlight that the claims against Leadenhall derive from a fishing expedition and not a "reasonable inquiry" indicating that "the factual contentions have evidentiary support." Fed. R. Civ. P. 11. A "litigant cannot merely plop 'upon information and belief' in front of a conclusory allegation and thereby render it non-conclusory." *Citizens United v. Schneiderman*, 882 F.3d 374, 384 (2d Cir. 2018). And more importantly, Rule 11 imposes a continuing obligation such that sanctions are warranted where "counsel knew or should have known [that his position] was no longer legally tenable" but persists in asserting it. *MSPA Claims 1, LLC v. Liberty Mut. Fire Ins. Co.*, No. 17-22539, 2024 WL 4190512, at *5 (S.D. Fla. Sept. 13, 2024); *see also Gulisano*, 34 F.4th at 942 ("[A]n attorney's obligations . . . are not measured solely as of the time when the pleading . . . is initially filed with the court, but also at the time when the attorney, having learned the claims lack merit, reaffirms them to the court.") (citation omitted); *Truesdell v. Southern Cal. Permanente Med. Grp.*, 293 F.3d 1146, 1153 (9th Cir. 2002) (sanctions warranted where the allegations—made "upon information and belief"—lacked "evidentiary support" and counsel must have known they were false); *Flores v. Park W. Parking LLC,* No. 06-22055-CIV, 2008 WL 11409098, at *8, *19 (S.D. Fla. Feb. 1, 2008) (imposing sanctions where attorney was "on notice that a claim is without merit").

Plaintiffs also dropped Leadenhall altogether from their Third Claim of Relief for replevin. *Compare* AC ¶ 115–19 *with* ECF No. 1 ¶¶ 45–50. This change is important because "an action of replevin" is based on "the unlawful detention of personal property." *Brown v. Reynolds*, 872 So. 2d 290, 294 (Fla. 2d DCA 2004) (citation omitted). Accordingly, Plaintiffs' decision to withdraw this claim as to Leadenhall acknowledges that they lack the facts to allege that Leadenhall has, or has ever had, possession of the "laptops and data" Plaintiffs seek to replevy. AC ¶ 116.

Plaintiffs' AC also exhibits several other shortcomings demonstrating a lack of good faith.

***Personal Jurisdiction.*** For example, Plaintiffs cannot establish personal jurisdiction over Leadenhall because they are unable to satisfy the requirements of Florida's long-arm statute or the Due Process Clause. Leadenhall did not commit *any* acts in Florida, much less any acts that gave rise to Plaintiffs' claims. And thus, Plaintiffs are left with the allegation that Leadenhall is subject

19

to jurisdiction because it "committed tortious acts" in Florida "through its agents." AC ¶ 16. This allegation is spurious for the reasons explained above.

*Civil Conspiracy.* Plaintiffs' claim for "Civil Conspiracy" is frivolous because "[t]here is no freestanding cause of action in Florida for 'civil conspiracy.'" *Tejera v. Lincoln Lending Servs., LLC*, 271 So. 3d 97, 103 (Fla. 3d DCA 2019). Instead, Plaintiffs must plead an agreement between alleged conspirators "to do an unlawful act or to do a lawful act by unlawful means," which they fail to do. *Harris v. Jayo (In re Haris)*, 3 F.4th 1339, 1350–1351, (11th Cir. 2021) (citation omitted). Plaintiffs also fail to allege the other elements of that claim.

*Aiding and Abetting.* Plaintiffs' aiding and abetting claim is directly contradicted by allegations they make elsewhere in the AC. For instance, Plaintiffs contend on one hand that Davis would not have had access to the credentials he used to access Plaintiffs' systems were it not for the Collateral Audit, AC ¶ 133, while simultaneously alleging that Davis used his own former 777 Partners credentials for virtually every alleged intrusion into Plaintiffs' systems, *see id.* ¶¶ 39, 45–69. The inconsistency within Plaintiffs' own pleading is not only fatal to their aiding and abetting claim but also suggests a sanctionable lack of good faith.

*Conversion.* Finally, Plaintiffs' claim for conversion—which is asserted vicariously—fails because Leadenhall never received any of the property Davis allegedly converted, *see Transcapital Bank v. Shadowbrook at Vero, LLC*, 226 So.3d 856, 864 (Fla. App. 2017), and because accessing a computer system does not amount to a "wrongful deprivation" of Plaintiffs' property, *see Utah Power Sys., LLC v. Big Dog II, LLC*, 352 So. 3d 504, 508 (Fla. 1st DCA 2022).

\* \* \*

Plaintiffs' willful ignorance of the evidence, combined with their deficient pleading, warrants more than dismissal of their claims against Leadenhall. With their backs against the wall after their years-long fraud was brought to light in the RICO Action, Plaintiffs seized upon a coincidental action by a former employee to make a federal case—literally—against its adversary. Investigating a hunch about a connection between Davis and Leadenhall is understandable; filing a lawsuit after that "investigation" revealed no such connection is sanctionable; and continuing to pursue frivolous claims in the face of uncontroverted evidence is beyond the pale.

## CONCLUSION

Leadenhall requests that the Court grant its Motion for Sanctions, and impose sanctions including, but not limited to, fees and costs Leadenhall has incurred in defending this action.

Dated:   January 6, 2025                    KING & SPALDING LLP

By:   *Brian P. Miller*
          Brian P. Miller
          Florida Bar No. 0980633
          Ross E. Linzer
          Florida Bar No. 0073094
          Southeast Financial Center
          200 S. Biscayne Boulevard, Suite 4700
          Miami, FL 33131
          Telephone: (305) 462-6000
          Fascimile: (305) 462-6100
          bmiller@kslaw.com
          rlinzer@kslaw.com

          Peter Starr (*pro hac vice*)
          Georgia Bar No. 648453
          1180 Peachtree Street, Suite 1600
          Atlanta, GA 30309
          Telephone: (404) 572-2767
          Facsimile: (404) 572-5100
          pstarr@kslaw.com

          Leigh M. Nathanson (*pro hac vice*)
          New York Bar No. 4900106
          Brian Donovan (*pro hac vice*)
          New York Bar No. 5433669
          1185 Avenue of the Americas
          New York, NY 10036-4003
          Telephone: (212) 556-2100
          Fascimile: (212) 556-2222
          lnathanson@kslaw.com
          bdonovan@kslaw.com

          *Attorneys for Leadenhall Capital Partners*
          *LLP and Leadenhall Life Insurance Linked*
          *Investments Fund PLC*

## <u>CERTIFICATION</u>

The undersigned hereby certifies that a copy of the foregoing Rule 11 Motion for Sanctions was served on Plaintiffs' counsel via email on December 12, 2024.  The Motion is now being filed on January 6, 2025, which is more than twenty-one days after it was served, as required by Fed. R. Civ. P. 11(c)(2).

By: *<u>Brian P. Miller</u>*
Brian P. Miller