**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

Case No. 24-81143-CIV-DMM

777 PARTNERS LLC and SUTTONPARK CAPITAL LLC,

        Plaintiffs,

vs.

LEADENHALL CAPITAL PARTNERS LLP, LEADENHALL LIFE INSURANCE LINKED INVESTMENTS FUND PLC, NOAH DAVIS, SAIPH CONSULTING LLC, and PAUL KOSINSKI.

        Defendants.

**DEFENDANTS LEADENHALL CAPITAL PARTNERS LLP AND LEADENHALL LIFE INSURANCE LINKED INVESTMENTS FUND PLC'S STATEMENT OF UNDISPUTED MATERIAL FACTS**

Defendants Leadenhall Capital Partners LLP and Leadenhall Life Insurance Linked Investments Fund PLC ("Leadenhall") respectfully submit this statement of undisputed material facts in accordance with Southern District of Florida Local Rule 56.1 in support of their motion for summary judgment.

I.      **Background and RICO Action in the Southern District of New York**

1. Plaintiff 777 Partners LLC ("777 Partners") is a Miami-based private investment firm that has invested in the insurance, aviation, sports, and media sectors. Plaintiff SuttonPark Capital LLC ("SuttonPark") is a corporate affiliate of 777 Partners that is a wholesale aggregator and servicer of structured settlements. ECF No. 1 ¶¶ 7-8; Ex. 1, Shapiro Tr. 35:8-15.

2. Defendant Leadenhall Capital Partners LLP is a London-based asset management firm which grants institutional investors access to insurance-related risks. Leadenhall Life Insurance Linked Investments Fund PLC is an affiliate of Leadenhall Capital Partners LLP based in Dublin, Ireland. Ex. 2, Gillespie Tr. 8:2-12.

3. In May 2021, Leadenhall entered into a secured credit facility with four "Borrower" entities that that are affiliated with 777 Partners and SuttonPark. The credit facility agreement was memorialized in a Loan and Security Agreement dated May 7, 2021 (the "LSA"). Ex. 3, RICO Action,[1] Gillespie Decl. ¶ 2; Ex. 4, LSA.

4. Pursuant to the LSA, the Borrowers pledged collateral to Leadenhall which secured the debt provided by Leadenhall. The Borrowers' obligations under the LSA were guaranteed by their indirect parents, 777 Partners and 600 Partners LLC ("600 Partners"). Ex. 4, LSA § 4.01(h); Ex. 5, 5/7/21 Guaranty Agreement.

5. In September 2022, Leadenhall received an anonymous email stating that 777 Partners Managing Partner Josh Wander "either never bought" the assets pledged as collateral or "already pledged them to another lender." Ex. 16, SDFL Gillespie Decl. ¶ 4; *see also* Ex. 52, Gorde Tr. 116:14-18.

6. After receipt of the anonymous email, Leadenhall initiated an investigation into the collateral backing ~$600 million in outstanding debt. Ex. 3, RICO Action, Gillespie Decl. ¶ 6.

---

[1] The "RICO Action" refers to the lawsuit Leadenhall has filed against Plaintiffs and their alleged co-conspirators in New York, captioned *Leadenhall Capital Partners LLP, et al. v. Wander, et al.*, No. 24-cv-3453-JGK (S.D.N.Y., filed May 3, 2024).

7. In April 2023, Wander admitted on calls recorded with his permission that the Borrowers had "double-pledged" approximately $100 million in assets to Leadenhall. Ex. 3, RICO Action, Gillespie Decl. ¶¶ 6-7; Ex. 6, RICO Action, Kane Decl. ¶¶ 3-5, 8.

8. Wander stated that the double-pledging of assets was a "mistake" and that he would "reconcile" the collateral "shortfall." Ex. 7, RICO Action, Corrected Am. Compl. ("RICO Compl.") ¶¶ 123-34; *see also* Ex. 8, RICO Action, 6/7/24 Hr'g Tr. 57:11-15.

9. In January 2024, Plaintiffs' affiliates admitted in restated monthly reports, called "Compliance Reports," that $350 million of Leadenhall's collateral had been double-pledged or fictitiously pledged. Ex. 3, RICO Action, Gillespie Decl. ¶¶ 9-10.

10. In March and April 2024, Wander told Leadenhall that Plaintiffs were unable to pay back even $15 million of the more than $600 million of Leadenhall's outstanding debt while 777 Partners was selling off assets. *Id.* ¶¶ 18-24.

11. On May 3, 2024, Leadenhall filed a lawsuit asserting fraud, contract, RICO, and unjust enrichment claims in the Southern District of New York against Plaintiffs, Plaintiffs' affiliates, Josh Wander, and Steven Pasko (among other defendants). *See* Ex. 7, RICO Compl.

12. The RICO Action alleged that Plaintiffs, Plaintiffs' affiliates, Josh Wander, and Steven Pasko (among others) pledged hundreds of millions of dollars of collateral to Leadenhall that Plaintiffs' affiliates had either already pledged to another lender or had not purchased in the first place. *See generally id.*

13. Wander and Pasko resigned as managers of 777 Partners and 600 Partners and engaged restructuring professionals from B. Riley Advisory Services ("B. Riley") to operate as day-to-day managers. Ex. 9, RICO Action, Saliba Decl. ¶¶ 18-22; Ex. 10, RICO Action, Shapiro Decl. ¶¶ 5-8.

14. Leadenhall obtained a preliminary injunction in the RICO Action restraining 777 Partners and certain affiliates' asset expenditures up to the amount of the outstanding debt and prohibiting further asset dissipations. Ex. 11, RICO Action, Prelim. Inj.

II. **Leadenhall's Retention of Saiph to Conduct the Collateral Audit**

15. The LSA grants Leadenhall and its agents the rights to:

> (a) conduct audits of the Receivables, the Collateral and the related books and records and collections systems of such Borrower, the Related Servicer or the Related Seller, as the case may be (which may, in the case of the SPLCSS Borrower and the Dorchester Borrower, include a fee of up to $50 per Eligible Receivable owned by such Borrower payable by such Borrower to a third party selected by the

2

> Administrative Agent for initial due diligence of the Receivables); (b) to examine and make copies of and abstracts from all books, records and documents (including computer tapes and disks) in the possession or under the control of such Borrower, the Related Servicer or the Related Seller, as the case may be, relating to Receivables and Collateral, including the Receivable Files and Related Contracts; and (c) to visit the offices and properties of such Borrower, the Related Servicer or the Related Seller, as the case may be, for the purpose of examining such materials described in clause (b) above, and to discuss matters relating to Receivables and the Collateral or such Borrower's, the Related Servicer's or the Related Seller's performance under the Transaction Documents or under the Related Contracts with any of the officers or employees of such Borrower . . . .

Ex. 4, LSA §5.02.

16. Leadenhall has a separate credit facility with 777 Partners affiliate Brickell Insurance Holdings LLC ("Brickell"). Leadenhall also has information rights under the Brickell facility. Ex. 12, Logee Tr. 112:9-114:25 ("[T]hroughout the Agreement there [are] rights for Leadenhall to have information"); *see also id.* 48:3-23 ("[A]s part of my role we monitored compliance with certain contracts. And one of those was Brickell Insurance Holdings' or Groups' reporting obligation, meaning there was an agreement that would require that Leadenhall be provided with Board materials for certain portfolio companies.").

17. In August 2023, Leadenhall engaged a third party, Saiph Consulting LLC ("Saiph"), to audit its collateral under a Consulting Agreement (referred to herein as the "Collateral Audit"). Ex. 13, 8/18/23 Executed Consulting Agreement; Ex. 14, 6/7/24 Am. Consulting Agreement.

18. Saiph's founder and CEO, Paul Kosinski, is the former COO of SuttonPark and was experienced in analyzing records in the "MP Fin" system. Ex. 15, Kosinski Decl. ¶¶ 5-7; Ex. 2, Gillespie Tr. 166:3-167:19, 337:5-18.

19. MP Fin is the system by which Plaintiffs allocated assets as collateral to secured lenders. Ex. 1, Shapiro Tr. 95:23-96:4.

20. The Amended Consulting Agreement between Leadenhall and Saiph provided that Saiph was an independent contractor of Leadenhall with the authority to:

> determine each Receivable's eligibility under the [LSA] and provide summary reporting of findings; (2) trace chain of title from each Receivables origination to placement in the credit facility financed by [Leadenhall]; (3) Prepare a schedule of all payments due under each Receivable (an "annuity master"); (4) Prepare a schedule of cash flow ("cash mapping") for each Receivable, including relevant lock boxes,

3

>concentration accounts and collection accounts; and (5) Collect all necessary information and data to allow [Leadenhall] to facilitate a potential transfer of servicing.

Ex. 14, 6/7/24 Am. Consulting Agreement §§ I.1; IV.I, Schedule A.

21. The Consulting Agreement provided that the document constituted the entire agreement between Leadenhall and Saiph and that "[a]ny modification of this Agreement will be effective only if it is in a writing signed by an authorized representative of the Party to be charged." *Id.* § IX.2.

22. 777 Partners objected to Leadenhall's retention of Saiph to conduct the Collateral Audit, stating in August 2023, "Paul Kosinski will not be permitted in our offices." Ex. 16, SDFL Gillespie Decl. ¶¶ 8-10; Ex. 17, 8/25/23 Email from F. Love to C. Gillespie.

23. 777 Partners Managing Partner Steven Pasko stated in November 2023: "At the request of A-CAP, I wanted to reiterate our original concerns regarding your request to use Paul Kosinski to perform an asset review of SuttonPark. Our objection is for two primary reasons: first, it would violate his severance agreement and, second and more importantly, he is currently a direct competitor." Ex. 18, 11/29/23 Email from S. Pasko to C. Gillespie.

24. In May 2024, after Wander's and Pasko's resignations, B. Riley instructed Plaintiffs to give Saiph access to MP Fin and other information relating to Leadenhall's collateral. Ex. 1, Shapiro Tr. 79:15-80:19, 224:4-8; Ex. 19, 7/24/24 Email from J. Howard to S. Taheri.

25. On May 28, 2024, Saiph began its on-site review at Plaintiffs' offices of the records in MP Fin pertaining to Leadenhall's collateral. Ex. 15, Kosinski Decl. ¶¶ 13-15.

26. In August 2024, 777 Partners suspended Saiph's access to MP Fin and 777 Partners' computer systems, citing "technological issues." Ex. 20, 8/14/24 Email from D. Pellegrino to L. Nathanson and R. Schwartz.

27. There is no evidence in the record that Leadenhall ever authorized Saiph to act beyond the scope of its contractually agreed-upon authority.

28. Leadenhall Managing Partner Craig Gillespie declared under penalty of perjury that Leadenhall expected Saiph at all times "to adhere by relevant rules and regulations and deliver the product that was agreed upon within the engagement letter." Ex. 2, Gillespie Tr. 105:20-23. In Gillespie's capacity as Leadenhall's corporate representative, Gillespie testified that he was aware of no facts suggesting Leadenhall directed Saiph to act outside of the Collateral Audit. Ex. 21, Leadenhall 30(b)(6) Tr. 263:16-264:22.

29. Saiph witnesses testified that they understood the Consulting Agreement to delineate the scope of Saiph's work. Ex. 22, Boersig Tr. 196:25-198:3 ("Q: And was it your understanding throughout the time that you worked on the collateral audit that that engagement letter defined the scope of what Saiph was supposed to do on Leadenhall's behalf? […] A: Yes, I believe so. I also spoke with -- confirmed with Paul Kosinski on what we were supposed to be tracking. […] A: No one at Saiph made me aware that Leadenhall wanted Saiph or anyone at Saiph to exceed their access outside of the bounds that SuttonPark had given them."); Ex. 23, Kosinski Tr. 181:18-183:12 (Kosinski confirming that "the three Consulting Agreements between Saiph and Leadenhall contain the scope of the work to be performed in them" and that he never told any Saiph personnel to "do something outside of the scope" of them).

30. On June 21, 2024, Leadenhall Managing Partner Phil Kane sent an email to B. Riley professionals requesting information relating to the assets and liabilities of 777 Partners and 600 Partners. Ex. 24, 6/21/24 Email from P. Kane to J. Howard. Plaintiffs have referred to this email in depositions. Plaintiffs' 30(b)(6) Shapiro Tr. 67:21-68:09 ("We receive an email from Phil Kane on June 21st.… In the meantime, we now learn that Noah Davis, who is engaged, an agent of Saiph, who is an agent of Leadenhall, is making unauthorized intrusions.").

31. On June 21, 2024, Noah Davis sent a message to Kosinski asking: "If I had a possible back-channel to get a copy of the database, would you want me to pursue that?"  Kosinski responded: "I think our clients wouldn't want that to jeopardize their pending litigation." Ex. 25, 6/21/24 Message from P. Kosinski to N. Davis. Gillespie, testifying as Leadenhall's corporate representative, testified Leadenhall was "completely unaware" of this June 21, 2024 communication between Davis and Kosinski. Ex. 21, Leadenhall 30(b)(6) Tr. 183:2-14.

32. Saiph's final report and interim updates to Leadenhall, plus the underlying files Saiph reviewed, have been produced in discovery. *See, e.g.,* Ex. 26, 9/5/24 Saiph Consulting Audit Report; *see also* ECF No. 53-3 (list of 50,000+ files); Ex. 27, 2/27/25 Production Cover Email from S. Ferguson. Plaintiffs have not identified a file provided by Saiph to Leadenhall that Leadenhall was not authorized to have.

33. Kosinski testified that neither Saiph nor Leadenhall suggested, implied, or asked Davis to make unauthorized intrusions into Plaintiffs' computer systems and offices. Ex. 23, Kosinski Tr. 183:23-184:20, 190:7-20. Kosinski further testified that Saiph did not use any information obtained by Davis in its work on the Collateral Audit. *Id.* 186:24-187:10.

34. Saiph Director of Operations Lauren Boersig testified, "[n]o one at Saiph made me aware that Leadenhall wanted Saiph or anyone at Saiph to exceed their access outside of the bounds that SuttonPark had given them." Ex. 22, Boersig Tr. 198:1-3; *see also id.* 197:9-14. Saiph confirmed the same in written discovery responses. Ex. 28, Saiph Resps. to Defs.' First Set of Reqs. for Admis. at 1-2.

35. Boersig testified she had personal knowledge of the information sent to Saiph by Leadenhall and that none of the information Saiph sent to Leadenhall was extracted by Davis. Ex. 22, Boersig Tr. 198:4-21.

36. Saiph admitted that "Leadenhall never directed [Saiph] or anyone working on [Saiph's] behalf to gain unauthorized access to the computer systems or physical offices of Plaintiffs." *See* Ex. 28, Saiph Resps. to Defs.' First Set of Reqs. for Admis. at 1-2.

37. Saiph's forensic IT expert witness, Robert Rohr, opined that: (1) there was no indication of a data transfer during any of Davis' intrusions, and (2) none of the possible 777 Partners data found on Davis' Saiph computer was transferred to any external source, including Leadenhall. Ex. 29, Rohr Report at 6 ("[T]here was no indication that the detected 777 data was transferred from the Saiph-issued devices to any external source."); Ex. 30, Rohr Tr. 153:13-23.

### III. Leadenhall Learns of Davis' Physical Intrusion from Saiph and Requests That Saiph Report Davis to Plaintiffs.

38. Noah Davis was the Chief Technology Officer of 777 Partners until April 2024.

39. Davis resigned in April 2024 following a poor performance review and a dispute over his bonus. Ex. 31, Plaintiffs' 30(b)(6) Shapiro Tr. 20:24-21:6 (describing a "employee bonus dispute" between Davis and the company); Ex. 1, Shapiro Tr. 78:7-12 (agreeing that non-payment of a bonus would qualify as a payment dispute); *see also* Ex. 32, Taheri Tr. 23:17-20.

40. Davis became an independent contractor of Saiph in May 2024. Ex. 15, Kosinski Decl. ¶ 25.

41. No contractual agreement exists between Leadenhall and Davis. Davis is not and never was an employee or independent contractor of Leadenhall. Ex. 16, SDFL Gillespie Decl. ¶ 17.

42. On September 10, 2024, Kosinski called Gillespie. Kosinski reported to Gillespie that, on September 5, 2024, Davis had entered SuttonPark's offices in Boca Raton, Florida and taken electronic equipment. Ex. 21, Leadenhall 30(b)(6) Tr. 192:13-193:16; Ex. 33, 9/17/24 Letter from L. Nathanson to J. McCarthy.

6

43. On September 10, 2024, Saiph's legal counsel informed Leadenhall's legal counsel that Saiph had interviewed Davis about the physical break-in. Saiph's legal counsel reported that Davis had admitted to taking cameras and video equipment from SuttonPark's and told Saiph that he had acted on his own out of anger over a payment dispute with 777 Partners. Ex. 33, 9/17/24 Letter from L. Nathanson to J. McCarthy.

44. On September 11, 2024, Saiph's legal counsel informed Leadenhall's legal counsel that Saiph had terminated Davis as an independent contractor. Ex. 34, 9/11/24 Letter from H. Morlan III to J. McCarthy.

45. Leadenhall's counsel requested that Saiph notify Plaintiffs of the break-in, which Saiph did by email, copying Leadenhall's counsel. Ex. 35, Nathanson Decl. ¶ 9; Ex. 36, 9/11/24 Email from L. Nathanson to J. McCarthy; Ex. 34, 9/11/24 Letter from H. Morlan III to J. McCarthy.

**IV.    Plaintiffs' Evidence Regarding Davis' Intrusions**

46. The discovery record consists of nearly 60,000 documents, approximately 70 written discovery requests, 18 fact depositions, and reports and depositions from two experts.

47. The discovery record contains no written communications between Leadenhall and Davis.

48. Plaintiffs engaged Eric Mazur, Senior Digital Investigative Consultant at B. Riley, to conduct the investigation into Davis' electronic intrusions. Ex. 31, Plaintiffs' 30(b)(6) Shapiro Tr. 155:5-8 ("Q: Were there any investigations performed concerning Noah Davis'[] intrusions, other than the investigation conducted by Eric Mazur? A: No.").

49. Mazur prepared an expert report (the "Mazur Report") analyzing the ten "intrusion events" alleged in the complaint, taking place between June 28, 2024 and August 9, 2024. Ex. 37, 9/27/24 Mazur Report at 3-7, 9-16.[2]

---

[2] Mazur issued three supplemental reports, the latest at 9:55 PM ET on the day before discovery closed. In his first supplemental report, Mazur provided additional detail on files purportedly recovered from a Saiph laptop. Ex. 38, 1/2/25 Supp. Mazur Report. In his second Supplemental Report, served on February 12, 2025, Mazur identified an additional intrusion on December 22, 2024, linked to the laptop of Davis' son, Max Davis. At his March 18, 2025 deposition, Taheri conceded that nothing in Mazur's reports links this intrusion to Leadenhall, Saiph, or Kosinski. Ex. 39, Plaintiffs' 30(b)(6) Taheri Tr. 89:7-21. Davis testified that he had no knowledge of the alleged Max Davis intrusion, unlike the other alleged intrusions about which he invoked his Fifth Amendment rights. Ex. 40, N. Davis Tr. 146:11-22.

50. In nine of those ten instances, Mazur opined that Davis had logged onto Plaintiffs' computer systems using his own remote electronic credentials, *see id.*, which Plaintiffs conceded that they had not deactivated following Davis' resignation in April 2024. Ex. 31, Plaintiffs' 30(b)(6) Shapiro Tr. 95:21-23 (A: "[Davis'] credentials were not shut off in full because he had a way to get in.").

51. With respect to only one "intrusion," Mazur opined that Davis had accessed 777 Partners' computer systems using credentials Plaintiffs provided to Lauren Boersig at Saiph. Mazur admitted he did not know one way or the other whether Davis was authorized to use Boersig's credentials in his IT support capacity. Ex. 37, Mazur Report at 7, 16; Ex. 41, Mazur Tr. 234:3-236:7.

52. Boersig testified that she provided Davis with her credentials so that he could "assess the front end data extraction tool" in connection with a collateral audit Saiph was performing for another 777 Partners creditor, Northwestern Mutual (referred to as "NML"). Ex. 22, Boersig Tr. 152:8-12, 159:15-20, 161:4-14.

53. Boersig testified that she was unaware of any prohibition on sharing credentials within Saiph because Saiph personnel had been "using Paul [Kosinski's] on-site credentials without any issue from Sutton[Park]." *Id.* 158:5-16.

54. Mazur opined that Davis accessed the MP Fin system; the laptop of Jennifer Logee, the former Chief Compliance Officer of 777 Partners affiliate Brickell; and the laptop of former 777 Partners Managing Partner Pasko—specifically a copy of his .OST email file. Ex. 37, Mazur Report at 10-14.

**V.     Plaintiffs' Investigation Revealed No Connection Between Davis and Leadenhall.**

55. The Mazur Report provided no opinion on Davis' motivations for the computer system intrusions. *See generally* Ex. 37, Mazur Report.

56. Mazur testified that Davis' motivations were outside the scope of his opinions and that he was not aware of any evidence linking Leadenhall to Davis or the intrusions. Ex. 41, Mazur Tr. 242:3-9 ("Q: But you're not aware of any connection between Davis and Leadenhall, correct? A: I'm not. Q: And you didn't come up with any forensic evidence of a connection between Davis and Leadenhall based on the work that you did, correct? A: That's correct.").

57. Mazur testified that he had no information or evidence demonstrating that Davis transferred specific files during the intrusions identified in the Mazur Report. *Id.* 154:23-155:21.

58. B. Riley Senior Managing Director and 777 Partners COO Mark Shapiro testified as Plaintiffs' corporate representative that Plaintiffs do not know whether Leadenhall has ever received or used any information purportedly taken by Davis. Ex. 31, Plaintiffs' 30(b)(6) Shapiro Tr. 97:23-98:6 ("Q: Is it fair to say you don't know whether Leadenhall ever received information accessed by Noah Davis through unauthorized intrusions? A: I think that is fair. Q: Is it fair to say you don't know whether Leadenhall ever used, in the New York litigation, information accessed by Noah Davis through unauthorized intrusions? A: That is fair.").

59. B. Riley CEO and 777 Partners manager Ian Ratner testified that he did not know whether Leadenhall received any information from Noah Davis' intrusions. Ex. 42, Ratner Tr. 174:23-75:19.

60. 777 Partners and SuttonPark principals and employees invoked the Fifth Amendment to refuse to answer questions at their depositions about Davis' purported intrusions and their bases for believing Leadenhall was involved. *See, e.g.,* Ex. 43, Pasko Tr. 52:1-5 ("Q: Do you have any evidence or factual basis to believe that Leadenhall directed Mr. Davis to commit unauthorized intrusions into 777's computer systems? […] A: I take the Fifth."); Ex. 44, J. Wander Tr. 43:6-13 ("Q: Isn't it true that plaintiffs have no evidence or factual basis to believe that Leadenhall directed Noah Davis to commit unauthorized intrusions into plaintiffs' computer systems? […] A: I invoke the Fifth."); Ex. 45, Adnani Tr. 28:24-29:5 (same); Ex. 46, Bennett Tr. 41:13-17 (same).

61. Plaintiffs' in-house counsel Mollie Wander refused to answer questions concerning any link between Leadenhall and Davis. Ex. 47, 3/13/25 M. Wander Tr. 27:15-20 ("Q: Do you have any factual basis or evidence to believe that Leadenhall directed Noah Davis to conduct unauthorized intrusions into 777 Partners or SuttonPark Capital's computer systems? A: I don't believe I can answer on the grounds of attorney/client work product and privilege.").

62. Davis refused to answer questions at deposition concerning his actions or motivations by invoking the Fifth Amendment. Davis testified that his invocation of the Fifth Amendment as to allegations in the complaint was not intended to endorse, or suggest there is any evidence supporting, those allegations. Ex. 40, N. Davis Tr. 213:3-214:3, 240:8-14.

63. Max Davis, Noah Davis' son, testified that he had never worked for or communicated with anyone at Leadenhall. Ex. 48, M. Davis Tr. 153:4-19 ("Q: Have you ever spoken with anyone from Leadenhall? A: Never. Q: Have you ever corresponded with anyone from Leadenhall?

A: Never. Q: By E-Mail, by text message, any kind of communications whatsoever with anyone from [Leadenhall], at any point in time? A: No communications whatsoever.").

64. Leadenhall Managing Partner Gillespie testified that Davis was "wholly unconnected to Leadenhall," Ex. 2, Gillespie Tr. 25:12-23, that no one at Leadenhall directed or in any way encouraged Davis to intrude into Plaintiffs' computer systems, *id.* 446:25-447:10 ("Q: Did you or anyone at Leadenhall direct Mr. Davis to intrude into the computer systems of 777 Partners or SuttonPark? A: Never. Q: Did you or anyone at Leadenhall direct Mr. Davis to intrude into the physical offices of 777 Partners or SuttonPark? A: Never."), and that Leadenhall had no knowledge that Davis did work in connection with the Collateral Audit, Ex. 16, SDFL Gillespie Decl. ¶ 15 ("To my knowledge, Mr. Davis never worked for Leadenhall in any capacity, including on the Collateral Audit."); *id.* ¶ 17 ("Leadenhall did not direct Mr. Davis to gain unauthorized access to Plaintiffs' computer systems, offices, or other property.").

65. Gillespie testified that Leadenhall never received any information from Davis. Ex. 2, Gillespie Tr. 447:11-14 ("Q. Did Leadenhall ever receive information from Mr. Davis? A. We've never received any information from Mr. Davis.").

66. The only interaction between Leadenhall and Davis was a one-time introduction on June 25, 2024, when Leadenhall personnel attended an onsite meeting at Saiph's offices. *Id.* 174:19-175:14 ("At one point when we had an in-person meeting in Florida with Mr. Kosinski, Mr. Davis was also in the location."); *see also* Ex. 21, Leadenhall 30(b)(6) Tr. 159:22-160:4.

67. Leadenhall's June 25, 2024 meeting with Saiph lasted most of the day and covered various topics; Davis was in attendance for only one hour, during which he presented on IT systems he was developing for Saiph for purposes of collateral servicing. *See id.* 261:19-262:15. Davis and Leadenhall did not discuss—nor have they ever discussed—the Collateral Audit. *See id.* 262:5-22.

68. Plaintiffs' corporate representative testified two days before discovery closed that Plaintiffs had no "direct evidence" connecting Leadenhall to Davis' actions. Ex. 31, Plaintiffs' 30(b)(6) Shapiro Tr. 66:1-9 ("Q: Okay. So I think we can agree on this, given your testimony. Would you agree with me that there is no direct evidence that Leadenhall directed Noah Davis to conduct unauthorized intrusions into computer systems or an office building? […] A: Based on how I just described direct evidence, I would agree that I have not seen direct evidence yet.").

69. Plaintiffs' corporate representative testified that Plaintiffs' evidence connecting Leadenhall to Davis's actions was "circumstantial." *Id.* 55:20-56:15 ("Q: Do you know when the

discovery deadline is in this case? A: It's coming up fairly soon, if not Friday. Q: Yep. So we are at the end of discovery, right? A: I think. Q: What evidence or factual basis does the company have that Leadenhall directed Noah Davis to intrude into plaintiffs' computer systems? […] A: I think I testified this in my earlier deposition that the—the dates, the timelines, the agency agreements between all the parties leads us to believe that this was done to help out the litigation in New York. […] Again, I think I testified on this earlier. It is circumstantial."); *id.* 93:9-14 ("Q: Is it fair to say that in your view Leadenhall is therefore responsible for any actions taken by Noah Davis? […] A: Potentially. That is for a court to decide but potentially.").

70. Leadenhall's IT department ran a "trace" across its systems to identify any interaction with the IP addresses Plaintiffs claim to be associated with Davis, which turned up no hits. Ex. 2, Gillespie Tr. 451:7-9; Ex. 21, Leadenhall 30(b)(6) Tr. 210:7-211:6.

### VI. Davis' Resignation and Subsequent Dealings with Plaintiffs

71. Taheri testified that he had a personal suspicion that Davis was directed to intrude into Plaintiffs' systems because "he [Davis] had no reason to have any of this data for his own personal gain." Ex. 32, Taheri Tr. 195:3-7. Taheri testified he had no factual basis for his suspicion that Davis was directed by Leadenhall to intrude into Plaintiffs' systems. *Id.* 199:6-14 ("Q: Do you have any factual basis to conclude that Leadenhall directed . . . Davis to gain unauthorized access to Jennifer Log[ee]'s laptop? A: No. Q: Do you have any factual basis to conclude that Leadenhall directed Mr. Davis to gain access to Mr. Pasko's laptop? A: I have no factual basis, no.").

72. Taheri testified that Davis was "constantly stressed" while working at 777 Partners, "slamming his fists on his desk and screaming at his computer" on a daily basis. *Id.* 76:9-77:2.

73. Taheri testified that Davis got a "very poor performance review from his boss" in the spring of 2024, which caused Davis not to receive a bonus. *Id.* 23:12-25; *see also* Ex. 31, Plaintiffs' 30(b)(6) Shapiro Tr. 13:5-14:20.

74. Taheri testified that Davis' tenure at 777 Partners ended when Davis tendered his resignation as a "power play" to leverage certain demands from Plaintiffs and 777 Partners accepted his resignation. Taheri testified that when Davis's power play backfired and Davis's bosses "didn't concede[,] he was very upset." Ex. 32, Taheri Tr. 23:12-26:1.

75. Taheri, Shapiro, and Mazur testified Davis was "disgruntled," and Taheri testified Davis wanted to "inflict damage" on 777 Partners when he left. *Id.* 138:1, 201:25-202:3 ("Q: Do you think Mr. Davis wanted to inflict damage on 777? A: To some extent by that point, I believe that

11

is at least partially true, yes."); *see also* Ex. 1, Shapiro Tr. 86:11-16; Ex. 41, Mazur Tr. 230:24-231:6.

76. Taheri testified Davis left on such "bad terms" that he refused to return all of his work devices, data, and passwords, and Taheri, upon learning that Davis had trespassed in SuttonPark's office, feared for his life and instructed his employees to stay home. Ex. 32, Taheri Tr. 257:22-258:18; Ex. 39, Plaintiffs' 30(b)(6) Taheri Tr. 222:12-223:12, 228:3-229:21, 250:9-251:2.

77. Taheri testified that Davis had used the company credit card without authorization to pay for personal expenses, including after his resignation. Ex. 32, Taheri Tr. 99:16-20, 100:4-23.

78. Taheri testified that Plaintiffs knew, from April 26, 2024, that Davis had retained 777 Partners' data—and that he still had access to "hundreds" of 777 Partners accounts, including exclusive access to its "1Password" account storing *all* of 777 Partners' credentials. Ex. 39, Plaintiffs' 30(b)(6) Taheri Tr. 165:3-15, 220:25-223:12, 242:10-244:20.

79. Taheri testified that he contacted Davis often after Davis' resignation to seek Davis' help administering 777 Partners' computer systems. Ex. 32, Taheri Tr. 80:3-23. Plaintiffs produced over 250 pages of communications between Taheri and Davis from after April 26, 2024, including several communications where Taheri asked for Davis' help to access 777 Partners accounts. *See, e.g.*, Ex. 49, 5/19/24 Message from S. Taheri to N. Davis ("[M]orning Noah, I have another question for you whenever you're around"); Ex. 50, 5/31/24 Message from S. Taheri to N. Davis ("[M]orning Noah. How do I handle ZK Access?").

80. Other than filing a police report following Davis' physical intrusion into office buildings, Plaintiffs took no legal action against Davis between April 26, 2024 and the filing of this lawsuit.

81. The police report filed by Plaintiffs on September 10, 2024 does not name or reference Leadenhall. Ex. 51, N. Davis Police Report.

82. Plaintiff SuttonPark's former Accounting Controller, Karen Gorde, testified that Plaintiffs stole $350 million from and knowingly lied to Leadenhall, including by pledging assets to Leadenhall that Plaintiffs knew they did not actually own. Ex. 52, Gorde Tr. 110:1-117:25; *id.* 110:1-5 ("Q: How much money did SuttonPark and 777 Partners steal from Leadenhall? […] A: The one I know of is the 350 million."); 113:23-114:2 ("Q: Is there any doubt in your mind that Steven Pasko and Josh Wander stole at least $350 million from Leadenhall? […] A: There's no doubt in my mind."); 116:14-18 ("Q: So is it fair to say that SuttonPark pledged assets to

12

Leadenhall as collateral that it never purchased in the first place?" […] A: I would say yes."); *id.* 117:7-18 (testifying that Wander and Pasko "knowingly pledged" assets that SuttonPark "never purchased in the first place").

83. Gorde testified that she had no knowledge of Davis' purported intrusions before she saw news reporting regarding them. *Id.* 103:8-13.

84. Several of Plaintiffs' employees, including Davis, received subpoenas from the U.S. Department of Justice ("DOJ") in connection with its investigation of 777 Partners. *See* Ex. 47, 3/13/25 M. Wander Tr. 167:3-10 (confirming that Nick Bennett, Alexander Adnani, Ken Reinhardt, Juan Arciniegas, Noah Davis, and "others" had received subpoenas from the DOJ in connection with its investigation of Plaintiffs).

85. Davis testified that he received a subpoena in June 2024 and that the DOJ first made him aware of Leadenhall's allegations against Plaintiffs in the RICO Action. Ex. 40, N. Davis Tr. 70:16-71:14, 226:11-18.

86. On June 28, 2024, Mollie Wander texted Davis offering to arrange counsel for him in connection with the grand jury subpoena Plaintiffs learned he had received. Ex. 53, 6/28/24 (3:40pm EST) Text from M. Wander to N. Davis; Ex. 54, 3/18/25 M. Wander Tr. 8:18-9:8.

87. On June 28, 2024, Davis conducted an unauthorized intrusion into MP Fin. Ex. 37, 9/27/24 Mazur Report at 3-4.

88. Mollie Wander testified that Davis had an incentive to comply with the subpoena to avoid criminal prosecution or receive a lighter sentence. Ex. 54, 3/18/25 M. Wander Tr. 16:1-13 ("Q: Can you think of any reason why an individual, such as, Noah Davis, who believes he might face criminal prosecution by the federal government, might want to see if he can provide information to the government? […] A: As we talked about before, you have a potential lighter sentencing. You brought up immunity. That's always a possibility.").

89. Ratner testified that Pasko—whose email files Plaintiffs contend Davis targeted—was a target of the DOJ investigation into 777 Partners and affiliates. Ex. 42, Ratner Tr. 95:22-96:1.

90. Davis testified that he provided information about 777 Partners in response to the DOJ subpoena. Ex. 40, N. Davis Tr. 227:17-228:21.

91. Shapiro, testifying as corporate representative, testified that Plaintiffs are paying for Davis' legal fees in connection with the DOJ's investigation. Ex. 31, Plaintiffs' 30(b)(6) Shapiro Tr. 235:16-236:20.

13

**VII.   Plaintiffs' Decision to File This Lawsuit Before Investigating**

92. Plaintiffs' privilege log reflects that on August 9, 2024, the day Plaintiffs first learned of Davis' intrusions, Plaintiffs met with counsel "concerning preparation of possible lawsuit." Ex. 32, Taheri Tr. 138:19-139:2; Ex. 55, Taheri Decl. ¶ 12; Ex. 56, 777 Partners' Privilege Log (providing privilege description of documents starting from August 9, 2024 as "[c]ommunications with counsel concerning preparation of possible lawsuit").

93. Shapiro testified that both B. Riley personnel and 777 Partners personnel including himself, Ratner, Pasko, Taheri, Jim Howard, Jon Walder, Mollie Wander, and Christopher O'Reilly participated in preliminary discussions about whether Leadenhall directed Davis' conduct. Ex. 1, Shapiro Tr. 106:19-107:6, 151:4-18.

94. Mollie Wander testified that, before filing the complaint, Plaintiffs held at least one meeting during which she, Pasko, and B. Riley professionals proposed suing Leadenhall, with a factual basis they now claim is privileged or subject to a Fifth Amendment invocation. Ex. 47, 3/13/25 M. Wander Tr. 27:15-20; 133:12-134:3; 155:24-156:22.

95. Shapiro testified that Pasko has "an interest in derailing the New York litigation," Ex. 1, Shapiro Tr. 151:1-151:3, and believes Leadenhall directed Davis' intrusions based on "just coincidence," *id.* 105:21-106:8.

96. Ratner testified that "there's a lot of animus" between 777 Partners and Leadenhall—a "higher level of animus than you might [usually] find between two corporate litigants." Ex. 42, Ratner Tr. 172:2-13.

97. Ratner testified that likely "more than ten" fraud actions have been filed against 777 Partners. *Id.* 94:8-13. Shapiro testified that none poses "greater" exposure than Leadenhall's RICO Action. Ex. 1, Shapiro Tr. 214:1-23.

98. Shapiro testified that the "timelines are suspicious" and "too coincidental" for Davis' intrusions to be unrelated to Leadenhall's RICO Action. Ex. 31, Plaintiffs' 30(b)(6) Shapiro Tr. 56:14-21, 62:15-63:16. Ratner testified that the purpose of discovery is to determine whether suspicions have any basis in the evidence. Ex. 42, Ratner Tr. 162:3-9 ("Q: Is there . . . evidence that Leadenhall got access to the data? A: Well, that's exactly to your point. That's why there's discovery.").

14

99. Ratner and Shapiro testified that they did not investigate, or believe it was necessary to investigate, other potential explanations for Davis' intrusions. Ex. 42, Ratner Tr. 111:11-112:21; Ex. 1, Shapiro Tr. 112:25-114:23.

100. Ratner testified that he wouldn't consider the idea that any party other than Leadenhall directed Davis' intrusions. Ex. 42, Ratner Tr. 111:11-113:6; *see also id.* 24:15-25:2 ("I almost wouldn't see it any other way."); Ex. 1, Shapiro Tr. 112:25-113:17 (Shapiro testifying he did not look into or consider whether another of Plaintiffs' creditors who had hired Saiph to perform a collateral audit was behind the intrusions).

101. Before Plaintiffs filed their original complaint, they had identified Davis as the perpetrator of the intrusions at issue in this case. Ex. 39, Plaintiffs' 30(b)(6) Taheri Tr. 199:8-200:24.

102. Before Plaintiffs filed their original complaint, they determined that Davis used his own 777 Partners credentials to commit all but one of his alleged intrusions (the exception being Davis' use of Boersig's credentials, which Plaintiffs have since admitted was not illegal but simply contrary to Plaintiffs' wishes). ECF No. 1 ¶ 27; Ex. 39, Plaintiffs' 30(b)(6) Taheri Tr. 220:3-11.

103. Before Plaintiffs filed their original complaint, they instructed their expert Mazur to assume that Davis was working on Leadenhall's behalf. *See* Ex. 41, Mazur Tr. 131:15-132:3, 241:5-7.

**VIII.   Plaintiffs' Claimed Damages**

104. Taheri testified that there is no functionality within MP Fin that "was previously available" but is "not available today." Ex. 32, Taheri Tr. 67:21-24. Mr. Taheri testified that none of 777 Partners' business operations were "impeded by the alleged system intrusions." *Id.* 214:5-21.

105. Testifying as a corporate representative, Taheri stated that Plaintiffs had suffered $8,000 in damages—the value of the equipment Davis stole during the break-in—but could not identify any damages Plaintiffs had suffered as a result of Davis' cyber intrusions. *See* Ex. 39, Plaintiffs' 30(b)(6) Taheri 251:10-18.

106. Shapiro testified that Plaintiffs' claimed damages in this case include (1) the costs of paying forensic experts to "[i]nvestigate, scope, and remediate" the alleged intrusions, (2) attorneys' fees incurred in litigating this case, and (3) the hourly costs of B. Riley personnel "and any other people that we have to put on the [matter] to monitor what's going on down there." Ex. 1, Shapiro Tr. 130:17-133:6.

| | |
|---|---|
| Dated: April 18, 2025 | **KING AND SPALDING LLP** |
| | |
| | */s/ Brian P. Miller* |
| | Brian P. Miller |
| | Florida Bar No. 0980633 |
| | Ross E. Linzer |
| | Florida Bar No. 0073094 |
| | Southeast Financial Center |
| | 200 S. Biscayne Boulevard, Suite 4700 |
| | Miami, FL 33131 |
| | Telephone: (305) 462-6000 |
| | Fascimile: (305) 462-6100 |
| | bmiller@kslaw.com |
| | rlinzer@kslaw.com |
| | |
| | Peter Starr (*pro hac vice*) |
| | Georgia Bar No. 648453 |
| | 1180 Peachtree Street, Suite 1600 |
| | Atlanta, GA 30309 |
| | Telephone: (404) 572-2767 |
| | Facsimile: (404) 572-5100 |
| | pstarr@kslaw.com |
| | |
| | Leigh M. Nathanson (*pro hac vice*) |
| | New York Bar No. 4900106 |
| | Brian Donovan (*pro hac vice*) |
| | New York Bar No. 5433669 |
| | 1185 Avenue of the Americas |
| | New York, NY 10036-4003 |
| | Telephone: (212) 556-2100 |
| | Facsimile: (212) 556-2222 |
| | lnathanson@kslaw.com |
| | bdonovan@kslaw.com |
| | |
| | *Attorneys for Defendants Leadenhall Capital Partners LLP and Leadenhall Life Insurance Linked Investment Fund PLC* |